# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| GERALD RABY, Individually and on behalf of all others similarly situated, | **Case No:** |
| Plaintiff, | **CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| v. | **JURY TRIAL DEMANDED** |
| EVOLV TECHNOLOGIES HOLDINGS, INC. F/K/A NEWHOLD INVESTMENT CORP., PETER GEORGE, MARIO RAMOS, MARK DONOHUE, KEVIN CHARLTON, and ADAM DEUTSCH, | |
| Defendants. | |

Plaintiff Gerald Raby ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, among other things, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, public filings, wire and press releases published by and regarding Evolv Technologies Holdings, Inc. f/k/a NewHold Investment Corp. ("Evolv" or the "Company"), and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a class action on behalf of persons or entities who purchased or otherwise acquired publicly traded Evolv securities between June 28, 2021 and March 13, 2024, inclusive

(the "Class Period"). Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

3.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

4.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the alleged misstatements entered and the subsequent damages took place in this judicial district.

5.      In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants (defined below), directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

6.      Plaintiff, as set forth in the accompanying certification, incorporated by reference herein, purchased Evolv securities during the Class Period and was economically damaged thereby.

7.      Defendant Evolv describes itself as a "leader in Artificial Intelligence ("AI")-based weapons detection for security screening. Our mission is to make the world a safer and more enjoyable place to live, work, learn, and play. We are democratizing security by making it

2

seamless for facility operators to address the chronic epidemic of escalating gun violence, mass shootings and terrorist attacks in a cost-effective manner while improving the visitor experience."

8.    Defendant Evolv is incorporated in Delaware and its head office is located at 500 Totten Pond Road, 4th Floor, Waltham, Massachusetts 02451.

9.    Evolv's common stock trades on the NASDAQ Exchange ("NASDAQ") under the ticker symbol "EVLV". Evolv warrants trade on the NASDAQ under the ticker symbol "EVLVW".

10.    On or around July 19, 2021, Evolv went public through a SPAC merger (the "SPAC Merger") with Newhold Investment Corp. ("Newhold"). For clarity, the Company prior to the merger will be known as "Legacy Evolv". Prior to the SPAC Merger, Newhold traded on the NASDAQ under the ticker symbol "NHIC".

11.    Defendant Peter George ("George") has served as the Company's Chief Executive Officer ("CEO") and President since the SPAC Merger, and was previously the CEO of Legacy Evolv. Defendant George also serves on the Board of Directors (the "Board").

12.    Defendant Mario Ramos ("Ramos") served as the Company's Chief Financial Officer ("CFO") and Chief Risk Officer from November 2021 through June 2022.

13.    Defendant Mark Donohue ("Donohue") has served as the Company's CFO since June 2022.

14.    Defendant Kevin Charlton ("Charlton") was the CEO of NewHold at the time of the SPAC Merger. Defendant Charlton currently serves on Evolv's Board.

15.    Defendant Adam Deutsch ("Deutsch") was the NewHold's CFO at the time of the SPAC Merger.

16.     Defendants George, Ramos, Donohue, Charlton and Deutsch are collectively referred to herein as the "Individual Defendants."

17.     Each of the Individual Defendants:

     (a)     directly participated in the management of the Company;

     (b)     was directly involved in the day-to-day operations of the Company at the highest levels;

     (c)     was privy to confidential proprietary information concerning the Company and its business and operations;

     (d)     was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

     (e)     was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

     (f)     was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

     (g)     approved or ratified these statements in violation of the federal securities laws.

18.     Evolv is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

19.     The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to Evolv under *respondeat superior* and agency principles.

4

20.     Defendant Evolv and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Materially False and Misleading
### Statements Issued During the Class Period

21.     On June 28, 2021, NewHold filed with the SEC its definitive proxy on SEC Form 424B3 (the "Proxy") to solicit votes for its July 15, 2021 Special Meeting to approve the SPAC Merger with the then-private Legacy Evolv.

22.     The Proxy contained the following statement:

Evolv Technologies, Inc. [. . .] is the global leader in AI-based touchless security screening. *Unlike conventional walk-through metal detectors, our products use advanced sensors, artificial intelligence software, and cloud services to reliably detect guns, improvised explosives, and large knives while ignoring harmless items like phones and keys*. This not only enhances security at venues and facilities but also improves the visitor experience by making screening up to ten times faster than alternatives at up to 70% lower total cost.

(Emphasis added).

23.     The statement in ¶ 22 was materially false and misleading because Evolv does not reliably detect knives or guns.

24.     The Proxy contained the following statement:

Our flagship product is **Evolv Express®**, a touchless security screening system designed *to detect firearms, improvised explosive devices, and tactical knives* as visitors walk through at a normal pace, individually or in groups, with no need to form into a single-file line.

(Emphasis added).

25.     The statement in ¶ 24 was materially false and misleading because it omitted that Evolv Express does not reliably detect knives.

26.     On July 23, 2021, Defendant George made an appearance on Fox Business, in a video entitled "Evolv Technologies uses AI powered security to detect weapons", which was posted on Fox Business's website. In this interview, Defendant George made the following statement:

> We have the signatures for all the weapons in the world [. . .] we've written the machine learning algorithms **for all the guns, all the bombs, and all the large tactical knives** in the world and our sensor system can identify those signatures quickly, send an alert, and will stop it before it gets into the venue.

> (Emphasis added).

27.     The statement in ¶ 26 was materially false and misleading at the time it was made because it overstated the capabilities of Evolv's technology, particularly as it related to detecting knives.

28.     On March 23, 2022, Evolv posted a blog post entitled "NCS[4] and Evolv Express", authored by Richard Abraham, the Company's Senior Vice President of Technical Sales and Solutions. This blog post stated, in pertinent part, the following:

**Key Findings:**

***The operational exercise incorporated forty-one functional areas, with Express earning an overall composite score of 2.84***. This score reflects that, on average, Express met the criteria established for this exercise. In fact, overall, Express performed very well. Scores in the categories evaluated during the exercise are presented below. It's important to note that, as a practice, Evolv does not publicly share any details that could compromise our customer's security process. Therefore, specific details such as actual weapon makes and models, images, etc. are not included here, but we do share this sensitive information with our customers privately in a responsible manner.

| Evaluation Category | Score |
| --- | --- |
| Detection of standardized test pieces defined in applicable standards | 3.0 |
| Detection of ferrous weapons including NILECJ test pieces, actual handguns, handgun components, knives, and pipe materials that could be used for constructing IEDs (cumulative score) | 2.7 |
| Detection of threat objects in small bags (cumulative score) | 3.0 |
| Visual indicators | 3.0 |
| Audible indicators | 2.3 |
| Detection of multiple threats on one person | 3.0 |
| Detection of multiple threats on multiple people | 3.0 |
| Exceeding dual-lane throughput claims of 3600 people per hour | 3.0 |
| Screening patrons at multiple walking speeds (cumulative score) | 2.8 |
| Flow control tablet performance (cumulative score) | 2.8 |
| Remote access capabilities (cumulative score) | 2.9 |
| Dashboard and insight analytic capabilities (cumulative score) | 2.8 |
| User interface indicators (cumulative score) | 3.0 |

*Scores marked as cumulative indicate the average of individual scores within the exercise category.*

\*        \*        \*

The fact is, technology, environmental conditions, architectural structures, conops, and staff training are all important factors that affect screening effectiveness. It's possible to eliminate many or all of the problematic factors in a controlled environment. ***It's not possible to do that in a real-world environment, and that's why I'm so proud of these Express results from NCS⁴.***

**Authentic Evaluators:**

***Although NCS⁴ is part of the University of Southern Mississippi, their approach is anything but academic***. NCS⁴ recruits ***third party evaluators who are seasoned security professionals and have been personally accountable for security screening***. NCS⁴ selects new evaluators for each operational exercise, ***so they have a fresh perspective and are looking at each solution in the context of the venue where it is being tested***.

In the case of the Express exercise, the evaluators were a retired U.S. Secret Service Special Agent in Charge, a Security Representative for an organization that produces live events, and a Security Representative for professional baseball, soccer, and hockey. Evolv didn't get to pick these evaluators.

I truly believe that the Express evaluators are solid proxies for the typical Express buyer. They had the same questions and "show me" attitude that we love to see in our customers. I learned a lot from them and appreciated their suggestions for ways we can both improve our product and better train our customers to get the best possible results. We're always learning and working to improve.

7

29.     The statements contained in ¶ 28 were materially false and misleading at the time they were made because blog post omitted that Evolv was heavily involved in the decision-making and language of the final report issued by NCS⁴, and that the Company effectively manipulated the testing so that it would score higher.

30.     The March 23, 2022 blog post contained the following summary:

**Summary:**

We at Evolv Technology feel confident that these NCS⁴ results ***provide third party validation*** of what hundreds of customers and over 200 million visitors already know from their personal experience: ***that Express offers an unmatched combination of high-performance weapons detection, low false alarm rates, high throughput, unique operational insight, and an awesome visitor experience***.

I am really looking forward to working with our customers to sort through what the NCS⁴ evaluation findings could mean for their facilities. I also can't wait to see how our future products perform in the NCS⁴ process. ***Having a trusted, fully independent third party available to stress test our product in real-world environment is an incredibly valuable asset***. It will push us to always be doing more to make people safe, and that's something I can always get excited about.

(Emphasis added).

31.     The statement in ¶ 30 was materially false and misleading at the time it was made because it overstated the effectiveness of Evolv's technology and falsely characterized NCS⁴'s testing as "independent", when in fact Evolv was able to give significant input on the final report and results ostensibly issued by NCS⁴.

32.     On March 28, 2022, the Company filed with the SEC its annual report on Form 10-K for the year ending December 31, 2021 (the "2021 Annual Report"). Attached to the 2021 Annual Report were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants George and Ramos attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

33.    The 2021 Annual Report contained the following statement:

Evolv Technologies Holdings, Inc. [. . .] *is a global leader in Artificial Intelligence ("AI") -based weapons detection for security screening*. Our mission is to make the world a safer and more enjoyable place to work, learn, and play. We are democratizing security by making it seamless for facility operators to address the chronic epidemic of escalating gun violence, mass shootings and terrorist attacks in a cost-effective manner while improving the visitor experience.

Unlike traditional walk-through metal detectors, our touchless security screening solutions use AI software, software as a service ("SaaS") cloud services and advanced sensors to *reliably detect dangerous weapons while significantly reducing nuisance alarms from harmless personal items*. This means that visitors can walk through our solution without stopping, without removing items from their pockets or bags, and without having to form a single file line. Our products significantly reduce the number of false positive alarms, allowing security staff to focus their attention on high probability threats.

(Emphasis added).

34.    The statement in ¶ 33 was materially false and misleading at the time it was made

because it overstated Evolv's capabilities.

35.    The 2021 Annual Report contained the following statement about Evolv Express,

the Company's flagship product:

Our flagship product is **Evolv Express**, a touchless security screening *system designed to quickly detect firearms, improvised explosive devices, and tactical knives in unstructured people flows*. Evolv Express currently supports a maximum screening throughput of 3,600 people per hour. Evolv Express became commercially available in October 2019.

(Emphasis added).

36.    The statement in ¶ 35 was materially false and misleading at the time it was made

because it overstated Evolv Express' capabilities, particularly regarding the detection of tactical

knives and firearms.

37.    The 2021 Annual Report contained the following statement:

*We are a global leader in AI-based weapons detection for security screening*. Unlike conventional walk-through metal detectors, our products use advanced sensors, artificial intelligence software, and cloud services *to reliably detect guns, improvised explosives,*

***and large knives*** while ignoring harmless items like phones and keys. This not only enhances security at venues and facilities but also improves the visitor experience by making screening up to ten times faster than alternatives at up to 70% lower total cost.

(Emphasis added).

38.     The statement in ¶ 37 was materially false and misleading at the time it was made because it overstated Evolv's capabilities, particularly regarding the detection of tactical knives and guns.

39.     The 2021 Annual Report contained the following risk disclosure:

***If our products fail or are perceived to fail to detect and prevent attacks or if our products fail to identify and respond to new and increasingly complex and unpredictable methods of attacks, our business and reputation may suffer***. There is no guarantee that our products will detect and prevent all attacks, especially in light of the rapidly changing security landscape to which it must respond, as well as unique factors that may be present in our customers' operating environments. Additionally, our products may falsely detect items that do not actually represent threats. These false positives may impair the perceived reliability of our products, and may therefore adversely impact market acceptance of our products, and could result in negative publicity, loss of customers and sales and increased costs to remedy any problem.

Our products, which are complex, may also contain undetected errors or defects when first introduced or as new versions are released. We have experienced these errors or defects in the past in connection with new products and product upgrades. We expect that these errors or defects will be found from time to time in the future in new or enhanced products after commercial release. Defects may result in increased vulnerability to attacks, cause our products to fail to detect security threats, or temporarily interrupt our products' ability to screen visitors in a customer's location. Any errors, defects, disruptions in service or other performance problems with our products may damage our customers' business and could harm our reputation. If our products fail to detect security threats for any reason, it may incur significant costs, the attention of our key personnel could be diverted, our customers may delay or withhold payment to us or elect not to renew or cause other significant customer relations problems to arise.

***We may also be subject to liability claims for damages related to errors or defects in our products. For example, if our products fail to detect weapons or explosive devices that are subsequently used by terrorists, criminals or unbalanced individuals to cause casualties at a high profile, public venue, our reputation could be significantly harmed***. A material liability claim or other occurrence that harms our reputation or decreases market acceptance of our products may harm our business and operating results. Although we have limitation of liability provisions in our terms and conditions

of sale, they may not fully or effectively protect us from claims as a result of federal, state, or local laws or ordinances, or unfavorable judicial decisions in the United States or other countries. The sale and support of our products also entails the risk of product liability claims. We maintain insurance to protect against certain claims associated with the use of our products, but our insurance coverage may not adequately cover any claim asserted against us. In addition, even claims that ultimately are unsuccessful could result in our expenditure of funds in litigation, divert or distract management's time and other resources, and harm our business and reputation.

(Emphasis added).

40.     The statement contained in ¶ 39 was materially false and misleading at the time it was made because it couched the failure of its products in hypothetical terms, when in reality the Company knew that its products were ineffective at detecting weapons, including knives and certain types of firearms. Further, the Company had taken significant action to make it appear that its products were effective, including manipulating test results.

41.     On March 24, 2023, the Company filed with the SEC its annual report on Form 10-K for the year ending December 31, 2022 (the "2022 Annual Report"). Attached to the 2021 Annual Report were certifications pursuant to SOX signed by Defendants George and Donohue attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

42.     The 2022 Annual Report contained the following statement:

Evolv Technologies Holdings, Inc. [. . .] *is a global leader in Artificial Intelligence ("AI")-based weapons detection for security screening*. Our mission is to make the world a safer and more enjoyable place to live, work, learn, and play. We are democratizing security by making it seamless for facility operators to address the chronic epidemic of escalating gun violence, mass shootings and terrorist attacks in a cost-effective manner while improving the visitor experience.

Unlike traditional walk-through metal detectors, our touchless security screening solutions use AI software, software-as-a-service ("SaaS") cloud services, and advanced sensors to *reliably detect weapons that could be a threat to a crowd of visitors while significantly reducing nuisance alarms from harmless personal items*. This means that visitors can walk through our solution without stopping, without removing personal items from their pockets or bags, and without having to form a single file line. Our

products significantly reduce the number of false positive alarms, allowing security staff to focus their attention on high probability threats.

(Emphasis added).

43.     The statement in ¶ 42  was materially false and misleading at the time it was made because it overstated Evolv's capabilities.

44.     The 2022 Annual Report contained the following statement about Evolv Express, the Company's flagship product:

Our flagship product is Evolv Express, a touchless security screening system **designed to quickly detect firearms, improvised explosive devices, and large tactical knives in unstructured people flows**. Evolv Express currently supports a maximum screening throughput of 4,000 people per hour.

(Emphasis added).

45.     The statement in ¶ 44 was materially false and misleading at the time it was made because it overstated Evolv Express' capabilities, particularly regarding the detection of tactical knives and firearms.

46.     The 2022 Annual Report contained the following statement:

**We are a global leader in AI-based weapons detection for security screening**. Unlike conventional walk-through metal detectors, our products use advanced sensors, artificial intelligence software, and cloud services **to reliably detect guns, improvised explosives, and large knives while ignoring harmless items like phones and keys**. This not only enhances security at venues and facilities but also improves the visitor experience by making screening up to ten times faster than alternatives at up to 70% lower total cost.

(Emphasis added).

47.     The statement in ¶ 46 was materially false and misleading at the time it was made because it overstated Evolv's capabilities, particularly regarding the detection of tactical knives and guns.

48.     The 2022 Annual Report contained the following risk disclosure:

***If our products fail or are perceived to fail to detect and prevent attacks or if our products fail to identify and respond to new and increasingly complex and unpredictable methods of attacks, our business and reputation may suffer***. There is no guarantee that our products will detect and prevent all attacks, especially in light of the rapidly changing security landscape to which it must respond, as well as unique factors that may be present in our customers' operating environments. Additionally, our products may falsely detect items that do not actually represent threats. These false positives may impair the perceived reliability of our products, and may therefore adversely impact market acceptance of our products, and could result in negative publicity, loss of customers and sales and increased costs to remedy any problem.

Our products, which are complex, may also contain undetected errors or defects when first introduced or as new versions are released. We have experienced these errors or defects in the past in connection with new products and product upgrades. We expect that these errors or defects will be found from time to time in the future in new or enhanced products after commercial release. Defects may result in increased vulnerability to attacks, cause our products to fail to detect security threats, or temporarily interrupt our products' ability to screen visitors in a customer's location. Any errors, defects, disruptions in service or other performance problems with our products may damage our customers' business and could harm our reputation. If our products fail to detect security threats for any reason, including failures due to customer personnel or security processes, it may result in significant costs, the attention of our key personnel could be diverted, our customers may delay or withhold payment to us or elect not to renew or cause other significant customer relations problems to arise.

***We may also be subject to liability claims for damages related to errors or defects in our products. For example, if our products fail to detect weapons or explosive devices that are subsequently used by terrorists, criminals or unbalanced individuals to cause casualties at a high profile, public venue, we could incur financial damages and our reputation could also be significantly harmed***. A material liability claim or other occurrence that harms our reputation or decreases market acceptance of our products may harm our business and operating results. Although we have limitation of liability provisions in our terms and conditions of sale, they may not fully or effectively protect us from claims as a result of federal, state, or local laws or ordinances, or unfavorable judicial decisions in the United States or other countries. The sale and support of our products also entails the risk of product liability claims. We maintain insurance to protect against certain claims associated with the use of our products, but our insurance coverage may not adequately cover any claim asserted against us. In addition, even claims that ultimately are unsuccessful could result in our expenditure of funds in litigation, divert or distract management's time and other resources, and harm our business and reputation.

(Emphasis added).

49.    The statement contained in ¶ 48 was materially false and misleading at the time it was made because it couched the failure of its products in hypothetical terms, when in reality the Company knew that its products were ineffective at detecting weapons, including knives and certain types of firearms. Further, the Company had taken significant action to make it appear that its products were effective, including manipulating test results.

50.    On February 20, 2024, the Company posted a press release on its website entitled "Evolv Technologies Corrects Misinformation about the Company." This press release contained the following statement:

> **Fact: Evolv undergoes rigorous internal *and* external testing and validation procedures that are implemented before, during, and after the procurement process. All of these third-party tests, conducted by third-party experts, concluded that the Evolv Express solution was highly effective at detecting firearms and many other types of weapons.**

Examples of Third-Party Testing (since 2022):

*      *      *

- NPSA, the National Protective Security Authority (UK), formerly known as the CPNI

51.    The statement in ¶ 50 was materially false and misleading because the UK Government's National Protective Security Authority (NPSA) does not even perform the type of testing discussed by Evolv in the February 20, 2024 press release.

52.    Later, the Company updated the statement identified in in ¶ 50 to instead say that "Metrix NDT Ltd commissioned by Evolv, tested and validated Evolv Express® against the NPSA's Discriminative Metal Detection Standards".

53.    The statement in ¶ 52 was still materially false and misleading, even after the update to the language posted on Evolv's website, because Metrix NDT Ltd did not "validate" Evolv Express.

54.     On February 29, 2024, the Company filed with the SEC its annual report on Form 10-K for the year ending December 31, 2023 (the "2023 Annual Report"). Attached to the 2021 Annual Report were certifications pursuant to SOX signed by Defendants George and Donohue attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

55.     The 2023 Annual Report contained the following statement:

Evolv Technologies Holdings, Inc. [. . .] **is a leader in Artificial Intelligence ("AI")-based weapons detection for security screening**. Our mission is to make the world a safer and more enjoyable place to live, work, learn, and play. We are democratizing security by making it seamless for facility operators to address the chronic epidemic of escalating gun violence, mass shootings and terrorist attacks in a cost-effective manner while improving the visitor experience.

Unlike traditional walk-through metal detectors, our touchless security screening solutions use AI software, software-as-a-service ("SaaS") cloud services, and advanced sensors to **reliably detect weapons that could be a threat to a crowd of visitors while significantly reducing nuisance alarms from harmless personal items**. This means that most visitors can walk through our solution without stopping, without removing personal items from their pockets or bags, and without having to form a single file line. Our products significantly reduce the number of false positive alarms, allowing security staff to focus their attention on high probability threats.

(Emphasis added).

56.     The statement in ¶ 55 was materially false and misleading at the time it was made because it overstated Evolv's capabilities.

57.     The 2023 Annual Report contained the following statement about Evolv Express, the Company's flagship product:

Our flagship product is Evolv Express, a touchless security screening system designed to **quickly detect firearms, improvised explosive devices, and large tactical knives in unstructured people flows**. Evolv Express currently supports a maximum screening throughput of approximately 4,000 people per hour.

58.     The statement in ¶ 57 was materially false and misleading at the time it was made because it overstated Evolv Express' capabilities, particularly regarding the detection of tactical knives and firearms.

59.     The 2023 Annual Report contained the following statement:

*We are a leader in AI-based weapons detection for security screening*. Unlike conventional walk-through metal detectors, our products use advanced sensors, artificial intelligence software, and cloud services to *reliably detect guns, improvised explosives, and large knives while ignoring harmless items like phones and keys*. This not only enhances security at venues and facilities but also improves the visitor experience by making screening up to ten times faster than alternatives at up to 70% lower total cost.

(Emphasis added).

60.     The statement in ¶ 59 was materially false and misleading at the time it was made because it overstated Evolv's capabilities, particularly regarding the detection of tactical knives and guns.

61.     The 2023 Annual Report contained the following risk disclosure:

*If our products fail or are perceived to fail to detect and prevent attacks or if our products fail to identify and respond to new and increasingly complex and unpredictable methods of attacks, our business and reputation may suffer*. There is no guarantee that our products will detect and prevent all attacks, especially in light of the rapidly changing security landscape to which it must respond, as well as unique factors that may be present in our customers' operating environments. Additionally, our products may falsely detect items that do not actually represent threats. These false positives may impair the perceived reliability of our products and may therefore adversely impact market acceptance of our products, which could, in turn, result in negative publicity, loss of customers and sales, and increased costs to remedy any problem.

Our products, which are complex, may also contain undetected errors or defects when first introduced or as new versions are released. We have experienced these errors or defects in the past in connection with new products and product upgrades. We expect that these errors or defects will be found from time to time in the future in new or enhanced products after commercial release. Defects may result in increased vulnerability to attacks, cause our products to fail to detect security threats, or temporarily interrupt our products' ability to screen visitors in a customer's location. Any errors, defects, disruptions in service or other performance problems with our products may damage our customers' business and could harm our reputation. If our

products fail to detect security threats for any reason, including failures due to customer personnel or security processes, it may result in significant costs, the attention of our key personnel could be diverted, our customers may delay or withhold payment to us or elect not to renew or cause other significant customer relations problems to arise.

***We may also be subject to liability claims for damages related to errors or defects in our products. For example, if our products fail to detect weapons or explosive devices that are subsequently used by terrorists, criminals, or unbalanced individuals to cause casualties at a high profile, public venue, we could incur financial damages and our reputation could also be significantly harmed***. A material liability claim or other occurrence that harms our reputation or decreases market acceptance of our products may harm our business and operating results. Although we have limitation of liability provisions in our terms and conditions of sale, they may not fully or effectively protect us from claims as a result of federal, state, or local laws or ordinances, or unfavorable judicial decisions in the United States or other countries. The sale and support of our products also entails the risk of product liability claims. We maintain insurance to protect against certain claims associated with the use of our products, but our insurance coverage may not adequately cover any claim asserted against us. In addition, even claims that ultimately are unsuccessful could result in our expenditure of funds in litigation, divert or distract management's time and other resources, and harm our business and reputation.

(Emphasis added).

62.     The statement contained in ¶ 61 was materially false and misleading at the time it was made because it couched the failure of its products in hypothetical terms, when in reality the Company knew that its products were ineffective at detecting weapons, including knives and certain types of firearms. Further, the Company had taken significant action to make it appear that its products were effective, including manipulating test results.

63.     The statements contained in ¶¶ 22, 24, 26, 28, 30, 33, 35, 37, 39, 42, 44, 46, 48, 50, 52, 55, 57, and 59  were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) Evolv materially overstated the efficacy of its products; (2) the lack of effectiveness of Evolv's

products with regard to detecting knives and guns led to an increased risk of undetected weapons entering locations such as schools; (3) Evolv deceived the general public, its customers, and its investors regarding the effectiveness of its products; and (4) as a result, Defendants' statements about its business, operations, and prospects, were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## **THE TRUTH BEGINS TO EMERGE**

64.     On November 2, 2022, before market hours, IPVM, which describes itself as the "world's leading authority on physical security technology", released a report entitled "BBC Exposes Evolv with IPVM Research." (the "IPVM Report").

65.     The IPVM Report stated that "A BBC special report based on 1,000+ pages of documents obtained by IPVM *has exposed security screening manufacturer Evolv for deceptive marketing and colluding with NCS4, a public entity, to hide test results* showing failures at weapons screening." (Emphasis added).

66.     The IPVM Report then stated the following about The National Center for Spectator Sports Safety and Security ("NCS⁴"):

> The National Center for Spectator Sports Safety and Security (NCS⁴), part of the University of Southern Mississippi, offers an "operational exercise" program "for the purposes of demonstrating advertised capabilities, industry best practices, and operational capacity to address gaps in sports safety and security." These occur at real public events, with experts invited to act as "independent evaluators."
>
> Results are then published in "a white paper that will be distributed to venue managers and operators for the purposes of education and as an aid in the procurement decision-making process."
>
> *          *          *
>
> While NCS⁴'s public report on Evolv Express *shows a seemingly-strong score of 2.84/3.00, the hidden private version (that IPVM obtained) tells a much different story including several failures that conflict with Evolv's public marketing*. NCS⁴'s heavily-redacted public report withheld detailed test results, evaluator comments, and other

information, only providing overall averages that are favorable to Evolv.

***Evolv publicized the report as "validation" from a "fully independent third party," but emails show Evolv forced NCS⁴ to redact the public report, and that Evolv executives heavily influenced the design of testing criteria and directly edited the report in numerous rounds of drafts, even asking for certain results to be removed***.

(Emphasis added).

67.    The IPVM Report contained the following image, showing an email between Richard ("Rick") Abraham and NCS⁴, where he stated that the NCS4 report would need to be reviewed by Evolv, showing that NCS⁴ was not independent, as Evolv had publicly represented:



68.    The IPVM Report further showed the following image, showing the extent of Rick Abraham's edits:

Below is one of more than a dozen draft versions of the report including numerous changes by Richard "Rick" Abraham, VP of Technical Sales & Solutions at Evolv.



69.     The IPVM Report further revealed that Evolv's technology is inadequate when it comes to detecting small, micro-compact pistols, as compared to a conventional metal detector:

> The full, unredacted NCS[4] white paper **reveals that Evolv failed to meet testing criteria for detection of micro-compact pistols, with only a 92% detection rate**, whereas a conventional metal detector would alert on this pistol virtually 100% of the time. Such firearms are increasingly popular according to industry data, representing 25% of 9mm handgun sales.

(Emphasis added).

70.     The IPVM Report contained the following image from the unredacted NCS[4] paper, showing Evolv Express's deficiencies with detecting small handguns.



| 1.4 | Micro-compact Pistol (Bodyguard 380) | **Requirement:** Evolv Express will detect a micro-compact at a rate of 98% or greater.<br>**Outcome:** Evolv Express had a detection rate of 92% in 25 walk-throughs.<br>**Evaluator Feedback:** The system had a 100% detection rate prior to adding additional rigors during the exercise. The issue identified can be mitigated through proper awareness and training for security staff assigned to screening. | 2.5 |

71.     The IPVM Report then stated that "[t]he evaluator noted without further explanation that '[t]he system had a 100% detection rate prior to adding additional rigors,'

indicating the actual detection rate with 'additional rigors' was lower than 92%." Further, the IPVM Report stated that "[a]ll ***the results for micro-compact pistols were deleted from the public report***." (Emphasis added).

72.     Regarding knives, the IPVM Report stated the following, and included the following images from the confidential, internal report, documenting Evolv Express's poor capabilities with regard to detecting knives:

> Evolv struggled with knives the most, prompting concern from evaluators. Again, these results and comments were deleted from the public report.

> Testing revealed that "the [Evolv Express] system was incapable of detecting every knife," despite conducting tests at one of the highest sensitivity settings for the device. With a score of 1.3 out of 3.0 for this category, Evolv detected some knives at a rate of 0% with a 53% rate overall.



> ***Results were so poor that evaluators said they "Recommend full-transparency to potential customers based on data collected."*** In a separate section of the report dedicated to evaluator feedback, multiple evaluators called knife detection "not consistent" and "unreliable".

> While the requirements for knife testing in the final version only mention blades longer than 5", test images show knives with varying blades including some that seem shorter than 5":



(Emphasis added).

73.     Further, the IPVM Report stated that "[i]n earlier drafts, specifications for knife testing read "knives with blades that ranged from under four inches to greater than six inches." After testing, this was changed to simply read "knives", as shown below[.]" It then showed the following image from two different NCS4 Report drafts, attesting to this observation:

74.     The IPVM Report then stated, "[t]he wording of this requirement raises questions, as it differs from past NCS⁴ language. While NCS⁴ requirements for object detection are typically quantitative (e.g. the system will detect X at a rate of Y% or greater) the language for Evolv has no quantitative requirement[.]"

75.     Also on November 2, 2022, BBC released an article entitled "Manchester Arena's weapon scanning tech questioned", which revealed documents shared with the BBC by IPVM, which describes itself as the "world's leading authority on physical security technology".

76.     This article in part stated the following:

Some of the world's biggest venues, including Manchester Arena, are using weapons scanners "incapable" of detecting some large knives."

***Evolv, a US-based company that sells artificial-intelligence (AI) scanners, claims they can detect all weapons***.

But documents shared with BBC News by research firm IPVM *suggest they may fail to detect certain types of knives, as well as some bombs and components*.

\*      \*      \*

AI and machine learning enable the scanners to create unique "signatures" of weapons that differentiate them from items such as computers or keys, Evolv says, reducing manual checks and preventing long queues.

"Metallic composition, shape, fragmentation – we have tens of thousands of these signatures, for all the weapons that are out there," chief executive Peter George said last year, "*all the guns, all the bombs and all the large tactical knives*."

(Emphasis added).

77.     The article then noted that doubts had been raised about claims such as those

made by Peter George, such as the one contained in ¶ 76:

For several years, independent security experts have expressed doubts about some of Evolv's claims.

The company has previously refused to let IPVM test its technology, Evolv Express.

But last year, it gave permission to the National Center for Spectator Sports Safety and Security (NCS4).

NCS4's public report, published earlier this year, gave Evolv a score of 2.84 out of three – many types of guns were detected 100% of the time.

But is also produced a private report, obtained via a Freedom of Information request by IPVM and shared with BBC News along with emails between Evolv and NCS4.

*And it gave Evolv's ability to detect large knives a score of just 1.3 out of 3.*

*In 24 walkthroughs Evolv Express failed to detect large knives 42% of the time.*

"The system was incapable of detecting every knife on the sensitivity level observed during the exercise," the report says.

"Recommend full transparency to potential customers, based on data collected."

IPVM's Conor Healy said: "*For certain categories of knives, the system didn't detect them at all when they were brought through. And that completely conflicts with what Evolv has told the public*."

24

(Emphasis added).

78.     The BBC was concerned enough about reporting on Evolv that it stated that "***for***
***security reasons, BBC News is reporting no further details about the documents' suggestion it***
***may also fail to detect certain types of bombs and their components***." (Emphasis added).

79.     The BBC article further revealed that NCS4's report had been manipulated by
Evolv employees. The article contained the following image showing that Evolv employees had
made tracked changes to the report to delete certain sections, consistent with emails obtained by
IPVM:



Emails obtained by IPVM show Evolv employees had been allowed to make "tracked changes" to the report - deleting certain sections.

A section on the detection of large knives deleted by an Evolv employee using 'track changes'

80.     The BBC article then stated that "[i]n one version [of the report], dated 19
January, the conclusion '***knives were not consistently detected***' was deleted." Further, the BBC
article stated that ***"[a]n Evolv employee using 'track changes' also deleted a reference to the***
***system being 'incapable of detecting every knife' and one to the 1.3 score***." (Emphasis added).

81.     On this news, the price of Evolv stock fell by $0.08, or 2.73% to close at $2.85
on November 2, 2022. The next day, it fell a further $0.16, or 5.6%, to close at $2.69.

82.     Then, on May 23, 2023, BBC News published an article entitled "AI scanner used in hundreds of US schools misses knives." (the "May 23 BBC Article").

83.     The May 23 BBC Article stated that "[a] security firm that sells AI weapons scanners to schools *is facing fresh questions about its technology after a student was attacked with a knife that the $3.7 [million] system failed to detect*." (Emphasis added).

84.     The May 23 BBC Article stated that the victim of this attack, a student named Ehni Ler Htoo, was "walking in the corridor of his school in Utica, New York, when another student walked up behind him and stabbed him with a knife." Htoo's lawyer told the BBC that he suffered "*multiple stab wounds to the head, neck, face, shoulder, back and hand*." (Emphasis added).

85.     The May 23 BBC Article stated that "[t]he *knife used in the attack was brought into Proctor High School despite a multimillion [dollar] weapons detection system installed by a company called Evolv Technology*." (Emphasis added).

86.     The May 23 BBC Article stated the following:

On 31 October, CCTV captured the perpetrator of the attack against Ehni Ler Htoo entering Proctor High School *and passing through the Evolv weapons scanners, according to one source at the school who has seen the security footage*.

"*When we viewed the horrific video, we all asked the same question. How did the student get the knife into the school?" said Brian Nolan, Superintendent of Utica Schools*.

The Knife used in the stabbing was more than 9 [inches, 22.8cm] long.

(Emphasis added).

87.     The May 23 BBC Article provided the following image of the knife used in the attack, confirming its large size:



Knife used in stabbing

88.     The May 23 BBC Article further stated:

The attack triggered an internal investigation by Utica's school district.

"***Through investigation it was determined the Evolv Weapon Detection system… was not designed to detect knives***," [Mr.] Nolan said.

***The scanners were removed from Proctor High School and replaced by 10 metal detectors***. But the scanners are still operating in the district's remaining 12 schools. [Mr.] Nolan says the district cannot afford to get rid of Evolv's system in its remaining schools.

Since that attack, [Mr.] Nolan says three other knives have been found on students in other schools in the district where the Evolv systems continue to operate.

***One of the knives was 7 [inches] long. Another was a curved blade with finger holes***. Another was a pocket knife. [Mr.] Nolan says ***they were all found because they were reported to staff – not because the weapons scanner had detected them***.

"***The kids [who had the knives] all said they walked right through the weapons detection system, we asked them about that… it truly, truly does not find knives***," he said.

(Emphasis added).

89.     The May 23 BBC Article then stated the following:

Evolv claims its system uses cutting-edge AI technology to find weapons. However, its critics say not enough is known about how the system works - or how effective this technology is at finding different types of weapons.

The BBC sent a detailed right of reply to Evolv, laying out what had happened at the school in Utica, and the decision of the school to stop using its system.

**We also asked what Evolv had told schools about what its system could and could not detect, whether it had told schools that independent testing had found its systems could not reliably detect large knives**, and whether it thought its systems were suitable for use in schools. **Evolv did not answer the questions**.

Conor Healy of IPVM, a firm that analyses security equipment, **says Evolv has exaggerated how effective the system is.**

"**There's an epidemic of schools buying new technology based on audacious marketing claims, then finding out it has hidden flaws, often millions of dollars later. Evolv is one of the worst offenders**. School officials are not technical experts on weapons detection, and companies like Evolv profit from their ignorance."

**Playing fast and loose with marketing claims is unacceptable when you sell a security product used to protect young people**, he added.

(Emphasis added).

90.     On this news, the price of Evolv stock fell by $0.45, or 7.56%, to close at $5.50

on May 23, 2023.

91.     On October 12, 2023, before the market opened, Evolv filed with the SEC a

Current Report on Form 8-K. In this current report, the Company announced the following:

On October 12, 2023, **the Company announced that the U.S. Federal Trade Commission had requested information about certain aspects of its marketing practices and we are pleased to answer their questions**, as well as educate them about our mission to make communities safer and more secure. Like many companies, when Evolv receives inquiries from regulators, our approach is to be cooperative and educate them about our company. The Company stands behind its technology's capabilities and performance track record, and is proud to partner with hundreds of security professionals to add a layer of advanced technology to their safety plan.

(Emphasis added).

92.     On this news, the price of Evolv stock fell $0.58 per share, or 13.33%, to close at

$3.77 on October 12, 2023.

93.     On October 25, 2023, during market hours, IPVM released an article entitled "Why We Believe Evolv Express Is Not Actually Intelligent" (the "October 2023 IPVM Article"). The October 2023 IPVM Article stated, in part, the following:

> While Evolv prominently markets "AI" (Artificial Intelligence), *we do not believe Evolv Express is actually intelligent because it struggles to differentiate small knives from cell phones and guns from laptops, capabilities that we believe are basic to being an "intelligent" weapons detector*.
>
> \*       \*       \*
>
> Evolv routinely disparages its "metal detector" competitors, *but Evolv's newest setting, released to deal with the problem of false alarms detecting knives as cell phones, shows how it has deceived the public and competes unfairly against rivals, causing public schools to spend far more on its systems than rivals*.
>
> **Fundamental Problems**
>
> \*       \*       \*
>
> Evolv was able to hide this problem until multiple stabbings at Evolv sites and IPVM disclosed NCS4 test results. *Afterward, Evolv released new higher sensitivity modes (similar to metal detectors) that reduced missing knives but increased false alarms on phones*.
>
> This creates *an unintelligent combination where Evolv's sensitivity slider on lower settings correctly alarms on guns but falsely on many laptops, plus missing smaller knives, while at higher settings, it starts falsely alarming on many cell phones*[.]
>
> \*       \*       \*
>
> Whatever "AI" Evolv claims, the real-world practical result is that it is not actually intelligent, just like its far lower-cost competitors who have and admit these same issues.
>
> Evolv has fought, for years, to hide these very fundamental facts, claiming that publicizing such information, rather than the fundamental flaws of the product Evolv sells, would harm the public.
>
> **Evolv Assured Opposite**
>
> Evolv assured the public and its investors for years that it could solve these fundamental problems of metal detectors.
>
> \*       \*       \*
>
> **Tuning Tradeoff, Not Actual Intelligence**

Evolv's "abilities" fundamentally rely on simplistic sensitivity tuning (their slider from A to now G) rather than actual intelligence. ***This is something IPVM was able to recreate by buying, testing, and tuning Evolv's conventional competitors***.

(Emphasis added).

94.   On this news, the price of Evolv stock fell $0.06, or 1.48%, to close at $3.99 on October 25, 2023.

95.   Then, on February 20, 2024, before the market opened, Evolv filed with the SEC a current report on Form 8-K, attached to which was a press release entitled "Evolv Technology Provides Regulatory Update." It stated, in pertinent part, the following:

[O]n Friday, February 16, 2024 the SEC notified ***the Company it was initiating an investigation that was described as a confidential "non-public, fact finding inquiry."*** The Company notes the SEC's explicit guidance that the investigation "should neither be construed as an indication by the Commission or its staff that any violation of law has occurred, nor as a reflection upon any person, entity, or security." The Company is eager to cooperate with the SEC as it is with any regulatory body.

(Emphasis added).

96.   On this news, which upon information and belief is related to the Evolv's technology, the price of Evolv stock fell by $0.82 per share, or 15.67%, to close at $4.41 on February 20, 2024.

97.   Then, on March 13, 2024, the BBC released an article entitled "AI weapons scanner backtracks on UK testing claims" (the "March 13 BBC Article"). The March 13 BBC Article stated the following:

Evolv Technology makes "intelligent" scanners designed to replace metal detectors by identifying people with concealed guns, knives and bombs.

But the company has come under mounting criticism for overstating what the technology can deliver.

***Evolv told BBC News it had altered its claims about UK testing to "better reflect the process taken".***

The Securities Exchange Commission (SEC) *launched an investigation into the company last month. And in October the company revealed the Federal Trade Commission (FTC) was looking into its marketing practices*.

*     *     *

The company had said that its AI weapons scanner had been tested by the UK Government's National Protective Security Authority (NPSA)[.]

*On 20 February the company put out a press release, including a claim that the NPSA was one of a number of testers who had "concluded that the Evolv Express solution was highly effective at detecting firearms and many other types of weapons"*.

But *BBC News can reveal the NPSA does not do this type of testing*.

When BBC News put this to Evolv, the company said: "After discussion with NPSA, we updated the language used in the February 20 press *release to better reflect the process taken*."

Instead, it said: an independent company had "tested and validated" Evolv's technology, using NPSA standards.

*But the UK company that did this testing, Metrix NDT, told BBC News it was "not correct to say we 'validated' the system".*

*     *     *

Metrix NDT managing director Nick Fox told BBC News that Evolv's system had indeed been tested against NPSA specifications.

*But when asked if Metrix NDT had found it "highly effective at detecting firearms and many other types of weapons", he said: "It is not within our remit to pass any value judgements on the results."*

Evolv told the BBC that in addition to those results, Evolv makes available to any serious prospective customer full third-party testing reports for detection performance.

Prof Marion Oswald, who was on the government's Centre of Data Ethics and Innovation advisory board until last year, told BBC News it was worrying the technology was replacing "tried and tested" security options.

"It does highlight the need for really close scrutiny and potential additional regulation of companies making these types of claims," she told BBC News.

And she worried how customers might be influenced, "especially if claims are being made about how certain government bodies may have been involved".

Evolv has previously said its technology detects the "signatures" of concealed weapons.

(Emphasis added).

98.     On this news, the price of Evolv stock fell by $0.13 per share, or 3.51%, to close at $3.57 on March 13, 2024.

99.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common shares, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

100.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than defendants who acquired Evolv securities publicly traded on the NASDAQ during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of Evolv, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

101.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Evolv securities were actively traded on NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds, if not thousands of members in the proposed Class.

102.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

103.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

104.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the Exchange Act was violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and financial condition of Evolv;

- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

- whether the Defendants caused Evolv to issue false and misleading filings during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false filings;

- whether the prices of Evolv securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

105.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and

burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

106.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Evolv shares met the requirements for listing, and were listed and actively traded on NASDAQ, an efficient market;

- As a public issuer, Evolv filed periodic public reports;

- Evolv regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases via major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

- Evolv's securities were liquid and traded with moderate to heavy volume during the Class Period; and

- Evolv was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were widely distributed and publicly available.

107.     Based on the foregoing, the market for Evolv securities promptly digested current information regarding Evolv from all publicly available sources and reflected such information in the prices of the shares, and Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

108.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information as detailed above.

### COUNT I
**For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder
Against All Defendants**

109.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

110.     This Count is asserted against Defendants is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

111.      During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

112.     Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;

- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Evolv securities during the Class Period.

35

113.    Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of Evolv were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of Evolv, their control over, and/or receipt and/or modification of Evolv's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning Evolv, participated in the fraudulent scheme alleged herein.

114.    Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Evolv personnel to members of the investing public, including Plaintiff and the Class.

115.    As a result of the foregoing, the market price of Evolv securities was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of Evolv securities during the Class Period in purchasing Evolv securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

116.    Had Plaintiff and the other members of the Class been aware that the market price of Evolv securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they

would not have purchased Evolv securities at the artificially inflated prices that they did, or at all.

117.   As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

118.   By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of Evolv securities during the Class Period.

**COUNT II**
**Violations of Section 20(a) of the Exchange Act**
**Against the Individual Defendants**

119.   Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

120.   During the Class Period, the Individual Defendants participated in the operation and management of Evolv, and conducted and participated, directly and indirectly, in the conduct of Evolv's business affairs. Because of their senior positions, they knew the adverse non-public information about Evolv's false financial statements.

121.   As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Evolv's financial condition and results of operations, and to correct promptly any public statements issued by Evolv which had become materially false or misleading.

122.   Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Evolv disseminated in the marketplace during the Class Period concerning Evolv's results of operations. Throughout the Class Period, the Individual

Defendants exercised their power and authority to cause Evolv to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Evolv within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Evolv securities.

123.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Evolv.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff, on behalf of himself and the Class, prays for judgment and relief as follows:

(a)     declaring this action to be a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and designating plaintiff's counsel as Lead Counsel;

(b)     awarding damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, together with interest thereon;

awarding plaintiff and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     awarding plaintiff and other members of the Class such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: March 25, 2024                    **THE ROSEN LAW FIRM, P.A.**
                                          /s/ Joshua Baker
                                          Joshua Baker, Esq. (BBO # 695561)
                                          Phillip Kim, Esq. (*pro hac vice* to be submitted

Laurence M. Rosen, Esq. (*pro hac vice* to
be submitted
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: jbaker@rosenlegal.com
        pkim@rosenlegal.com
        lrosen@rosenlegal.com

*Counsel for Plaintiff*