UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


GERALD RABY, Individually and on behalf )   Civil Action
of all others similarly situated,   )   No. 24-10761-ADB
  )
      Plaintiff,   )
  )
V.   )
  )
EVOLV TECHNOLOGIES HOLDINGS, INC.   )
F/K/A NEWHOLD INVESTMENT CORP.,   )
PETER GEORGE, MARIO RAMOS, MARK DONOHUE, )
KEVIN CHARLTON, and ADAM DEUTSCH,   )
  )
      Defendants.   )



BEFORE THE HONORABLE ALLISON D. BURROUGHS
UNITED STATES DISTRICT JUDGE


MOTION HEARING

July 25, 2024



John J. Moakley United States Courthouse
Courtroom No. 17
One Courthouse Way
Boston, Massachusetts  02210



Kelly Mortellite, RPR, RMR, CRR
Official Court Reporter
One Courthouse Way, Room 3200
Boston, Massachusetts  02210
mortellite@gmail.com

APPEARANCES:

Counsel on behalf of Movant Robert Falk:
Casey Sadler
Glancy Prongay & Murray LLP
1925 Century Park East
Suite 2100
Los Angeles, CA 90067
310-201-9150
cadler@glancylaw.com

Daryl DeValerio Andrews
Andrews DeValerio
P.O. Box 67101
Chestnut Hill, MA 02467
617-999-6473
daryl@andrewsdevalerio.com

Counsel on behalf of Movant Oklahoma Police Pension and
Retirement System:
Steven J. Buttacavoli
Leslie R. Stern
Berman Tabacco
One Liberty Square
Boston, MA 02109
617-542-8300
sbuttacavoli@bermantabacco.com

Counsel on behalf of Defendants:
R. Todd Cronan
Justin Ward
Goodwin Procter LLP
100 Northern Avenue
Boston, MA 02210
617-570-1000
jward@goodwinlaw.com

P R O C E E D I N G S

(The following proceedings were held in open court before the Honorable Allison D. Burroughs, United States District Judge, United States District Court, District of Massachusetts, at the John J. Moakley United States Courthouse, One Courthouse Way, Courtroom 17, Boston, Massachusetts, on July 25, 2024.)

(Case called to order.)

COURTROOM CLERK:  Will counsel identify themselves for the record.

MR. SADLER:  Good morning, Your Honor.  Thank you. Casey Sadler, Glancy Prongay Murray for Robert Falk.

MR. BUTTACAVOLI:  Good morning, Your Honor.  Steven Buttacavoli from Berman Tabacco here in Boston on behalf of the Oklahoma Police Pension and Retirement System.  With my is my partner, Leslie Stern.

MS. STERN:  Leslie Stern, Berman Tabacco, on behalf of Oklahoma Police.

THE COURT:  Have you entered an appearance, Ms. Stern?

MS. STERN:  Excuse me?

THE COURT:  Have you entered an appearance?

MS. STERN:  I have not.

THE COURT:  You're not on my list.  You might want to do that.  It's not an order.  It's just a suggestion.

MS. ANDREWS:  Daryl Andrews, Andrews DeValerio, local

counsel for movant, Robert Falk.

THE COURT:  Okay.

MR. CRONAN:  Good morning, Your Honor.  I'm Todd Cronan from Goodwin Procter in Boston, along with my colleague Justin Ward.  We'll be representing all defendants in this matter.  Our friends at Latham will be withdrawing their appearance, and we filed electronically this morning.

THE COURT:  Okay.

MR. CRONAN:  Thank you.

THE COURT:  I saw someone had filed electronically this morning.

So I've never actually had a situation quite like this, but let's start with counsel for Mr. Falk.  I think they've raised some good points about your typicality and your adequacy, and it doesn't look like you actually -- your client purchased the stock on the open market and was therefore someone who had to make a decision to purchase the security, which is I think what this kind of comes down to.

So you can correct me if anything I said was wrong, and then you can tell me where you stand on it.

MR. SADLER:  Yes, Your Honor.  That's not quite accurate, I don't believe.  Essentially he had the right to private securities.  You know, they were not publicly traded.  But this isn't a situation where there was just a merger and he didn't have anything.  He could have sold those private

securities and he didn't.  He decided to hold on to them.  And he held them and then, through the merger, he acquired the new shares, right?  And that's pretty standard in a lot of Section 11 cases when there's an IPO and a lot of bond cases when there's offerings.  And in those situations that is an acquisition or a purchase of security.

The fact that there's an affirmative decision, oh, I decided to buy them, is not really the situation, right?  In lots of cases people have the option to not do anything and a warrant switches over, or they have an option to maintain and a merger happens and they get new shares.  This is akin to that.

He had these things.  He could have done something with them.  He didn't.  He believed the company and he decided to keep them, and then he lost his value.  He's kind of in the same situation as everyone else who held these same private securities that turned into public securities during the class period.

As their papers even admit, a majority of the people in the class were in the same situation in that all of these shares went public through this merger.  So you can't have, well, it's not an individualized issue.  It's the same as tons of other people, right?  So it's not atypical from the class.  If anything, since more people did it this way than the other way, they would be atypical from the rest of the class.

THE COURT:  And tell me.  So I've done a lot of these

PSLRA cases, but there's never really been a dispute about who had the largest financial stake, and no one ever raised typicality and adequacy charges.  So what's the burden of proof on typicality and adequacy and who has it?

MR. SADLER:  Yes, Your Honor.  As an initial thing, I don't think there's a dispute here on who has the largest financial interest.  I mean, we have the financial interest that's the largest.  We are only supposed to look at us.  It's not a comparative analysis.  It's kind of irrelevant to whatever they're saying.  They have to show evidence that we are atypical when they haven't, right?  It's not they have ranks --

THE COURT:  Evidence at what level?  Like a preponderance?

MR. SADLER:  I mean, I think the statute is -- it isn't super clear, right?  It's a court discretionary thing.  It's whether it's likely to -- it's a likely standard, so I guess preponderance of the evidence, if it's unique to you as not to someone else.  That's why I think it's important that we look at these kind of rank speculation arguments that they make about, oh, he has inside information, right?  They make a bunch of speculation and innuendo, and we actually provide evidence in a declaration from him saying, I don't have this information they claim I might have.  So we've satisfied the burden to what there is, and they haven't been able to rebut that.

So since we're atypical, they have to affirmatively rebut the presumption as to us, and we don't believe they've come close to it.  They've just made a bunch of speculative arguments, with no basis, and by our declaration, we've confirmed they're just wrong.  Oh, they must have known something.  The guy left two years before the class period.

And ironically, at least to me, they're arguing, hey, look, we should appoint institution because they're sophisticated, right, or like the PSLRA encourages it.  The PSLRA does not specifically encourage institutions over individuals.  It's very clear.  The person who lost the most money and that's the order you look at it.

What the PSLRA was actually concerned with was sophistication.  They wanted sophisticated people to come forward and be lead plaintiffs and oversee lead counsel.  I think it's pretty clear here that our individual, who worked at the company, knows a ton about it, is upset, felt he was lied to and has come forward, is the more sophisticated entity.  I don't think the Oklahoma, whoever is the investment advisor -- there's no declaration from, no facts from, someone affiliated with it bought some stock randomly; whereas our guy actually knows about the company, is in a position to oversee this litigation.  And he's like the ideal lead candidate, and he lost three times more money.  So to us, it's pretty open and shut I think.

THE COURT:  Okay.

MR. BUTTACAVOLI:  So I think that there are a couple of responses to what counsel just said.  And I think in the initial matter, when he's describing the automatic transaction by which Mr. Falk received Evolv securities, and he states in the papers filed with the initial motion that the shares were received on July 16, 2021 pursuant to the merger agreement.

Now, we heard that Mr. Falk acquired these shares at some point during the course of his employment, 2016, 2019. What we haven't heard and what is not before the court is when in fact he actually acquired those shares, at what price he may have acquired those shares, if he paid anything for them at all, if they weren't some direct grant given to him by his former employer or then current employer, or any other information that demonstrates how he first became that shareholder in Legacy Evolve.

THE COURT:  Why is that important?

MR. BUTTACAVOLI:  Because what he has now is this automatic transaction.  We've cited authority to this effect in the case.  He has made no investment decision.

THE COURT:  Let me just stop you.  What he's saying was the investment decision was to keep the stock when he could have sold it, not relative to how he acquired it but relative to what he did afterwards, right?

MR. BUTTACAVOLI:  But the federal securities laws

don't provide for a holder claim, right?  You have a claim in connection with the purchase or sale of a security.  And so because here the false and misleading statements -- and a necessary element of the Section 10(b) complaint, the case that is asserted in this complaint is an element of false and misleading statements, that shareholders relied on those false and misleading statements, that the false and misleading statements artificially inflated the price of the subject securities, and as the truth emerged as to those misrepresentations, stock price fell and shareholders were damaged as a result.

If you automatically receive your shares, you cannot be acting in response to any misrepresentation and omission.

THE COURT:  You're not selling it based on the misrepresentation.

MR. BUTTACAVOLI:  In his case he's not purchasing or taking any affirmative step to convert the privately held shares to the publicly traded shares, right?  It's all done pursuant to the private agreement.  The merger agreement itself says anyone with those shares, automatically they will convert when the shareholders of the then publicly traded shell SPAC holding company, when they vote to approve the merger, all these things happen automatically.

Among the things that happen automatically is people like Mr. Falk get shares converted to these new valuable

publicly traded shares.  There's nothing he did, nothing he could have done in response to that.

Now, there's this assertion that he could have sold those shares.  Mr. Falk submitted two declarations that are before the court, neither of which specify any action that he could have or did or did not undertake in connection with those shares.  That circumstance we would submit is nearly identical to what the Central District of California confronted in the *Owlet* case, which we submitted as an exhibit to the Egan declaration that was filed with the court on June 7.

There, there were three competing movants for lead plaintiff in that case.  There was also a fourth that related to a separate claim that was asserted in that case that's not relevant for purposes of the analysis.  There are three movants, one of whom was exactly like Mr. Falk, someone who prior to the class period in connection with that prior employment received shares of the Legacy company.  Those shares automatically converted through the merger agreement.

The Central District of California found that that movant was not an adequate class representative, could not be appointed lead plaintiff in the case and declined to appoint them on virtually identical facts.  And for similar reasons, in the other cases we cite, including the Health South case, which was at the class certification stage there, the court declined to certify the class because two of the lead plaintiffs were in

a position like Mr. Falk where there was no affirmative investment decision.  There was no action to rely on misrepresentations and omissions that the automatic conversion of the shares rendered them incapable of representing a class of investors who, like Oklahoma Police, purchased shares in the open market in reliance on the integrity of the market price of securities that was alleged to be artificially inflated by defendant's misrepresentation.

THE COURT:  If he's right that the majority of the class is situated to Mr. Falk, does that change the analysis?

MR. BUTTACAVOLI:  No, and I do take issue with that assertion, right?  Because what Mr. Falk owned were Legacy shares that converted.  And what is certainly true is that at the moment of the merger, a majority of the shareholders held securities that were part of the Legacy SPAC entity.  And he admits in his reply brief what he received in connection with the transaction, yeah, it wasn't the publicly traded Evolv shares at that time.  They were technically the SPAC shares and they converted, yada yada.  But the majority of the shareholders, I believe it was -- there were 8.7 million shareholders who are unlike Mr. Falk because some portion of them purchased -- well, all of those 8.7 million purchased the publicly traded shares of the SPAC company.  There are another almost five million who held some sort of convertible preferred shares in the SPAC company that are also sort of in a similar

position.  And all that are left are the few former employees of the company who had these presumably valueless, non-traded, privately held shares that by nature of the merger transaction suddenly had value.

And that segues to a point I think it's important to be before the court and it sort of infects the loss representation that Mr. Falk submitted.  We noted in our opposition brief that his claimed loss in this case is unsupported, right?  What he did is essentially took the closing price for the securities on the date that the automatic transaction occurred and said, I'm going to set that as my purchase price.

Again, that's why I began by saying he didn't have any information as to when he actually acquired those shares.  He didn't actually say how much he might have paid in that original connection.  Did he have any out-of-pocket loss? Because what he has done is taken a benchmark, setting the basis for his loss that I don't see any support in any other authority to suggest that's appropriate.

And the only other movant in this case is Oklahoma Police, who has an unquestionable set of bona fides with respect to their open market purchases of 128,000 shares in the open market at $711,000 in net expenditures and the $224,000 in claimed losses, that's a standard lead plaintiff application. There's nothing unusual about Oklahoma Police.

However, it's this other claimed loss that Mr. Falk is saying, I should now be presumed to be in charge. He has not given the court any indication as to why you should take his word for that. And moreover, as we've stated in our briefing, there are significant issues as to whether or not he is a plaintiff in this action, right?

One of the things that counsel was saying at the outset is that all these transactions, it's standard, and he made reference to the Section 11 case. This isn't a Section 11 case. This is a section 10(b) securities fraud case that has very specific elements of the offense. If someone comes to the court seeking appointment in the case, they have to be a member of that class as a threshold matter. And he hasn't demonstrated that. And the automatic nature of the transaction precludes him from representing the class because he can't establish that fraud-on-the-market reliance that the class is going to pursue in this case. The nature of those claims is described in the complaint. We have to live with the four corners of the complaint that are before the court at this point.

And if you look at the Section 10(b) allegations that define that plaintiffs intend to rely on the fraud of the market and how that impacts and how the shareholders would not have purchased the shares at artificially inflated prices or at all if they had known of the truth of the misrepresentations in

this case.  That's what the claim is about.  Mr. Falk didn't do that.

THE COURT:  So I want to understand, is it your position that you have to have a purchase or a sale and the decision not to sell is never adequate on a Section 10 case?

MR. BUTTACAVOLI:  I can't say that the decision not to sell is inadequate, but that's not before the court in any of the pleadings.  That was asserted this morning, that that's the case.  I don't think there's anything in any of the submissions in any of the descriptions of what the privately held Evolv securities were, you know.  Was there a market for those securities?  There's nothing in the record to indicate that.

And moreover, under the authority that we've cited, even if one were to sort of make those leaps and say that, yes, these are transactions, ultimately the shares that Mr. Falk had weren't entitled to vote.  All the cases he cited about an exchange of shares as constituting a purchase of securities under the federal securities laws involved an exchange of shares where the shareholders doing so were voting.  You're trying to find a proxy for this purchase on the market at a market price, and you're taking action, you're benchmarking it against, and the vote is used to get to that same place.

That's not at issue here.  That wasn't permitted under the merger agreement.  The only shareholders that voted were the shares in the SPAC company that converted.  We would submit

that even though the class is not exactly defined in a crystal clear way, it's not a paragon of excellent drafting in terms of this complaint.  Those folks are arguably not within the definition of the class in the complaint.  We think the drafters intended that.

But Mr. Falk isn't that kind of shareholder.  He had shares that he passively held that automatically converted.  And, yeah, he can't be a member of the class as defined in this complaint.  There is no provision for the class including anyone who may have refrained from selling.  This is about people who purchased in reliance on the alleged misrepresentations.

THE COURT:  Do you have any response to that?

MR. SADLER:  Yeah, I have a bunch of stuff, there's a bunch of things.

THE COURT:  Start with that, start with whether or not he is in the class.

MR. SADLER:  Well, he is in the class.  And this goes back to something I said that was wrong, which is, he's saying a publicly traded company, the SPAC, bought a publicly traded company.  That's not true.  It was a private company.  That's what a SPAC does.  So there wasn't public Legacy of all shares.  All these people were all kind in the same situation and their shares come over.

And the thing with the class here, and this is what's

kind of crazy to me, the class are people who bought or acquired, otherwise acquired, which is in the class definition, the shares of NewHold during the class period.  NewHold had securities, and then at a certain point they changed their name to Evolv.  They are the same securities through the class.  So if you acquired the securities at any point of NewHold/Evolv, they're the same, they just changed the name, you were a class member.  He clearly is.  He acquired shares during the class period.

THE COURT:  All right.  I don't have the class definition in front of me.  I just have the briefing in front of me.  Is "acquired" covered in the class definition or it's not?

MR. BUTTACAVOLI:  Let me pull the complaint.

MR. SADLER:  It is.  It is, in paragraph 1, "This is a class action on behalf of persons or entities who purchased or otherwise acquired publicly traded Evolv securities."  Evolv is defined as Evolv?  Formally known as NewHold, because they're the same company.

That brings me to some additional things I want to talk about, what he was saying, they've cited *Owlet* many times, which is a case of CD Cal.  Let's ignore for a second that it's out of circuit, and we cite other cases from CD Cal that have found the exact opposite and that the First Circuit and Supreme Court said otherwise.  So it's clearly a nonbinding authority.

But even so --

THE COURT:  Are you saying, did you just say there's a First Circuit case that is disavowed *Owlet*?

MR. SADLER:  No, not specifically.  We cited in ours *Versyss v. Coopers*, stating that, "In the context of a merger, it is surely true National Securities," which is Supreme Court, "that the NDS stockholders would be treated for purposes of 10(b) as having sold their NDS stock and purchased stock in return in a situation where there was a merger."  To us, I mean that's the First Circuit.  They have CD Cal cases.

But even ignoring all of that, in *Owlet*, the situation was the guy who had the stock was like, You know what?  I want to sell my stock because I think this company is terrible, before the merger happened, and the board of the company said, No, you can't do that.  And the court found, yeah, that guy who was like, I don't want this merger to happen, I'm not into this, and went to the board and fought to get it done, and the board said, no, that fact pattern made you subject to unique defenses, and it does.  He was actively saying, I don't believe in this merger, I don't want to have this stock, I don't want to have that.

So then when the merger completed, he can't say he relied on the statements.  He was affirmatively acting in contrast to that.  So that case is clearly not applicable here, right?  They're ignoring that part.  They're saying he owned

earlier shares.  It's not, that's not what's happening here. In the context of we have to prove -- you can sell private securities if you want to go out and sell them.  There's a market in all sorts of pre-IPO cases.  That's not a thing. They're saying we have to affirmatively -- no, we don't.  We are the presumptively lead plaintiff.  They have to rebut the presumption and they haven't.  They just have a bunch of speculation and out-of-circuit cases, and they're just kind of making these assertions broadly.

And something he said that is quite troubling is that if they get appointed lead counsel, they have to file an amended complaint.  Are they saying because the poorly drafted initial complaint that was not drafted by either of us -- I'm not disparaging anyone -- didn't include, say, Section 11 claims for the merger in the middle, that they're just not going to bring them?  Because that's really concerning because, as they admit, that's a majority of the people in the class. They're saying we're going to just make it this small little class.  So, okay.  That's kind of a dangerous precedent. They're admitting that they're acting in their client's interest over the rest of the class, which are all these people who lost money on the stock, right?

Just because the thing says it now doesn't mean you're going to be the fiduciary on behalf of all the shareholders going forward, if you're just like, yeah, I'm going to waive

all these claims.  I mean, defendants be will be super psyched about it because the case will be a whole lot smaller, but we don't think that's appropriate, and we don't think that's zealously acting in front of your client.

THE COURT:  Go ahead.

MR. BUTTACAVOLI:  If I can respond to that, I think there are a couple of errors.  And number one is, counsel is speculating as to what an amended complaint may look like.  That's not what we're here to address today.  We're here to address what is the complaint that's before the court that was provided in connection with the required PSLRA notice.

THE COURT:  Well, he says he's in the class the way it's drafted.

MR. BUTTACAVOLI:  And we disagree because we don't believe, the nature of his transaction doesn't involve the investment decision, doesn't involve a purchase of securities sufficient to put him in the class.

THE COURT:  He says "acquire" is sufficient.

MR. BUTTACAVOLI:  Well, purchased or acquired, he still needs to prove for the 10(b) claim.  So number one, the class definition, he makes reference to Evolv securities.  I think what was omitted there -- and he quoted the very first paragraph of the complaint.  The class definition is really in paragraph 100, which refers to "purchasing Evolv securities publicly traded on the NASDAQ during the class period and who

were damaged thereby."

Evolv securities, now again, this is a drafting problem, there are only two Evolv securities that are defined in the complaint.  At paragraph 9, the complaint defines Evolv securities as including two things -- well, they don't use the term "Evolv securities."  They describe two categories of securities that were publicly the traded on the NASDAQ.  Common stock that was traded under the ticker symbol EVLV and warrants that were traded under the ticker symbol EVLVW, both on the NASDAQ.  That's defined in paragraph 9 of the complaint.

Paragraph 10 describes a second category of securities.  The SPAC blank check company shares that were publicly traded before the acquisition under the symbol NHIC.  Those are called the NewHold shares or NHIC shares.  That's different from what's in the definition.  Again, he doesn't fall within the definition because of the nature of the transaction, number one; and number two, he's not part of the class because he doesn't have this individual, this issue of reliance, fraud in the market reliance, because the transaction was untethered to the market price of the securities.

Even if you were to move past that, that the mere fact that we're having this conversation as to whether Mr. Falk is even a member of this class, it then goes to the Rule 23 questions of adequacy and typicality, that, if he were to proceed as the lead plaintiff in this case, would cause

enormous distraction, expense and delay on the part of the class to resolve these questions, right?

As to then, for the Rule 23 factors, whether or not he's subject to unique defenses or reliances, well, this is the same for all shareholders.  Well, the necessary element, if you can't establish fraud-on-the-market reliance because your transaction isn't tethered to the market price of securities or the integrity of the market price securities, you're going to have to prove individual reliance.

And as that suggests, that is inherently an individual question.  Did you rely on these statements?  Did you rely on any other information?  That's going to all be unique to Mr. Falk and his circumstance.  And from a class action standpoint, the class claims can't proceed that way.  Securities class actions proceed under the fraud on the market theory because individual reliance blows up the ability to hold these cases out as class actions.

I think we've kind of gotten into that class definition, but at the end of the day all of these same factors turn on the Rule 23 questions and whether he's made the requisite prima facie showing that he meets those requirements.  And here he hasn't because of the different nature of the transactions, the fact that he was not entitled to vote.  He didn't make an affirmative investment decision.  He can't rely on fraud on the market reliance.  Regardless of whether or not

there is an acquisition as opposed to a purchase, that acquisition still needs to be tethered in the federal securities laws, and we submit that Mr. Falk's transaction doesn't meet that test.  And in either event, all of these questions will come back at a later stage in the litigation and overwhelm the case and create issues for the Rule 23 factors.

MR. SADLER:  Just real quick.  I just want to rebut one thing.  Again, he's saying, because he's made a big deal about this, this is going to be an issue going forward.  If that was the case, then anyone who just attacked anyone, it's a big thing and later in the case it's going to become something that's a unique defense.  That's just not the standard at all.  It's actually evidence of something.

And here, as he just admitted, whether the people relied applies to all of the people who acquired their stock this way, which is lots of people.  And so this isn't a unique defense to him.  Again, it's going to be proved on a class-wide basis.  In class cert in these cases, where you have an expert, they opine, it is no other work to have these discussions.  To say this is a going to be a big focus of the case is simply not true.

THE COURT:  Ms. Stern, do you have anything you want to add?  Not you.  Her.  We're equal opportunity in here.

MS. STERN:  Thank you.  No.  I just wanted to make a few clarifying points here.  We're not saying that you could

never not have an acquisition and have a 10(b) claim.  It's the details of this acquisition that make it subject to flaws for a securities fraud claim, that there was no vote, the SPAC company voted on the merger, and as Mr. Buttacavoli said, Evolv Legacy did not.

I also wanted to clear up that we were never saying that Evolv Legacy was a public company.  I think that is why in our opposition papers we had noted that there's no information about how he came to these shares, what the cost basis would be, drawing attention to how that loss calculation came to be valued at 995.  That was merely the price by which the merger happened for the Legacy shareholders.  So we were never saying that Legacy Evolv was public.

The other thing I just wanted to note, and I think Mr. Buttacavoli actually has the case, that even the case law that Falk cites to to support that an acquisition can be a purchase under the securities laws involves a security where the investors voted.  So there's no case law that we're aware of that allows someone who acquired shares passively with no affirmative action whatsoever to constitute a purchase under the securities laws.

THE COURT:  How about you, Ms. Andrews?

MS. ANDREWS:  No.  The only thing I would add, Your Honor, is I think there might have been some confusion about Evolv being part -- the class period is from June to September,

and the SPAC converted in July. So by saying that if the class wasn't a purchaser of the SPAC that they're not part of the class, that's not in the complaint. Because in the complaint definition of "the class" is broader than only purchasers of Evolv. So purchasers of the SPAC are also included in the class just by virtue of the date.

MR. SADLER: Just one last point. They talk about -- these SPAC cases are relatively new. There's, like, this is a new phenomenon and they've all blown up in the last five years. In these SPAC cases, what happens is the SPAC company is purchasing private companies. So these aren't situations where they're like, oh, here it's unique because they didn't vote the Evolv people. That's just how it works. It was a private company. So they agreed to be bought and then the SPAC company votes on whether the merger happens.

So this is very standard. This isn't some, like, unique, atypical situation. We cite cases where that's the case. This is like a pretty standard new thing happening here. Because the nature of a SPAC is a public basically shell company is using the money from shareholders to buy a private company and bring it public. That's the whole nature of the transaction.

THE COURT: All right. So Mr. Cronan and Mr. Ward, I know you don't have any dog hunting in this exactly, but do you have any view on the law that would be helpful?

MR. CRONAN:  We don't, Your Honor, in the sense that we can provide some additional factual background.  But in terms of the adequacy issues and the class definition, that really is between the two plaintiff parties.

THE COURT:  Okay.  I though you showed up, so you might as well get a chance to speak.

You have to have the last word, right?  I'm going to give it to you because the burden is yours, so go.

MR. BUTTACAVOLI:  I wanted to, Ms. Stern mentioned the case that was cited in Falk's own opening moving papers, page 5 of that opening brief.  It's *Leech v. Brooks Automation, Inc.* It's a 2006 Westlaw case 3690736, and at page star 3 of that case, right, this criticism that we don't have in-district authority that holds that passive transfer of shares can constitute a purchase, this is one of -- this is Mr. Falk's own case that interestingly begins with a premise that "Institutional investors like Oklahoma Police should be presumed to be the lead plaintiffs," but this goes on to note that the individual movant who claimed, like Mr. Falk, to have the larger loss in that case says that he, quote, "did not acquire shares of Brooks," this the company, "on the open market but rather was granted shares during Brooks' negotiated acquisition of PRI.  In addition, he only acquired such shares during a very narrow window during the class period."

So that's very much similar to the situation of

Mr. Falk here who acquired his shares within the first two weeks of the class period that's asserted here, even though this goes on until '23.  That's Mr. Falk's own authority.  And so I, in preparing for this hearing, discovered this last night and thought we wanted to bring that to the court's attention.

THE COURT:  All right.  You both have done a fantastic job, and I need to go back and read the papers in the cases, but you've both done a fine service to your clients.  I'm going to recess for today and we'll kick out an opinion as soon as we can, okay?  Or an answer.  "Opinion" might be an overstatement, but an answer.  Thanks, everyone.  We're recessed.

(Adjourned, 10:30 a.m.)

CERTIFICATE OF OFFICIAL REPORTER


            I, Kelly Mortellite, Registered Professional

Reporter, Registered Merit Reporter and Certified Realtime

Reporter, in and for the United States District Court for the

District of Massachusetts, do hereby certify that the foregoing

transcript is a true and correct transcript of the

stenographically reported proceedings held in the

above-entitled matter to the best of my skill and ability.

                    Dated this 29th day of July, 2024.


                    /s/ Kelly Mortellite

                    _____

                    Kelly Mortellite, RPR, RMR, CRR

                    Official Court Reporter