## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| GERALD RABY, Individually and on Behalf of All Others Similarly Situated,<br><br>      Plaintiff,<br><br>   v.<br><br>EVOLV TECHNOLOGIES HOLDINGS, INC. F/K/A NEWHOLD INVESTMENT CORP., *et al.*,<br><br>      Defendants. | Case No. 1:24-cv-10761-ADB<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>(Filed Pursuant To Schedule Granted On October 1, 2024, ECF No. 60) |

## TABLE OF CONTENTS

**Page**

I.  NATURE OF THE ACTION AND OVERVIEW ..................................................1

II.  JURISDICTION AND VENUE ....................................................................5

III.  PARTIES ............................................................................................6

IV.  SUBSTANTIVE ALLEGATIONS ...............................................................8

    A.  The Company's Business And Evolv Express.........................................8

    B.  Evolv Goes Public Through A SPAC...................................................9

        1.  SPACs Like NHIC Are Incentivized To Complete Any Business Combination...................................................................................9

        2.  In July 2021, NHIC Completed The Business Combination, And Evolv Became A Public Company ...........................................11

    C.  Defendants Issued Materially Misleading Statements And Omissions About The Efficacy Of Evolv Express ...............................................12

    D.  The Efficacy Of Evolv Express Was Publicly Called Into Doubt By Third Parties..............................................................................................14

    E.  Regulators Opened Investigations Spurred By School Attacks Due To Evolv Express's Failure To Detect Weapons ......................................19

    F.  Unbeknownst To Investors, Evolv Improperly Recognized Revenue On Transactions Where There Were Extra-Contractual Terms And Conditions ........21

        1.  Evolv Sells Express Directly And Through Channel Partners .................21

        2.  Evolv Offered Trials For Customers To Test Evolv Express Without A Purchase Commitment .....................................................23

        3.  Evolv Recognized Revenue While Customers Did Not Have A Purchase Obligation, Thereby Violating GAAP.......................................25

    G.  Defendants Admitted Revenue Was Overstated By "Extra-Contractual Terms And Conditions" ...................................................................29

V.  DEFENDANTS' FALSE AND/OR MISLEADING STATEMENTS AND/OR OMISSIONS ...................................................................................30

    A.  Effectiveness Of Evolv Express...........................................................30

    B.  Sales And Marketing.........................................................................36

    C.  Revenue Recognition Policy ...............................................................37

    D.  Financial Results ..............................................................................39

    E.  Internal Control Over Financial Reporting ............................................52

VI.  LOSS CAUSATION..............................................................................59

VII.    CLASS ACTION ALLEGATIONS ..................................................................61

VIII.   ADDITIONAL ALLEGATIONS REGARDING DEFENDANTS' SCIENTER............62

        A.      Evolv's Product Effectiveness And Its Sales Were Central To Its Business.........63

        B.      The Overstatement Comprised A Substantial Amount Of The Company's
                Revenue Such That Knowledge Or Extreme Recklessness On The Part Of
                Defendants Is The Only Reasonable Inference ......................................................64

        C.      That George Was Terminated "Effective Immediately" Soon After The
                Company Announced The Impending Restatement Supports A Finding Of
                Scienter ...................................................................................................................64

        D.      That The Company Was Already Under Investigation By The FTC And
                SEC Further Demonstrates The Individual Defendants' Recklessness ................66

        E.      Improperly Recognized Revenue Was To One Of Its Largest Channel
                Partners ...................................................................................................................67

        F.      The Company Failed To Maintain Effective Internal Controls Over
                Revenue Even After Being Aware That The Company Already Had
                Weakness In Its Revenue Internal Controls..........................................................67

        G.      Corporate Scienter And *Respondeat Superior* .......................................................70

IX.     UNDISCLOSED ADVERSE FACTS ............................................................................70

X.      APPLICABILITY OF PRESUMPTION OF RELIANCE ...............................................71

XI.     NO SAFE HARBOR .....................................................................................................73

XII.    CLAIMS .......................................................................................................................74

XIII.   PRAYER FOR RELIEF ...............................................................................................80

XIV.    JURY TRIAL DEMANDED .........................................................................................81

Lead Plaintiff Robert Falk ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Evolv Technologies Holdings, Inc. ("Evolv" or the "Company") f/k/a NewHold Investment Corp. ("NHIC") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Evolv; and (c) review of other publicly available information concerning Evolv.

## I.    NATURE OF THE ACTION AND OVERVIEW

1.    This is a class action on behalf of persons and entities that: (1) purchased or otherwise acquired Evolv securities between June 28, 2021 and October 25, 2024, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act"); and/or (2) purchased or otherwise acquired Evolv common stock pursuant to the Company's registration statement and prospectus (together, "Registration Statement") issued in connection with the July 2021 Business Combination (defined herein), seeking to pursue remedies under Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act").

2.    This action concerns Defendants' failure to disclose that Evolv's flagship product was not as effective as claimed and that as a result, they gave customers the product to test without a purchase commitment.  Further, certain of the Company's executives hid the fact that customers did not have to purchase the product from relevant accounting personnel, the Company's Audit Committee, and its outside auditor. As a result, the Company prematurely and improperly recognized revenue.  Despite a myriad of internal control deficiencies of which Defendants and the Board were aware, these contractual terms and its revenue impact was not disclosed until the

independent members of the Board of Directors launched an investigation. Following the investigation, Defendants admitted Evolv had incorrectly recognized revenue of "approximately $4 million to $6 million" on a net basis over 2 years and its financial results for certain periods "should no longer be relied upon because of the misstatements." Just days later, the Company terminated in long-standing Chief Executive Officer, Defendant Peter George.

3.      Evolv develops and sells artificial intelligence ("AI")-based weapons detection for security screening. According to the Company, its products use AI cloud services and advanced sensors to purportedly "address the chronic epidemic of escalating gun violence, mass shootings and terrorist attacks in a cost-effective manner." Its flagship product is the Evolv Express, which is a touchless screening system that has been commercially available since 2019 to detect firearms, improvised explosive devices, and knives. According to the Company, it can screen a maximum of 4,000 people per hour (compared to the 350 people per hour for traditional metal detectors) because visitors can walk through the entrance at a normal pace with their bags and without emptying their pockets. The Company claims that its product is better than traditional metal detectors, which can have operational problems and hidden costs, such as false alarms that lead to an intrusive and labor cost-intensive pat down for the visitor.

4.      At all relevant times, Defendants touted Evolv's products efficacy. For example, the Registration Statement stated:

> **Reliable Precision**.   Our technology uses artificial intelligence to reliably detect real threats and ignore harmless items as visitors walk through side-by-side while carrying their bags, without emptying their pockets. This dramatically reduces the number of nuisance alarms.

Even after the Business Combination was consummated, Defendants continued to make similar statements regarding the efficacy of the Evolv Express product.

5.      Starting in November 2022, third party outlets began to question the Company's efficacy statements.  For example, on November 22, 2022, BBC News reported that documents showed Evolv Express "fail[s] to detect certain types of knives, as well as some bombs and components."  Similarly, a report issued by IPVM published excerpts of documents obtained by a FOIA request showed that Evolv Express only detects micro-compact pistols with a 92% detection rate, but a conventional metal detector would detect the same weapon 100% of the time and that "Evolv detected some knives at a rate of 0% with a 53% rate overall." Likewise, on May 23, 2023, BBC reported that Evolv Express was removed from a school after it failed to detect a 9-inch knife and was replaced by conventional metal detectors.

6.      Following these disclosures and school attacks where the Express product had failed to detect weapon, regulators began investigating the Company and its marketing statements. For example, on October 12, 2023, before the market opened, Evolv disclosed that it was under investigation by the U.S. Federal Trade Commission ("FTC") regarding "certain aspects of its marketing practices."  Then, on February 19, 2024, Evolv announced that it was under investigation by the SEC for a confidential "non-public, fact finding inquiry."[1]  On both of these announcements, the Company's stock declined heavily.

7.      Unbeknownst to investors, Express' ability to detect different types of weapons depended on the circumstances. Because Evolv targeted venues without standardized regulations for security protocols, customers would have to test the Express at their venue to understand its effectiveness.  Thus, in order for customers to try out the product, certain customers were granted a trial period before having to decide whether they wanted to purchase the product.  However, the

---

[1] According to analysts that followed Evolv, the SEC investigation was investigating similar issues as the FTC investigation.

Company recognized revenue on these transactions even where the client was not obligated to purchase the product, which is in violation of generally accepted accounting principles related to revenue recognition.

8.     The Company admitted on October 25, 2024 that certain large customers had "extra-contractual terms and conditions" which were not disclosed to accounting personnel, that Evolv had improperly recognized revenue on these transactions, and that as a result their financial statements could no longer be relied upon.  As the Company admitted, "certain sales of products and subscriptions to channel partners and end users were subject to extra-contractual terms and conditions that impacted revenue recognition and other metrics" and "certain Company personnel engaged in misconduct in connection with those transactions."

9.     The Company further explained that an internal investigation was conducted to determine "when senior Company personnel became aware of these issues" and concluded that senior Company personnel had concealed this conduct from Evolv's accountants, the Board and its outside accounting firm:[2]

> these extra-contractual terms and conditions were *withheld* from the Company's Audit Committee of the Board (the "Audit Committee") and the Company's independent registered public accounting firm, PricewaterhouseCoopers LLP ("PwC").

10.     Only days after this announcement, the Company announced that it had "terminated" the Company's CEO, Peter George, "effective immediately."  According to a press release issued on October 31, 2024, Peter George's termination followed "months of careful planning and deliberation by the Board . . . to plan for an orderly CEO transition." However, the Company did not have a permanent replacement ready at the time of the termination.

---

[2] Unless otherwise stated, all emphasis in bold and italics hereinafter is added, and all footnotes are omitted.

11.     Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors: (1) that Evolv Express failed to accurately detect large knives and other weapons; (2) that, as a result, the effectiveness of Evolv Express was overstated; (3) that the Company used extra-contractual terms and conditions in certain of its arrangements with customers and channel partners; (4) that these extra-contractual terms were not shared with accounting personnel and its outside auditor; (5) that these terms were not shared with accounting personnel and its outside auditor due to Evolv's failure to institute internal controls regarding revenue recognition and segregation of finance and accounting duties; (6) that, as a result, these extra-contractual terms and conditions were not accounted in accordance with GAAP; (7) that, as a result, Evolv's revenue and other financial items that are a function of revenue were overstated; and (8) and that as a result of the foregoing, Defendant's positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

## II.    JURISDICTION AND VENUE

12.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5), and Sections 11 and 15 of the Securities Act (15 U.S.C. §§ 77k and 77o).

13.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 27 of the Exchange Act (15 U.S.C. § 78aa), and Section 22 of the Securities Act.

14.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts charged herein,

including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District. In addition, the Company's principal executive offices are located in this District.

15.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## III.    PARTIES

16.     Plaintiff Robert Falk, as set forth in the attached certification, incorporated by reference herein, purchased Evolv securities during the Class Period and/or acquired Evolv common stock pursuant to the Registration Statement, and suffered damages as a result of the false and/or misleading statements and/or material omissions alleged herein.

17.     Defendant Evolv is incorporated under the laws of Delaware with its principal executive offices located in Waltham, Massachusetts. Evolv's common stock trades on the NASDAQ exchange under the symbol "EVLV," and its warrants trade on the NASDAQ exchange under the symbol "EVLVW." Prior to the Business Combination, Evolv's Class A common stock traded on the NASDAQ exchange under the symbol "NHIC," its redeemable warrants under the symbol "NHICW," and its Units under the symbol "NHICU."

18.     Defendant Peter George ("George") has served as President and Chief Executive Officer ("CEO") of Evolv since the Business Combination. Prior to that, he was the President and CEO of Legacy Evolv.

19.     Defendant Mark Donohue ("Donohue") has served as the Company's Chief Financial Officer ("CFO") since June 2022.

20.    Defendant Mario Ramos ("Ramos") served as the Company's CFO and Chief Risk Officer from November 2021 to May 31, 2022.

21.    Defendant Kevin Charlton ("Charlton") has served as a director of Evolv's Board of Directors since the Business Combination. Prior to that, he was the CEO of NHIC. He signed or authorized the signing of the Registration Statement filed with the SEC.

22.    Defendants George, Donohue, Ramos, and Charlton (collectively the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein.

23.    Defendant Thomas J. Sullivan ("Sullivan") was the Chairman of NHIC's Board of Directors, and he signed or authorized the signing of the Registration Statement filed with the SEC.

24.    Defendant Charles Goldman ("Goldman") was the Vice Chairman of NHIC's Board of Directors, and he signed or authorized the signing of the Registration Statement filed with the SEC.

25.    Defendant Charlie Baynes-Reid ("Baynes-Reid") was NHIC's Chief Operating Officer, and he signed or authorized the signing of the Registration Statement filed with the SEC.

He actively participated in the identification of Legacy Evolv as a target for the Business Combination and subsequent negotiations alongside Defendant George.

26.    Defendant Adam Deutsch ("Deutsch") was NHIC's CFO, and he signed or authorized the signing of the Registration Statement filed with the SEC.

27.    Defendant Marc Saiontz ("Saiontz") was a director of NHIC, and he signed or authorized the signing of the Registration Statement filed with the SEC.

28.    Defendant Kathleen Harris ("Harris") was a director of NHIC, and she signed or authorized the signing of the Registration Statement filed with the SEC.

29.    Defendant Brian Mathis ("Mathis") was a director of NHIC, and he signed or authorized the signing of the Registration Statement filed with the SEC.

30.    Defendant Neil Glat ("Glat") was a director of NHIC, and he signed or authorized the signing of the Registration Statement filed with the SEC.

31.    Defendant Sezaneh Taherian ("Taherian") was a director of NHIC, and she signed or authorized the signing of the Registration Statement filed with the SEC.

32.    Defendants Charlton, Sullivan, Goldman, Baynes-Reid, Deutsch, Saiontz, Harris, Mathis, Glat, and Taherian are collectively referred to hereinafter as the "Securities Act Individual Defendants."

## IV.    SUBSTANTIVE ALLEGATIONS

### A.    The Company's Business And Evolv Express

33.    Evolv develops and sells AI-based weapons detection for security screening. Its products use AI cloud services and advanced sensors to purportedly "address the chronic epidemic of escalating gun violence, mass shootings and terrorist attacks in a cost-effective manner." According to Evolv, its products are superior to traditional metal detectors which have operational

problems and hidden costs, including false alarms that lead to intrusive and labor cost-intensive pat downs.

34.    Its flagship product is the Evolv Express, which is a touchless screening system to detect firearms, improvised explosive devices, and knives. It can screen a maximum of 4,000 people per hour (compared to the 350 people per hour for traditional metal detectors) because visitors can walk through the entrance at a normal pace with their bags and without emptying their pockets. It has been commercially available since October 2019.

35.    Evolv Express's legacy predecessor was the Evolv Edge, which was commercially launched in 2017. Its primary distinguishing feature was the ability to detect non-metallic explosive devices, as well as improvised explosive devices, firearms, and tactical knives. At the time of the Business Combination, the Company announced that Evolv Edge would not "be a significant portion of [its] growth plan." By December 31, 2021, Evolv Edge units were retired and removed from service, and the Company transitioned customers from the legacy Evolv Edge units to the current Evolv Express units. Thus, since 2022, the Company's product revenue was derived from sales of Evolv Express.

**B.    Evolv Goes Public Through A SPAC**

**1.    SPACs Like NHIC Are Incentivized To Complete Any Business Combination**

36.    Special purpose acquisition companies ("SPACs") are publicly traded companies with no business activities that are formed specifically to acquire an existing operating company. The capital from the SPAC's initial public offering ("IPO") is held in trust for a specific period of time to fund the acquisition.

37.    If a merger or acquisition is successfully made within the allocated time frame, founders and managers of the SPAC can profit through their ownership of the SPAC's securities

(typically about 20% of the SPAC's stock, in addition to warrants to purchase additional shares). However, if an acquisition is not completed within that time frame, then the SPAC is dissolved and the money held in trust is returned to investors, with no compensation paid to the founders and managers of the SPAC, whose SPAC securities expire worthless.  Accordingly, the founders and management team of a SPAC are highly incentivized to complete an acquisition within their deadline, even if the benefits of that transaction for the public shareholders of the SPAC are dubious.

38.    The business combination effectuated by the SPAC is in many respects similar to a traditional IPO, in that a previously private company becomes publicly traded. However, SPAC transactions and IPOs have certain key differences. In a traditional IPO, banks underwrite the offering and perform substantial due diligence in order to evaluate the company going public, to formulate appropriate disclosures to prospective investors, and to accurately price its securities. However, in a SPAC transaction, there are no underwriters; the due diligence and the disclosures supporting the business combination are solely determined by the SPAC and its controlling persons, who have strong incentives to agree to, and obtain shareholder approval for, an acquisition regardless of its true merits.

39.    Typically, common stockholders of a SPAC are granted voting rights to approve or reject the business combination proposed by the management team. Thus, when the management team identifies a target, a proxy statement must be distributed to all SPAC stockholders, which includes the target company's financial statements and the terms of the proposed business combination. Public stockholders in SPACs rely on management of the SPAC and the target company to honestly provide accurate information about any contemplated transactions.

### 2. In July 2021, NHIC Completed The Business Combination, And Evolv Became A Public Company

40.    NHIC was a SPAC that concentrated on finding a target company engaged in industrial technology, with a particular emphasis on a business that aligned with several key themes commonly referred to as "Industry 4.0." NHIC's leadership believed that companies using advanced data analytics, software, artificial intelligence, and cutting edge instrumentation and process automation had a significant competitive advantage over businesses that had not embraced such solutions.

41.    In August 2020, NHIC completed its IPO, selling 17.25 million units for $10 per unit. Each unit consisted of one share of Class A common stock and one-half of one redeemable warrant. Each whole warrant could be exercised at $11.50 per share to purchase one share of Class A common stock. As of March 31, 2021, approximately $172,598,000 was held in a trust account established for the benefit of the public shareholders (i.e., to fund a business combination).

42.    On March 5, 2021, NHIC entered into a merger agreement with Evolv Technologies, Inc. d/b/a Evolv Technology, Inc. ("Legacy Evolv"). Pursuant to the agreement, Legacy Evolv became a wholly owned subsidiary of NHIC, which was renamed to Evolv (the "Business Combination").

43.    On April 2, 2021, the Company filed the Registration Statement on Form S-4 with the SEC. On June 9, 2021, the Company filed its final amendment to the Registration Statement with the SEC on Form S-4/A, which forms part of the Registration Statement. The Registration Statement was declared effective on June 25, 2021.

44.    On June 28, 2021, the Company filed its prospectus on Form 424B3 with the SEC, which forms part of the Registration Statement.

45. On July 16, 2021, the Business Combination closed. In connection with the July 15, 2021 vote to approve the transaction, holders of 8,755,987 shares of NHIC's Class A common stock properly exercised their redemption right for a pro rata portion of the trust account, thereby redeeming a total of approximately $87.6 million. The remaining $85 million in the trust account was used to fund the Business Combination.

46. As a result of the Business Combination, each share of Legacy Evolv preferred stock and common stock was converted into the right to receive approximately 0.378 shares of Evolv's Class A common stock. In the Business Combination, the Company issued 94,192,534 shares of common stock to Legacy Evolv stockholders. The proceeds, net of redemptions, received from the Business Combination were $84.9 million.

47. Based on the number of shares of common stock outstanding on July 16, 2021, Legacy Evolv shareholders owned 92.7% of the common stock of the Company and NHIC shareholders owned approximately 7.3%.

**C. Defendants Issued Materially Misleading Statements And Omissions About The Efficacy Of Evolv Express**

48. The Registration Statement was signed by the Securities Act Individual Defendants. The Registration Statement was negligently prepared and, as a result, contained untrue statements of material facts and/or omitted to state facts necessary to make the statements made therein not misleading, and the Registration Statement was not prepared in accordance with the rules and regulations governing their preparation.

49. For example, the Registration Statement stated:

**Reliable Precision**.   Our technology uses artificial intelligence ***to reliably detect real threats*** and ignore harmless items as visitors walk through side-by-side while carrying their bags, without emptying their pockets. This dramatically reduces the number of nuisance alarms.

50. Investors, including Plaintiff, who purchased or otherwise acquired Evolv stock pursuant to the Business Combination suffered substantial losses. On July 19, 2021, the first trading session after the Business Combination closed, the Company's stock opened trading at $10.50 per share. Since the Business Combination, and as a result of the disclosures of material adverse facts omitted from the Registration Statement, Evolv's common stock price has declined precipitously. On March 25, 2024, when this action commenced, the Company's stock price closed at $3.59 per share, a decline of approximately 65% since the Business Combination closed. As a result, investors who bought or otherwise acquired Evolv stock pursuant to the Registration Statement suffered substantial losses.

51. Even after the close of the Business Combination, Defendants continued to make misleading public statements regarding the efficacy of Evolv Express.  For example, on July 23, 2021, Defendant George made an appearance on Fox Business, which was posted on Fox Business's website in a video entitled "Evolv Technologies uses AI powered security to detect weapons." In this interview, Defendant George made the following statement:

> We have the signatures for all the weapons in the world [. . .] we've written the machine learning algorithms for ***all the guns, all the bombs, and all the large tactical knives in the world and our sensor system can identify those signatures*** quickly, send an alert, and will stop it before it gets into the venue.

52. On May 11, 2023, Craig Hallum issued a research note in connection with the Company's first quarter 2023 financial results, recognizing Evolv's reputational risk: "Given the stakes involved, if ***Evolv's systems fail to detect a weapon*** or are perceived to have failed, Evolv may lose its credibility in being able to detect weapons. This would likely result in churn and lower customer adds, and the stock price may suffer."

**D.    The Efficacy Of Evolv Express Was Publicly Called Into Doubt By Third Parties**

53.    On November 2, 2022, before the market opened, BBC News reported they had received documents that showed Evolv Express "fail[s] to detect certain types of knives, as well as some bombs and components."  The article reported that, according to emails obtained via Freedom of Information Act ("FOIA") request by IPVM, a third party on physical security technology, there were discrepancies between the NCS4's public report on Evolv Express's effectiveness and a private one shared with the Company. The article stated, in relevant part:

> NCS4's public report, published earlier this year, gave Evolv a score of 2.84 out of three – many types of guns were detected 100% of the time.

> But it also produced a private report, obtained via a Freedom of Information request by IPVM and shared with BBC News along with emails between Evolv and NCS4.

> And it gave Evolv's ability to detect large knives a score of just 1.3 out of 3.

> In 24 walkthroughs, Evolv Express failed to detect large knives 42% of the time.

> "The system was incapable of detecting every knife on the sensitivity level observed during the exercise," the report says. "Recommend full transparency to potential customers, based on data collected."

> IPVM's Conor Healy said: "For certain categories of knives, the system didn't detect them at all when they were brought through. And that completely conflicts with what Evolv has told the public."

> NCS4's report does not say, and BBC News is not reporting, what types of large knives the technology failed to detect. And for security reasons, BBC News is reporting no further details about the documents' suggestion it may also fail to detect certain types of bombs and their components.

54.    The BBC article explained that these differences were due to Evolv's changes to the report, including "deleting certain sections" and the scores about the effectiveness in weapons detection. Specifically, the article stated, in relevant part:

> Emails obtained by IPVM show Evolv employees had been allowed to make "tracked changes" to the report - deleting certain sections. In one version, dated 19 January, the conclusion "knives were not consistently detected" was deleted. An

Evolv employee using "track changes" also deleted a reference to the system being "incapable of detecting every knife" and one to the 1.3 score.

Asked why Evolv had been able to edit what was labelled an independent report, NCS4 told BBC News it "did not allow Evolv to directly edit the report". "The 'track changes' feature was used as a means to collect feedback," an official said.

And NCS4 "stands by its process, which has proven effective in informing and educating solution providers and practitioners".

55.    Despite these changes to the NCS4's report, "Evolv did not dispute the private report's conclusions." According to the BBC article:

"We work closely to communicate sensitive security information, including the capabilities and limitations of our system, so that security professionals can make the most informed decisions for their specific venue," an official told BBC News.

"We feel providing a blueprint of how to get around the security-screening process and technology to the public will make the venues our customers secure less safe."

56.    Also on November 2, 2022, IPVM published excerpts of these documents obtained by the FOIA request. It found that the full, unredacted NCS4 report shows Evolv Express only detects micro-compact pistols with a 92% detection rate, but a conventional metal detector would detect the same weapon 100% of the time. The references to the micro-compact pistols had been deleted from the public version of the NCS4 report.

57.    According to IPVM, the NCS4 report had found that "Evolv detected some knives at a rate of 0% with a 53% rate overall." As a result, the evaluators "Recommend[ed] full-transparency to potential customers based on data collected." IPVM's article stated:



| 1.8 | Knife (greater than 5" in length) | **Requirement:** Evolv Express is capable of detecting knives made of ferrous metals and exceeding 5" in length (no detection rate provided). **Outcome:** Multiple knives of different types/kinds were processed through at randomized test locations. Some knives alerted at 100%, while others were not detected. The overall detection rate was 58% in 24 walk-throughs. **Evaluator Feedback:** The technology can detect some knives of various sizes, shapes, and thicknesses at various test locations, but the system was incapable of detecting every knife on the sensitivity level observed during the exercise. Recommend full-transparency to potential customers based on data collected. | 1.3 |

Results were so poor that evaluators said they "Recommend full-transparency to potential customers based on data collected." In a separate section of the report dedicated to evaluator feedback, multiple evaluators called knife detection "not consistent" and "unreliable".

58.    Moreover, the public report noticeably excluded measurements that are typically

used by NCS4 to show the significance of the weapons detected. The IPVM report stated:

>   While the requirements for knife testing in the final version only mention blades longer than 5", test images show knives with varying blades including some that seem shorter than 5": [image omitted] In earlier drafts, specifications for knife testing read "knives with blades that ranged from under four inches to greater than six inches." After testing, this was changed to simply read "knives," as shown below:

## Knife Testing Wording Changes                                    IPVM

**NCS4 Report Draft (01/18)**

**3.3.3. Test Objects**

Clean test subjects processed through the system at walking pace of 1.0 – 1.5 m/s, followed by test objects. Test objects were steel (UNS G41400) simulated handguns following the dimension criteria outlined in NILECJ-STD-0601.00 and NIJ Standard-0601.02 (Figure 19), firearms, ==knives with blades that ranged from under four inches to greater than six inches==, and innocuous items (e.g., wrist watches and cell phones). The steel simulated handguns were positioned on clean test subjects and processed through the Evolv Express a total of 225 times while evenly distributed among the nine test locations identified in NIJ 0601.02. Figure 20 illustrates the nine test locations (right) and the steel simulated handgun (left).

**NCS4 Report Draft (01/24)**

**3.3.3. Test Objects**

Clean test subjects processed through the system at walking pace of 1.0 – 1.5 m/s, followed by test objects. Test objects were steel (UNS G41400) simulated handguns following the dimension criteria outlined in NILECJ-STD-0601.00 and NIJ Standard-0601.02, firearms, firearm components, ==knives==, and innocuous items (e.g., wrist watches and cell phones). The steel simulated handguns were positioned on clean test subjects and processed through the Evolv Express a total of 225 times while evenly distributed among the nine test locations identified in NIJ 0601.02. Figure 12 illustrates the nine test locations (right) and the steel simulated handgun (left).

The wording of this requirement raises questions, as it differs from past NCS4 language. While NCS4 requirements for object detection are typically quantitative (e.g. the system will detect X at a rate of Y% or greater) the language for Evolv has no quantitative requirement:

> Evolv Express is capable of detecting knives made of ferrous metals and exceeding 5" in length (no detection rate provided).

By comparison, NCS4's Patriot One testing had far more extensive testing requirements for knives:

| PatriotOne Extensive Knife Testing | | | IPVM |
|---|---|---|---|
| 1.2 | Knife (blade greater than 6") | **Requirement:** The system will detect knives larger than 6" at a rate of 80% or greater. **Outcome:** Total rate at 9 test locations was 96% for knives of this size used during exercise. **Evaluator Feedback:** Although the system exceeded percentage threshold, misses were observed in the same 2 test locations experiencing lower detection rates outlined in Functional Area 1.1. | 2.4 |
| 1.3 | Knife (blade greater 4", but less than 6") | **Requirement:** The system will detect knives between 4" and 6" at a rate of 70% or greater. **Outcome:** Total rate at 9 test locations was 88% for knives of this size used during exercise. **Evaluator Feedback:** Although the system exceeded the detection threshold, detection did not always align with the displayed detection areas on the tablet. Monitoring freezes were also observed during high traffic, which impacted alert times. Additionally, misses were most commonly observed in the same 2 test locations experiencing lower detection rates outlined in Functional Area 1.1. | 2.2 |
| 1.4 | Knife (blade less than 4") | **Requirement:** The system will detect knives smaller than 4" in blade length. For the purposes of this exercise, this function was observed but not rated. **Outcome:** The total detection rate at randomized test locations was 73% for knives less than 4" in length. | N/A |

59.     The IPVM article also noted that Evolv Express does not detect non-ferrous materials, such as "plastic explosives, 3D-printed guns, and many types of improvised explosive devices (IEDs) such as lead pipe bombs." The article recognized: "Aside from how security managers at venues consider non-ferrous detection in risk assessments, ***the issue here is disclosure and false marketing. Evolv claims it can detect all weapons, but its inability to detect non-ferrous materials clearly shows this is false***."

60.     In response, Evolv's Chief Marketing Officer Dana Loof provided a statement to IPVM, emphasizing that the sensitive security information should not be available to public and claiming that "[t]here were no alterations to scores." Specifically, the statement read, in relevant part:

. . . We urge you not to make sensitive security information available to the general public. If there are any prospects, customers or partners that have not already viewed the private report under NDA, they can sign up HERE.

Regarding your accusations, as per standard practice in the operational exercise process, commentary was provided by Evolv, and questions were asked for clarification, no requests for changes were ever made to the NCS⁴ scores. NCS⁴ maintains the source document and reviews the merit of each comment. There were no alterations to scores, and any changes to evaluator feedback were communicated with and approved by individual evaluators. The only difference in the process followed was to provide a public and a private version of the report, with all of the information the evaluators felt necessary to include. Again, we feel providing a blueprint of how to get around the security screening process and technology will make the public and the venues our customers secure less safe.

### E.      Regulators Opened Investigations Spurred By School Attacks Due To Evolv Express's Failure To Detect Weapons

61.      On May 23, 2023, BBC reported that Evolv Express was removed from a school after it failed to detect a 9-inch knife and was replaced by conventional metal detectors. According to the article:

A security firm that sells AI weapons scanners to schools is facing fresh questions about its technology after a student was attacked with a knife that the $3.7m system failed to detect. On Halloween last year, student Ehni Ler Htoo was walking in the corridor of his school in Utica, New York, when another student walked up behind him and stabbed him with a knife. Speaking exclusively to the BBC, the victim's lawyer said the 18-year-old suffered multiple stab wounds to his head, neck, face, shoulder, back and hand.

\*       \*       \*

The knife used in the stabbing was more than 9in (22.8cm) long. The attack triggered an internal investigation by Utica's school district.

"Th[o]rough investigation it was determined the Evolv Weapon Detection System… was not designed to detect knives," Mr Nolan said.

The scanners were removed from Proctor High School and replaced by 10 metal detectors. But the scanners are still operating in the district's remaining 12 schools. Mr Nolan says the district cannot afford to get rid of Evolv's system in its remaining schools.

Since that attack, Mr Nolan says three other knives have been found on students in other schools in the district where the Evolv systems continue to operate. One of the knives was 7in long. Another was a curved blade with finger holes. Another

was a pocket knife. Mr Nolan says they were all found because they were reported to staff - not because the weapons scanner had detected them.

62.     On this news, the Company's stock price fell $0.45, or 7.56%, to close at $5.50 per share on May 23, 2023, on unusually heavy trading volume.

63.     On October 12, 2023, before the market opened, Evolv disclosed that it was under investigation by the U.S. Federal Trade Commission ("FTC") regarding "certain aspects of its marketing practices." In a Form 8-K filed with the SEC, Evolv stated:

> On October 12, 2023, the Company announced that the U.S. Federal Trade Commission had requested information about certain aspects of its marketing practices and we are pleased to answer their questions, as well as educate them about our mission to make communities safer and more secure. Like many companies, when Evolv receives inquiries from regulators, our approach is to be cooperative and educate them about our company. The Company stands behind its technology's capabilities and performance track record, and is proud to partner with hundreds of security professionals to add a layer of advanced technology to their safety plan.

64.     On this news, the Company's stock price fell $0.58, or 13.33%, to close at $3.77 per share on October 12, 2023, on unusually heavy trading volume.

65.     On Monday, February 19, 2024 (President's Day), Evolv announced that it was under investigation by the SEC. In a press release, Evolv stated:

> Evolv Technology (NASDAQ: EVLV), the leading security technology company pioneering AI-based weapons detection to create safer experiences, today provided an update on a request received from the U.S. Securities and Exchange Commission (SEC). Specifically, on Friday, February 16, 2024 the SEC notified the Company it was initiating an investigation that was described as a confidential "non-public, fact finding inquiry." The Company notes the SEC's explicit guidance that the investigation "should neither be construed as an indication by the Commission or its staff that any violation of law has occurred, nor as a reflection upon any person, entity, or security." The Company is eager to cooperate with the SEC as it is with any regulatory body.

66.     On this news, the Company's stock price fell $0.82, or 15.67%, to close at $4.41 per share on February 20, 2024, on unusually heavy trading volume.

67.    On March 13, 2024, BBC reported that "Evolv backtracks on UK testing claims" made in a prior press release. Specifically, the article stated:

> The company had said that its AI weapons scanner had been tested by the UK Government's National Protective Security Authority (NPSA).

> On 20 February the company put out a press release, including a claim that the NPSA was one of a number of testers who had "concluded that the Evolv Express solution was highly effective at detecting firearms and many other types of weapons".

> But BBC News can reveal the NPSA does not do this type of testing.

> When BBC News put this to Evolv, the company said: "After discussion with NPSA, we updated the language used in the February 20 press release to better reflect the process taken."

> Instead, it said: an independent company had "tested and validated" Evolv's technology, using NPSA standards.

> But the UK company that did this testing, Metrix NDT, told BBC News it was "not correct to say we 'validated' the system" [because] "It is not within our remit to pass any value judgements on the results."

> *        *        *

> Evolv also amended another claim in its 20 February press release. Evolv had initially referred to the designation of its technology under the US Department of Homeland Security Safety (DHS) Act as an example of recent "third party testing".

> This was later changed so as to reflect the fact that this designation does not involve the conduct of a new test by the DHS but is an evaluation of other evidence.

68.    On this news, the Company's stock price fell $0.13, or 3.5%, to close at $3.57 per share on March 13, 2024.

### F.    Unbeknownst To Investors, Evolv Improperly Recognized Revenue On Transactions Where There Were Extra-Contractual Terms And Conditions

#### 1.    Evolv Sells Express Directly And Through Channel Partners

69.    Evolv sells its products through a direct sales organization and a global distribution channel of strategic partners and resellers, including Motorola Solutions, Inc. ("Motorola"), STANLEY Securitas, and Johnson Controls, to cover more than 30 countries. Its customers

include major sports stadiums and arenas, performing arts and entertainment venues, major tourist destinations and cultural attractions, hospitals, schools, and prominent houses of worship. Since fiscal 2022, Motorola has been a channel partner and one of Evolv's "significant customers," representing more than 10% of the Company's total revenue or accounts receivable.

70.     The Company recognizes revenue from (1) subscription agreements, which are generally accounted for as operating leases, inclusive of security-as-a-service ("SaaS") and maintenance; (2) sale of products; (3) SaaS and maintenance related to products sold; (4) license fees since March 2023; and (5) professional services, including installation, training, and event support. However, Evolv expected product revenue as a percentage of overall revenue to decline over time as more customers entered full subscription transactions and subscription revenues became more valuable.

71.     The Company primarily recorded sales through "pure subscription" agreements that bundled AI software, cloud services, and advanced sensor equipment. These agreements are for a defined term (usually multi-year), in annual prepayment installments, with no right of cancellation for convenience. Historically, Evolv also offered purchase-subscription agreements where the customer paid a one-time upfront fee for the equipment and a mandatory annual subscription fee for access to software and cloud services, but the Company transitioned away from this model during fiscal 2023. Both pure subscription and purchase subscription models are SaaS subscriptions.

72.     Evolv also has a distributor licensing agreement with Columbia Electrical Contractors, Inc. ("Columbia Tech"), Evolv's primary contract manufacturer, which is dated March 2023. Under this agreement, Columbia Tech has a limited, non-exclusive license to contract directly with certain resellers to fulfill sales demand for end-user customers who want to purchase

the hardware equipment outright. Evolv still contracts directly with the seller to provide a multi-year SaaS subscription to end-users.

73.    Until the end of fiscal 2022, Evolv claimed that contracts were "generally noncancelable and nonrefundable after ownership passes to the customer," and since first quarter 2023, the arrangements were "generally noncancelable and nonrefundable after shipment to the customer." In either case, Evolv claimed to recognize revenue "when control of the product [w]as transferred to the customer, which follows the terms of each contract."

### 2.    Evolv Offered Trials For Customers To Test Evolv Express Without A Purchase Commitment

74.    According to multiple former employees, Evolv Express was not as effective as the Company claimed. Rather, its ability to detect different types of weapons depended on the circumstances. Because Evolv targeted venues without standardized regulations for security protocols, customers would have to test the Evolv Express at their venue to understand its effectiveness.

75.    Former employee ("FE") 1[3] stated that "there was no official efficacy testing" and "testing can be dialed up or down, in terms of sensitivity." That would require an organization to set forth certain minimum standards across all entities (sports arenas, for example). However, he stated that churches and schools are "not well-organized enough to say, 'Here's a standard we're all going to agree to, across the US.'" As a result, he stated that Express systems were "always piloted . . . because the product can perform differently, depending on the environment." Specifically, he said that "*most buyers would pilot the product – would say, 'I want this for a week*

---

[3] All former employees are defined using the masculine pronoun to protect their anonymity. FE 1 was Evolv's Director of Channel Sales from September 2021 to December 2022.

*or month to test it myself.*'" FE 5[4] confirmed that he "never sold an Evolv product without it being tested by the end user. . . . It was, 'Here's a demo product,' and the client can test it for some length of time."

76.    Through this testing period, many customers found Express was not effective. FE 2[5] noted that Motorola was buying a lot of Express systems but, "over the last two quarters, sales have dropped off" because the product is ineffective. According to a current Channel Sales Executive at Motorola, Express "was pushed hard but [he] never even got close to prospecting a deal." The Motorola executive stated that there was "high pressure to sell those things during the first six months" he was at Motorola, but it was deprioritized "because consumers . . . weren't getting the results they wanted."

77.    Similarly, FE 3[6] recalled that a hospital system had bought 10 to 12 Express systems but experienced "so many false alarms" that the customer realized the system did not work the way Evolv marketed. After that customer's experience, FE 3 instructed his team not to sell Express anymore. Evolv's technology's focus on metal density and the object's shape led to a high incidence of false alarms. According to FE 3, "A pretty classic false alarm was an umbrella. . . . Also, metal glasses cases could be a potential pipe bomb."

78.    Multiple former employees confirmed that Express could not detect knives. According to FE 3, Express was no longer a viable solution for customers who found out that it could not detect knives, despite being marketed as a generic "weapons" detection system.

---

[4] FE 5 was a Regional Sales Director at Motorola from February 2022 to November 2023. Prior to that, he was a Regional Sales Manager at Motorola since 2016.

[5] FE 2 was Evolv's Director of Revenue Enablement from April 2021 to April 2023.

[6] FE 3 was a Regional Sales Director at Motorola from 2018 to 2023.

79.    FE 2 stated that Evolv tested "equipment when delivered and when it comes back from customers," which confirms that customers returned Express based on their trial runs.

80.    Trials or pilots of Express enabled the Company to improperly report revenue. FE 2 provided an illustrative example: "Let's say a sales rep has a deal that's going to come in, but not before the end of the quarter. And the executive calls Ms. Sales Rep and says, 'Hey, we could put it on a slow truck, and, *if they need to return it, that's fine*. They could take delivery of that.'" FE 4[7] corroborated that there was end-of-period pressure to deliver product *before* the sales order was confirmed, stating that several people had asked, for example, "How quick can you deliver these units to South Carolina? We're still planning the sales order, but we want to see it there by X date." According to FE 4, these requests occurred more frequently at the end of quarter or end of month.

### 3.    Evolv Recognized Revenue While Customers Did Not Have A Purchase Obligation, Thereby Violating GAAP

81.    Under SEC Regulation S-X, Evolv must comply with generally accepted accounting principles ("GAAP") to present financial statements. Filings that do not comply with GAAP are "presumed to be misleading or inaccurate." 17 C.F.R. §210.4-01(a)(1). Accounting Standards Codification ("ASC") are promulgated by the Financial Accounting Standards Board ("FASB") as the source of authoritative GAAP for nongovernmental entities.

82.    ASC 606 is an accounting standard that governs the recognition of revenue from contracts with customers. It was promulgated by the FASB in 2014 to improve the financial reporting of revenue and to allow topline financial statements to be compared. The "core principle" of ASC 606 "is that an entity recognizes revenue to depict the transfer of promised goods or

---

[7] FE 4 was Evolv's Director of Logistics & Order Management from 2021 to 2022.

services to customers in an amount that reflects the consideration to which the entity expects to be entitled in exchange for those goods or services." In accordance with that principle, revenue is recognized using the following 5-step process:

Step 1: Identify the contract(s) with a customer—A contract is an agreement between two or more parties that creates enforceable rights and obligations. The guidance in this Topic applies to each contract that has been agreed upon with a customer and meets specified criteria. In some cases, this Topic requires an entity to combine contracts and account for them as one contract. ***This Topic also provides requirements for the accounting for contract modifications.***

Step 2: Identify the performance obligations in the contract—A contract includes promises to transfer goods or services to a customer. If those goods or services are distinct, the promises are performance obligations and are accounted for separately. A good or service is distinct if the customer can benefit from the good or service on its own or together with other resources that are readily available to the customer and the entity's promise to transfer the good or service to the customer is separately identifiable from other promises in the contract. . . .

Step 3: Determine the transaction price—The transaction price is the amount of consideration in a contract to which an entity expects to be entitled in exchange for transferring promised goods or services to a customer. ***The transaction price can be a fixed amount of customer consideration, but it may sometimes include variable consideration or consideration in a form other than cash.*** . . .

Step 4: Allocate the transaction price to the performance obligations in the contract—An entity typically allocates the transaction price to each performance obligation on the basis of the relative standalone selling prices of each distinct good or service promised in the contract. If a standalone selling price is not observable, an entity estimates it. Sometimes, the transaction price includes a discount or a variable amount of consideration that relates entirely to a part of the contract. The requirements specify when an entity allocates the discount or variable consideration to one or more, but not all, performance obligations (or distinct goods or services) in the contract. . . .

Step 5: Recognize revenue when (or as) the entity satisfies a performance obligation—An entity recognizes revenue when (or as) it satisfies a performance obligation by transferring a promised good or service to a customer (which is when the customer obtains control of that good or service). The amount of revenue recognized is the amount allocated to the satisfied performance obligation. A performance obligation may be satisfied at a point in time (typically for promises to transfer goods to a customer) or over time (typically for promises to transfer services to a customer). For performance obligations satisfied over time, an entity recognizes revenue over time by selecting an appropriate method for measuring the entity's progress toward complete satisfaction of that performance obligation. . . .

ASC 606-10-05-4 (internal references omitted).

83.    According to PwC, the Company's auditor, side agreements to a contract have implications for revenue recognition. Specifically:[8]

> Sometimes the parties will enter into amendments or "side agreements" to a contract that either change the terms of, or add to, the rights and obligations of that contract. These can be verbal or written changes to a contract. Side agreements could include cancellation, termination, or other provisions. They could also provide customers with options or discounts, or change the substance of the arrangement. All of these items have implications for revenue recognition; therefore, understanding the entire contract, including any amendments, is critical to the accounting conclusion.

84.    If a customer receives a product "for trial or evaluation purposes and . . . is not committed to pay any consideration until the trial period elapses," then "control of the product is not transferred to the customer until either the customer accepts the product or the trial period elapses." ASC 606-10-55-88. This means that Evolv cannot recognize revenue until the customer accepts the product or until the trial period elapses. PwC provides the following example to illustrate:

> **EXAMPLE RR 2-5**
> Identifying the contract – free trial period
>
> ServiceProvider offers to provide three months of free service on a trial basis to all potential customers to encourage them to sign up for a paid subscription. At the end of the three-month trial period, a customer signs up for a noncancellable paid subscription to continue the service for an additional twelve months.
>
> Should ServiceProvider record revenue related to the three-month free trial period?
>
> *Analysis*
>
> No. A contract does not exist until the customer commits to purchase the twelve months of service. The rights and obligations of the contract only include the future twelve months of paid subscription services, not the free trial period. Therefore, ServiceProvider should not record revenue related to the three-month free trial

---

[8] https://viewpoint.pwc.com/dt/us/en/pwc/accounting_guides/revenue_from_contrac/revenue_from_contrac_US/chapter_2_scope_and__US/26identifying_the_co_US.html

period (that is, none of the transaction price should be allocated to the three months already delivered). The transaction price should be recognized as revenue on a prospective basis as the twelve months of services are transferred.

85.     Similarly, a third party such as a distributor or channel partner may not necessarily have control of the product. If the distributor holds the product in a consignment arrangement, revenue cannot be recognized. ASC 606-10-55-79. Indicators of a consignment arrangement include:

a. The product is controlled by the entity until a specified event occurs, such as the sale of the product to a customer of the dealer, or until a specified period expires.

b. The entity is able to require the return of the product or transfer the product to a third party (such as another dealer).

c. The dealer does not have an unconditional obligation to pay for the product (although it might be required to pay a deposit).

ASC 606-10-55-80.

86.     The consideration allocated to performance obligations "can vary because of discounts, rebates, refunds, credits, price concessions, incentives, performance bonuses, penalties, or other similar items." ASC 606-10-32-6. It can also vary "if an entity's entitlement to the consideration is contingent on the occurrence or nonoccurrence of a future event." *Id.* Moreover, an entity "shall include in the transaction price" the variable consideration "only to the extent that it is **probable** that a significant reversal in the amount of cumulative **revenue** recognized will not occur when the uncertainty associated with the variable consideration is subsequently resolved." ASC 606-10-32-11.

87.     By including extra-contractual terms and conditions, Evolv was required to consider those terms to determine when to recognize revenue (and in what amounts). Specifically, the Company could not recognize revenue during a trial period because the customer had not

committed to purchasing Express or a subscription. Due to the failure to consider the complete

contract, Defendants overstated revenue in violation of GAAP.

### G.    Defendants Admitted Revenue Was Overstated By "Extra-Contractual Terms And Conditions"

88.    On October 25, 2024, before the market opened, Evolv announced that it would

restate its financial statements since second quarter 2022 because "certain sales of products and

subscriptions to channel partners and end users were subject to extra-contractual terms and

conditions that impacted revenue recognition and other metrics." As a result, revenue had been

overstated by approximately $4 to $6 million on a net basis. In a Form 8-K filed with the SEC, the

Company stated, in relevant part:

> In September 2024, an ad hoc committee of independent directors (the "Committee") of the Board of Directors (the "Board") of Evolv Technologies Holdings, Inc. (the "Company"), under the direction of the Board, commenced an investigation of the Company's sales practices, including whether certain sales of products and subscriptions to channel partners and end users were subject to extra-contractual terms and conditions that impacted revenue recognition and other metrics, and if so, when senior Company personnel became aware of these issues.

> The Committee's investigation is ongoing. ***However, the Committee has made a preliminary determination that certain sales, including sales to one of its largest channel partners, were subject to extra-contractual terms and conditions, some of which were not shared with the Company's accounting personnel, and that certain Company personnel engaged in misconduct in connection with those transactions.*** Furthermore, these extra-contractual terms and conditions were withheld from the Company's Audit Committee of the Board (the "Audit Committee") and the Company's independent registered public accounting firm, PricewaterhouseCoopers LLP ("PwC"). ***As a result of these preliminary findings, the Committee has determined that the accounting for certain sales transactions was inaccurate and that, among other things, revenue was prematurely or incorrectly recognized in connection with financial statements prepared for the periods between the second quarter of 2022 and the second quarter of 2024.*** The Committee has determined that these misstatements are material for certain financial statements prepared for these periods and that the recognition of revenue in the proper periods will impact each of those financial statements. The Committee currently estimates that, on a net basis (taking into account revenue that was prematurely recognized but offset by amounts appropriately recognized in subsequent periods) through June 30, 2024, ***the sales transactions at issue have resulted in premature or incorrect revenue recognition of approximately $4***

**million to $6 million. The Committee anticipates that the vast majority of this revenue was prematurely rather than incorrectly recognized.** This estimate is preliminary and subject to change pending the conclusion of the investigation. **Other previously reported metrics that are a function of revenue were also misstated as a result of these revenue misstatements.**

Accordingly, on October 24, 2024, based on the Committee's recommendation, the Board determined that the Company's previously issued consolidated financial statements and other financial data for the fiscal years ended December 31, 2022 and December 31, 2023 contained in its Annual Report on Form 10-K, and its condensed consolidated financial statements for the quarters and year-to-date periods ended June 30, 2022, September 30, 2022, March 31, 2023, June 30, 2023, September 30, 2023, March 31, 2024 and June 30, 2024 contained in its Quarterly Reports on Form 10-Q (collectively, the "Non-Reliance Periods"), should no longer be relied upon because of the misstatements described above. The Board also determined that the Company's disclosures related to such financial statements and related communications issued by or on behalf of the Company with respect to the Non-Reliance Periods should no longer be relied upon. The Company is in the process of evaluating the impact on internal control over financial reporting and expects to report one or more additional material weaknesses in internal control over financial reporting. Certain members of the Audit Committee and the Board discussed this conclusion with PwC.

The Committee is working expeditiously to complete the investigation and prepare amendments to the Company's financial statements and related filings. The Company has self-reported these issues to the Division of Enforcement of the U.S. Securities and Exchange Commission (the "SEC"), which had been conducting a previously disclosed and unrelated investigation. The Company is continuing to cooperate with the SEC investigation.

89.     On this news, the Company's stock price fell $1.63, or 39.75%, to close at $2.47 per share on October 25, 2024, on unusually heavy trading volume.

90.     On October 31, 2024, Evolv announced that it had terminated Defendant George as President and CEO.

## V.     DEFENDANTS' FALSE AND/OR MISLEADING STATEMENTS AND/OR OMISSIONS

### A.     Effectiveness Of Evolv Express

91.     The Registration Statement stated that Evolv Express "reliably" detects weapons, in relevant part:

Evolv Technologies, Inc. [. . .] is the global leader in AI-based touchless security screening. ***Unlike conventional walk-through metal detectors, our products use advanced sensors, artificial intelligence software, and cloud services to reliably detect guns, improvised explosives, and large knives while ignoring harmless items like phones and keys.*** This not only enhances security at venues and facilities but also improves the visitor experience by making screening up to ten times faster than alternatives at up to 70% lower total cost.

92.    The Registration Statement also stated that Evolv's business "could" be harmed

"if" its products "are perceived to fail to detect threats," stating:

> ***If Evolv's products fail or are perceived to fail to detect threats such as a firearm or other potential weapon or explosive device, or if its products contain undetected errors or defects, these failures or errors could result in injury or loss of life, which could harm its brand and reputation and have an adverse effect on its business and results of operations.***
>
> ***If Evolv's products fail or are perceived to fail to detect and prevent attacks or if its products fail to identify and respond to new and increasingly complex and unpredictable methods of attacks, its business and reputation may suffer.*** There is no guarantee that its products will detect and prevent all attacks, especially in light of the rapidly changing security landscape to which it must respond, as well as unique factors that may be present in its customers' operating environments. Additionally, its products may falsely detect items that do not actually represent threats. These false positives may impair the perceived reliability of its products, and may therefore adversely impact market acceptance of its products, and could result in negative publicity, loss of customers and sales and increased costs to remedy any problem.
>
> Evolv's products, which are complex, may also contain undetected errors or defects when first introduced or as new versions are released. Evolv has experienced these errors or defects in the past in connection with new products and product upgrades. It expects that these errors or defects will be found from time to time in the future in new or enhanced products after commercial release. Defects may result in increased vulnerability to attacks, cause its products to fail to detect security threats, or temporarily interrupt its products' ability to screen visitors in a customer's location. Any errors, defects, disruptions in service or other performance problems with its products may damage its customers' business and could harm its reputation. ***If its products fail to detect security threats for any reason, it may incur significant costs, the attention of its key personnel could be diverted, its customers may delay or withhold payment to us or elect not to renew or cause other significant customer relations problems to arise.***

(First emphasis in original.)

93.    The above statements appeared in substantially the same form in the Company's annual report Form 10-K filed with the SEC on March 28, 2022 (the "2021 10-K"); the Company's annual report Form 10-K filed with the SEC on March 24, 2023 (the "2022 10-K"); and the Company's annual report Form 10-K filed with the SEC on February 29, 2024 (the "2023 10-K").

94.    On July 23, 2021, Defendant George made an appearance on Fox Business, in a video entitled "Evolv Technologies uses AI powered security to detect weapons", which was posted on Fox Business's website. In this interview, Defendant George made the following statement:

> We have the signatures for all the weapons in the world [. . .] we've written the machine learning algorithms *for all the guns, all the bombs, and all the large tactical knives in the world and our sensor system can identify those signatures quickly, send an alert, and will stop it before it gets into the venue.*

95.    On March 23, 2022, Evolv posted a blog post entitled "NCS and Evolv Express", authored by Richard Abraham, the Company's Senior Vice President of Technical Sales and Solutions. This blog post stated, in pertinent part, the following:

**Key Findings:**

*The operational exercise incorporated forty-one functional areas, with Express earning an overall composite score of 2.84.* This score reflects that, on average, Express met the criteria established for this exercise. In fact, overall, Express performed very well. Scores in the categories evaluated during the exercise are presented below. It's important to note that, as a practice, Evolv does not publicly share any details that could compromise our customer's security process. Therefore, specific details such as actual weapon makes and models, images, etc. are not included here, but we do share this sensitive information with our customers privately in a responsible manner.

| Evaluation Category | Score |
|---|---|
| Detection of standardized test pieces defined in applicable standards | 3.0 |
| Detection of ferrous weapons including NILECJ test pieces, actual handguns, handgun components, knives, and pipe materials that could be used for constructing IEDs (cumulative score) | 2.7 |
| Detection of threat objects in small bags (cumulative score) | 3.0 |
| Visual indicators | 3.0 |
| Audible indicators | 2.3 |
| Detection of multiple threats on one person | 3.0 |
| Detection of multiple threats on multiple people | 3.0 |
| Exceeding dual-lane throughput claims of 3600 people per hour | 3.0 |
| Screening patrons at multiple walking speeds (cumulative score) | 2.8 |
| Flow control tablet performance (cumulative score) | 2.8 |
| Remote access capabilities (cumulative score) | 2.9 |
| Dashboard and insight analytic capabilities (cumulative score) | 2.8 |
| User interface indicators (cumulative score) | 3.0 |

*Scores marked as cumulative indicate the average of individual scores within the exercise category.*

\*          \*          \*

The fact is, technology, environmental conditions, architectural structures, conops, and staff training are all important factors that affect screening effectiveness. It's possible to eliminate many or all of the problematic factors in a controlled environment. ***It's not possible to do that in a real-world environment, and that's why I'm so proud of these Express results from NCS***[4].

96.    On March 28, 2022, the Company filed its 2021 10-K, which stated, in relevant part:

Evolv Technologies Holdings, Inc. [. . .] ***is a global leader in Artificial Intelligence ("AI") -based weapons detection for security screening***. Our mission is to make the world a safer and more enjoyable place to work, learn, and play. We are democratizing security by making it seamless for facility operators to address the chronic epidemic of escalating gun violence, mass shootings and terrorist attacks in a cost-effective manner while improving the visitor experience.

Unlike traditional walk-through metal detectors, our touchless security screening solutions use AI software, software as a service ("SaaS") cloud services and advanced sensors to ***reliably detect dangerous weapons while significantly reducing nuisance alarms from harmless personal items.*** This means that visitors can walk through our solution without stopping, without removing items from their pockets or bags, and without having to form a single file line. Our products significantly reduce the number of false positive alarms, allowing security staff to focus their attention on high probability threats.

\*          \*          \*

33

*We are a global leader in AI-based weapons detection for security screening.* Unlike conventional walk-through metal detectors, our products use advanced sensors, artificial intelligence software, and cloud services to *reliably detect guns, improvised explosives, and large knives* while ignoring harmless items like phones and keys. This not only enhances security at venues and facilities but also improves the visitor experience by making screening up to ten times faster than alternatives at up to 70% lower total cost.

97.     The above statement appeared in substantially the same form in the 2022 10-K and 2023 10-K.

98.     On March 31, 2022, Evolv announced receipt of the U.S. Department of Homeland Security SAFETY Act Designation for Evolv Express in a press release that stated, in relevant part:

> Evolv Technology (NASDAQ: EVLV, "Evolv"), the global leader in weapons detection security screening, today announced that Evolv Express®, its artificial intelligence (AI)-based weapons detection system, has been awarded the U.S. Department of Homeland Security (DHS) SAFETY Act Designation as a Qualified Anti-Terrorism Technology (QATT).
>
> Technologies that are awarded the SAFETY Act Designation have undergone rigorous use and review to meet and/or exceed the DHS' performance standards that include examination of test results for weapons detection, operational use and effectiveness, manufacturing and quality assurance practices, and customer feedback.
>
> The Support Anti-Terrorism by Fostering Effective Technologies Act (SAFETY Act) was introduced by Congress in 2002 to incentivize the creation of technologies to combat terrorism in the wake of 9/11. The SAFETY Act is intended to ensure that the threat of liability caused by a terrorist event does not deter manufacturers or sellers of effective anti-terrorism technologies from developing, commercializing and deploying technologies that could potentially save lives. The Acting Under Secretary for Science and Technology is the deciding official for current SAFETY Act applications.
>
> This Designation demonstrates Evolv's belief that the security industry demands a new standard for security screening that can adequately address threats to crowds where people gather without impacting their experience. *The pinpointed accuracy of threats detected, insightful analytics that help improve security operations, and the continual improvements through machine learning are features that set Evolv apart from existing standards.* Evolv Express is the only high-throughput weapons detection screening system to achieve SAFETY Act Designation.

99.    Evolv continued to tout the designation by DHS. For example, the 2022 10-K

stated:

> ***The loss of designation of our Evolv Express system as a Qualified Anti-Terrorism Technology under the Homeland Security SAFETY Act could result in adverse reputational and financial consequences.***
>
> Our Evolv Express system has been awarded the U.S. Department of Homeland Security ("DHS") SAFETY Act Designation as a Qualified Anti-Terrorism Technology. Technologies that are awarded the SAFETY Act Designation have undergone rigorous use and review to meet and/or exceed the DHS' performance standards that include examination of test results for weapons detection, operational use and effectiveness, manufacturing and quality assurance practices, and customer feedback.
>
> Any amendments or interpretive guidance related to the SAFETY Act may affect our ability to retain our SAFETY Act Designation, may increase the costs of compliance, and/or may negatively impact our ability to attract new customers. Because we view our SAFETY Act Designation as a differentiating factor among our industry peers, if laws and regulations change relating to the SAFETY Act or if we fail to comply with the SAFETY Act's requirements, our business, financial condition, results of operations, and stock price could be materially and adversely affected.

100.    The above statement in the 2022 10-K appeared in substantially the same form in

the 2023 10-K.

101.    The above statements were materially false and/or misleading, and failed to

disclose material adverse facts about the Company's business, operations, and prospects.

Specifically, Defendants failed to disclose to investors: (1) that Evolv Express failed to accurately

detect large knives and other weapons; (2) that, as a result, the effectiveness of Evolv Express was

overstated; and (3) that, as a result of the foregoing, Defendants' positive statements about the

Company's business, operations, and prospects were materially false and/or misleading and/or

lacked a reasonable basis.

B.    Sales And Marketing

102.    The Registration Statement warned that Evolv's success depended on the "reliable performance" of Evolv Express, stating in relevant part:

> ***Evolv's brand, reputation and ability to attract, retain and serve its customers are dependent in part upon the reliable performance of its products and infrastructure.***
>
> Evolv's brand, reputation and ability to attract, retain and serve its customers are dependent in part upon the reliable performance of, and the ability of its existing customers and new customers to access and use, its solutions, including real-time analytics and intelligence. Evolv has experienced, and may in the future experience, disruptions, outages and other performance problems due to a variety of factors, including infrastructure changes, equipment failure, human or software errors, capacity constraints, and fraud or cybersecurity attacks. In some instances, it may not be able to identify the cause or causes of these performance problems within an acceptable period of time.
>
> Interruptions in its systems or the third-party systems on which it relies, whether due to system failures, computer viruses, physical or electronic break-ins, or other factors, could affect the security or availability of its products, network infrastructure, cloud infrastructure and website.
>
> ***Problems with the reliability or security of its systems could harm its reputation. Damage to its reputation and the cost of remedying these problems could negatively affect its business, financial condition and operating results.*** Additionally, its third-party hosting suppliers have no obligations to renew their agreements with us on commercially reasonable terms or at all, and certain of the agreements governing these relationships may be terminated by either party at any time. If Evolv is unable to maintain, renew, or expand its agreements with these providers on commercially reasonable terms, it may experience costs or downtime as it transitions its operations.
>
> Any disruptions or other performance problems with its products could harm its reputation and business and may damage its customers' businesses. Interruptions in its service delivery might reduce its revenue, cause us to issue credits to customers, subject us to potential liability and cause customers not to renew their subscription purchases of its products.

(First emphasis in original.)

103.    The above statement appeared in substantially the same form in the 2021 10-K, 2022 10-K, and 2023 10-K. The above statements were materially false and/or misleading, and

failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors: (1) that Evolv Express failed to accurately detect large knives and other weapons; (2) that, as a result, the effectiveness of Evolv Express was overstated; (3) that, as a result, the risk to Evolv's reputation and success had already materialized; and (4) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially false and/or misleading and/or lacked a reasonable basis.

### C.    Revenue Recognition Policy

104.    For revenue recognition, the Registration Statement stated, in relevant part:

**Revenue Recognition**

***The Company recognizes revenue in accordance with ASC 606.*** We derive revenue primarily from the sale of our products, subscriptions, maintenance, and services to customers.

In addition to selling its products directly to customers, Evolv enters into leasing arrangements ("subscriptions") and maintenance contracts with customers. Lease terms are typically four years. Both subscription revenue and maintenance are recognized ratably over the period of the arrangement.

We also provide installation and training services for our products. Revenue is recognized upon the completion of these services.

105.    The 2021 10-K stated that Evolv recognized revenue pursuant to ASC 606, except as to subscriptions which were accounted under ASC 840, and that the revenue recognition for sales directly or through channel partners was the same. Specifically, the 2021 10-K stated, in relevant part:

The Company recognizes revenue in accordance with *Accounting Standards Codification 606 – Revenue from Contracts with Customers* ("ASC 606"). Under ASC 606, revenue is recognized when a customer obtains control of promised goods or services, in an amount that reflects the consideration which the entity expects to receive in exchange for those goods or services. In order to achieve this core principle, the Company applies the following five steps when recording revenue: (1) identify the contract, or contracts, with the customer, (2) identify the

performance obligations in the contract, (3) determine the transaction price, (4) allocate the transaction price to the performance obligations in the contract and (5) recognize revenue when, or as, performance obligations are satisfied.

The Company derives revenue from (1) subscription arrangements accounted for as operating leases under ASC 840 and (2) from the sale of products, inclusive of SaaS and maintenance and (3) professional services. The Company's arrangements are generally noncancelable and nonrefundable after ownership passes to the customer. Revenue is recognized net of sales tax.

*      *      *

*Revenue from Channel Partners*

A portion of our revenue is generated by sales in conjunction with our channel partners. When we transact with a channel partner, our contractual arrangement is with the channel partner and not with the end-use customer. Whether we transact with a channel partner and receive the order from a channel partner or directly from an end-use customer, our revenue recognition policy and resulting pattern of revenue recognition is the same.

106.    The 2022 10-K stated that Evolv recognized revenue pursuant to ASC 606, except as to subscriptions which were accounted under ASC 842, and that the revenue recognition for sales directly or through channel partners was the same. Specifically, the 2022 10-K stated, in relevant part:

The Company recognizes revenue in accordance with Accounting Standards Codification 606 – *Revenue from Contracts with Customers (*"ASC 606"). Under ASC 606, revenue is recognized when a customer obtains control of promised goods or services, in an amount that reflects the consideration which the entity expects to receive in exchange for those goods or services. In order to achieve this core principle, the Company applies the following five steps when recording revenue: (1) identify the contract, or contracts, with the customer, (2) identify the performance obligations in the contract, (3) determine the transaction price, (4) allocate the transaction price to the performance obligations in the contract and (5) recognize revenue when, or as, performance obligations are satisfied.

The Company derives revenue from (1) subscription arrangements accounted for as operating leases under ASC 842 (and ASC 840, *Leases ("ASC 840")* prior to the adoption of ASC 842) and (2) from the sale of products, inclusive of SaaS and maintenance and (3) professional services. The Company's arrangements are generally noncancelable and nonrefundable after ownership passes to the customer. Revenue is recognized net of sales tax.

38

*      *      *

*Revenue from Channel Partners*

A portion of our revenue is generated by sales in conjunction with our channel partners. When we transact with a channel partner, our contractual arrangement is with the channel partner and not with the end-use customer. Whether we transact with a channel partner and receive the order from a channel partner or directly from an end-use customer, our revenue recognition policy and resulting pattern of revenue recognition is the same.

107.    The above statement regarding Evolv's revenue recognition policy appeared in substantially the same form in the 2023 10-K.

108.    The above statements were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors: (1) that the Company used extra-contractual terms and conditions in certain of its arrangements with customers and channel partners; (2) that these extra-contractual terms were not shared with accounting personnel and its outside auditor; (3) that, as a result, these extra-contractual terms and conditions were not accounted in accordance with GAAP; and (4) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially false and/or misleading and/or lacked a reasonable basis.

### D.    Financial Results

109.    For revenue in fiscal 2020, the Registration Statement stated,

***Revenue, Cost of Revenue and Gross Profit***

*Product*

Product revenue was $1.3 million for the year ended December 31, 2020, compared to $4.2 million for the year ended December 31, 2019. Cost of product revenue was $1.2 million for the year ended December 31, 2020, compared to $4.2 million for the year ended December 31, 2019. The decrease of $2.9 million in revenue and decrease of $3.1 million in cost of revenue was primarily due to a shift from direct

39

product sales of Evolv Edge product to subscription based sales of our Evolv Express. . . .

*Subscription*

Subscription revenue was $2.6 million for the year ended December 31, 2020, compared to $1.1 million for the year ended December 31, 2019. Cost of subscription revenue was $1.8 million for the year ended December 31, 2020, compared to $0.5 million for the year ended December 31, 2019. The increase of $1.5 million in revenue and increase of $1.3 million in cost of revenue was primarily due to a shift from direct product sales of Evolv Edge product to subscription based sales of our Evolv Express. . . .

*Service*

Service revenue was $0.9 million for the year ended December 31, 2020, compared to $0.6 million for the year ended December 31, 2019. Cost of service revenue was $0.5 million for each of the years ended December 31, 2020 and 2019. The increase of $0.3 million in revenue was primarily due to increased installation and training related to the Evolv Express product. . . .

110. On August 16, 2021, Evolv announced its second quarter 2021 financial results in a press release that stated, in relevant part: "Total revenue for the second quarter of 2021 was $4.5 million, an increase of 590% compared to $0.6 million for the second quarter of 2020. Total Contract Value ("TCV") of orders booked for the second quarter of 2021 was $10.9 million, an increase of 361% compared to $2.6 million in the second quarter of 2020."

111. On November 10, 2021, Evolv announced its third quarter 2021 financial results in a press release that stated, in relevant part: "Total revenue for the third quarter of 2021 was $8.4 million, an increase of 473% compared to $1.5 million for the third quarter of 2020. Total Contract Value ("TCV") of orders booked for the third quarter of 2021 was $16.9 million, an increase of 365% compared to $3.6 million in the third quarter of 2020."

112. On March 14, 2022, the Company announced its fourth quarter and full year 2022 financial results in a press release that stated, in relevant part:

Total revenue for the fourth quarter of 2021 was $6.8 million, an increase of 236% compared to $2.0 million for the fourth quarter of 2020. Total Contract Value

40

("TCV")[] of orders booked for the fourth quarter of 2021 was $17.9 million, an increase of 201% compared to $6.0 million in the fourth quarter of 2020. Annual Recurring Revenue ("ARR")[] was $12.9 million at the end of fourth quarter of 2021, an increase of 220% compared to $4.0 million in the fourth quarter of 2020.

(Footnotes omitted.)

113.    On May 11, 2022, Evolv announced its first quarter 2022 financial results in a press release that stated, in relevant part:

Total revenue for the first quarter of 2022 was $8.7 million, an increase of 118% compared to $4.0 million for the first quarter of 2021. Total Contract Value ("TCV")[] of orders booked for the first quarter of 2022 was $19.2 million, an increase of 128% compared to $8.4 million in the first quarter of 2021. Annual Recurring Revenue ("ARR")[] was $16.6 million at the end of first quarter of 2022, an increase of 207% compared to $5.4 million in the first quarter of 2021.

(Footnotes omitted.)

114.    On May 13, 2022, Evolv filed its Form 10-Q for the period ended March 31, 2022 (the "1Q22 10-Q"), affirming the previously reported financial results. It also stated the following regarding its significant accounting policies, which had not materially changed since the 2021 10-K except as to leasing arrangements.

115.    On August 10, 2022, the Company announced its second quarter 2022 financial results in a press release that stated, in relevant part:

Total revenue for the second quarter of 2022 was $9.1 million, an increase of 94% compared to $4.7 million for the second quarter of 2021. Total Contract Value ("TCV")[] of orders booked for the second quarter of 2022 was $22.1 million, an increase of 111% compared to $10.5 million in the second quarter of 2021. Annual Recurring Revenue ("ARR")[] was $20.9 million at the end of second quarter of 2022, an increase of 181% compared to $7.4 million at the end of the second quarter of 2021. Net loss for the second quarter of 2022 was $(25.7) million, or $(0.18) per basic and diluted share, compared to net loss of $(23.0) million, or $(1.93) per basic and diluted share, in the second quarter of 2021. Adjusted earnings (loss)[] for the second quarter of 2022 was $(17.3) million, or $(0.12) per basic and diluted share, compared to $(9.1) million, or $(0.76) per basic and diluted share, for the second quarter of 2021. Adjusted EBITDA4 for the second quarter of 2022 was $(16.4) million compared to $(5.2) million in the second quarter of 2021.

116.    On August 18, 2022, the Company filed its Form 10-Q for the period ended June 30, 2022 (the "2Q22 10-Q"), affirming the previously reported financial results. Specifically, it provided the following table of disaggregated revenue:

| | | Three Months Ended June 30, | | | Six Months Ended June 30, | |
| | | 2022 | 2021 | | 2022 | 2021 |
|---|---|---|---|---|---|---|
| Product revenue | $ | 4,146 | $ 2,617 | $ | 9,340 | $ 4,884 |
| Leased equipment | | 4,006 | 1,521 | | 7,010 | 2,748 |
| SaaS and Maintenance revenue | | 729 | 230 | | 1,097 | 362 |
| Professional services revenue | | 189 | 310 | | 333 | 377 |
| Total revenue | $ | 9,070 | $ 4,678 | $ | 17,780 | $ 8,371 |

117.    On November 9, 2022, Evolv announced its third quarter 2022 financial results in a press release that stated, in relevant part:

> Total revenue for the third quarter of 2022 was $16.5 million, an increase of 96% compared to $8.4 million for the third quarter of 2021. Total Contract Value ("TCV")[] of orders booked for the third quarter of 2022 was $45.4 million, an increase of 167% compared to $17.0 million in the third quarter of 2021. Annual Recurring Revenue ("ARR")[] was $28.7 million at the end of third quarter of 2022, an increase of 189% compared to $9.9 million at the end of the third quarter of 2021. Net loss for the third quarter of 2022 was $(18.6) million, or $(0.13) per basic and diluted share, compared to net income attributable to common stockholders for basic and diluted shares of $20.8 million and $21.3 million, respectively, or $0.17 per basic share and $0.14 per diluted share, in the third quarter of 2021. Adjusted earnings (loss)[] for the third quarter of 2022 was $(18.6) million, or $(0.13) per diluted share, compared to adjusted earnings (loss)[] of $(12.9) million, or $(0.08) per diluted share, for the third quarter of 2021. Adjusted EBITDA[] for the third quarter of 2022 was $(18.0) million compared to $(11.5) million in the third quarter of 2021.

118.    Also on November 9, 2022, Evolv filed its Form 10-Q for the period ended September 30, 2022 (the "3Q22 10-Q"), affirming the previously reported financial results. Specifically, it provided the following table of disaggregated revenue:

|                                           |    | Three Months Ended September 30, |    |       |    | Nine Months Ended September 30, |    |        |
|-------------------------------------------|----|-------|----|-------|----|--------|----|--------|
|                                           |    | 2022  |    | 2021  |    | 2022   |    | 2021   |
| Product revenue                           | $  | 9,839 | $  | 5,395 | $  | 19,179 | $  | 10,279 |
| Leased equipment                          |    | 5,198 |    | 2,312 |    | 12,208 |    | 5,060  |
| SaaS and Maintenance revenue              |    | 1,180 |    | 300   |    | 2,277  |    | 662    |
| Professional services and other revenue   |    | 313   |    | 417   |    | 646    |    | 794    |
| Total revenue                             | $  | 16,530| $  | 8,424 | $  | 34,310 | $  | 16,795 |

119.    On March 1, 2023, Evolv announced its fourth quarter and full year 2022 financial

results in a press release that stated, in relevant part:

**Results for the Fourth Quarter of 2022**

Total revenue for the three months ended December 31, 2022 was $20.9 million, an increase of 217% compared to $6.6 million for the three months ended December 31, 2021. Total Contract Value ("TCV")[] of orders booked for the three months ended December 31, 2022 was $57.6 million, an increase of 222% compared to $17.9 million in the three months ended December 31, 2021. Annual Recurring Revenue ("ARR")[] was $34.1 million as of December 31, 2022, an increase of 164% compared to $12.9 million as of December 31, 2021. Net loss for the three months ended December 31, 2022 was $(28.1) million, or $(0.19) per basic and diluted share, compared to net income of $4.8 million or $0.03 per basic and diluted share in the three months ended December 31, 2021. Adjusted earnings (loss)[] for the three months ended December 31, 2022 was $(18.1) million, or $(0.12) per diluted share, compared to adjusted earnings (loss)[] of $(16.3) million, or $(0.10) per diluted share, for three months ended December 31, 2021. Adjusted EBITDA[] for the three months ended December 31, 2022 was $(17.8) million compared to $(15.2) million in the three months ended December 31, 2021.

**Results for 2022**

Total revenue in 2022 was $55.2 million, an increase of 136% compared to $23.4 million in 2021. TCV[] of orders booked in 2022 was $144.1 million, an increase of 168% compared to $53.8 million in 2021. Net loss in 2022 was $(86.2) million, or $(0.60) per basic and diluted share, compared to net loss of $(10.9) million, or $(0.15) per basic and diluted share, in 2021. Adjusted earnings (loss)[] in 2022 was $(72.4) million, or $(0.50) per diluted share, compared to $(49.8) million, or $(0.69) per diluted share, in 2021. Adjusted EBITDA[] in 2022 was $(69.4) million, compared to $(40.2) million in 2021.

120.    On March 24, 2023, Evolv filed its Form 10-K for the period ended December 31, 2022 (the "2022 10-K"), affirming the previously announced financial results. Specifically, it provided the following table of disaggregated revenue:

| | | Twelve Months Ended December 31, | |
|---|---|---|---|
| | | 2022 | 2021 |
| Product revenue | $ | 31,985 | $  13,631 |
| Leased equipment | | 17,569 | 7,803 |
| SaaS, maintenance, and other revenue | | 4,665 | 846 |
| Professional services | | 976 | 1,113 |
| Total revenue | $ | 55,195 | $  23,393 |

121.    On May 10, 2023, Evolv announced its first quarter 2023 financial results in a press release that stated, in relevant part:

**Results for the First Quarter of 2023**

Total revenue for the first quarter of 2023 was $18.6 million, an increase of 113% compared to $8.7 million for the first quarter of 2022. Annual Recurring Revenue ("ARR")[] was $42.0 million at the end of first quarter of 2023, an increase of 153% compared to $16.6 million at the end of the first quarter of 2022. Net loss for the first quarter of 2023 was $(28.6) million, or $(0.20) per basic and diluted share, compared to net loss of $(13.8) million, or $(0.10) per basic and diluted share, in the first quarter of 2022. Adjusted earnings (loss)[] for the first quarter of 2023 was $(16.9) million, or $(0.12) per diluted share, compared to adjusted earnings (loss)[] of $(18.5) million, or $(0.13) per diluted share, for the first quarter of 2022. Adjusted EBITDA[] for the first quarter of 2023 was $(15.4) million compared to $(17.3) million in the first quarter of 2022. Cash and cash equivalents as of March 31, 2023 was $182 million which reflected the Company's decision to pay off its $30 million debt facility during the first quarter of 2023. The Company had no debt as of March 31, 2023.

The following table summarizes the breakdown of recurring and non-recurring revenue[] during each quarter:

|  | Three Months Ended March 31, | | |
| --- | --- | --- | --- |
|  | 2023 | 2022 | % Change |
| Recurring revenue | $ 9,075 | $ 3,159 | 187 % |
| Non-recurring revenue | 9,506 | 5,551 | 71 % |
| Total revenue | $ 18,581 | $ 8,710 | 113 % |

122.    On May 10, 2023, the Company filed its Form 10-Q for the period ended March 31, 2023 (the "1Q23 10-Q"), affirming the previously reported financial results. Specifically, it provided the following table of disaggregated revenue results:

|  | Three Months Ended March 31, | | |
| --- | --- | --- | --- |
|  | 2023 | 2022 | |
| Product revenue | $ 8,754 | $ 5,194 | |
| Leased equipment | 6,466 | 3,004 | |
| SaaS, maintenance, and other revenue | 2,778 | 368 | |
| Professional services | 583 | 144 | |
| Total revenue | $ 18,581 | $ 8,710 | |

123.    On August 10, 2023, Evolv announced its second quarter 2023 financial results in a press release that stated, in relevant part:

**Results for the Second Quarter of 2023**

Total revenue for the second quarter of 2023 was $19.8 million, an increase of 119% compared to $9.1 million for the second quarter of 2022. Annual Recurring Revenue ("ARR")[] was $54.3 million at the end of second quarter of 2023, an increase of 160% compared to $20.9 million at the end of the second quarter of 2022. Net loss for the second quarter of 2023 was $(66.8) million, or $(0.45) per basic and diluted share, compared to net loss of $(25.7) million, or $(0.18) per basic and diluted share, in the second quarter of 2022. Adjusted earnings (loss)3 for the second quarter of 2023 was $(14.3) million, or $(0.10) per diluted share, compared to adjusted earnings (loss)[] of $(17.3) million, or $(0.12) per diluted share, for the second quarter of 2022. Adjusted EBITDA[] for the second quarter of 2023 was $(13.8) million compared to $(16.4) million in the second quarter of 2022. As of June 30, 2023, the Company had cash, cash equivalents, and restricted cash of $156.8 million and no debt.

*        *        *

45

|  | Three Months Ended June 30, | | |
|---|---|---|---|
|  | 2023 | 2022 | % Change |
| Recurring revenue | $ 11,689 | $ 4,604 | 154 % |
| Non-recurring revenue | 8,136 | 4,466 | 82 % |
| Total revenue | $ 19,825 | $ 9,070 | 119 % |

124.    On August 10, 2023, the Company filed its Form 10-Q for the period ended June 30, 2023 (the "2Q23 10-Q"), affirming the previously reported financial results. Specifically, it provided the following table of disaggregated revenue results:

|  | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
|  | 2023 | 2022 | 2023 | 2022 |
| Product revenue | $ 7,243 | $ 4,146 | $ 15,997 | $ 9,340 |
| Leased equipment | 7,964 | 4,006 | 14,430 | 7,010 |
| SaaS, maintenance, and other revenue | 4,121 | 729 | 6,899 | 1,097 |
| Professional services | 497 | 189 | 1,080 | 333 |
| Total revenue | $ 19,825 | $ 9,070 | $ 38,406 | $ 17,780 |

125.    On October 12, 2023, Evolv announced its preliminary third quarter 2023 financial results in a press release that stated, in relevant part:

> Based on preliminary third quarter estimates which are subject to change, the Company currently expects:
>
> ·    Total revenues to range between $19.3 million to $19.8 million
>
> ·    Q3 ending ARR[] to range between $65.5 million to $66.0 million
>
> ·    Q3 net additions to range between 620 to 625
>
> ·    Gross margin to range between 56% to 57%
>
> ·    Adjusted[] gross margin to range between 57% to 58%
>
> ·    Approximately 30% of net additions in the quarter to be via the new distribution model announced in Q2'23
>
> ·    Approximately 70 new customers added across multiple end markets including education, healthcare, professional sports, tourist attractions and industrial workplaces.

46

126.    On November 9, 2023, Evolv announced its third quarter 2023 financial results in a press release that stated, in relevant part:

**Results for the Third Quarter of 2023**

Total revenue for the third quarter of 2023 was $20.2 million, an increase of 22% compared to $16.5 million for the third quarter of 2022. Annual Recurring Revenue ("ARR")[] was $65.8 million at the end of third quarter of 2023, an increase of 129% compared to $28.7 million at the end of the third quarter of 2022. Net income for the third quarter of 2023 was $6.0 million, or $0.04 per basic share and $0.03 per diluted share, compared to net loss of $(18.6) million, or $(0.13) per basic and diluted share, in the third quarter of 2022. Adjusted earnings (loss)[] for the third quarter of 2023 was $(12.0) million, or $(0.08) per diluted share, compared to adjusted earnings (loss)3 of $(18.6) million, or $(0.13) per diluted share, for the third quarter of 2022. Adjusted EBITDA[] for the third quarter of 2023 was $(11.1) million compared to $(18.0) million in the third quarter of 2022. As of September 30, 2023, the Company had cash, cash equivalents, marketable securities, and restricted cash of $140.4 million and no debt.

*        *        *

| | Three Months Ended September 30, | | |
|---|---|---|---|
| | 2023 | 2022 | % Change |
| Recurring revenue | $          14,377 | $          6,221 | 131 % |
| Non-recurring revenue | 5,814 | 10,309 | (44)% |
| Total revenue | $          20,191 | $          16,530 | 22 % |

127.    On November 9, 2023, Evolv filed its Form 10-Q for the period ended September 30, 2023 (the "3Q23 10-Q"), affirming the previously reported financial results. Specifically, it provided the following table of disaggregated revenue results:

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2023 | 2022 | 2023 | 2022 |
| Product revenue | $ 3,191 | $ 9,839 | $ 19,188 | $ 19,179 |
| Leased equipment | 10,231 | 5,198 | 24,661 | 12,208 |
| SaaS, maintenance, and other revenue | 4,397 | 1,180 | 11,296 | 2,277 |
| Professional services | 360 | 313 | 1,440 | 646 |
| License fee and other revenue | 2,012 | — | 2,012 | — |
| Total revenue | $ 20,191 | $ 16,530 | $ 58,597 | $ 34,310 |

128.    On February 29, 2024, the Company announced its fourth quarter and full year 2023 financial results in a press release that stated, in relevant part:

**Results for the Fourth Quarter of 2023**

Total revenue for the fourth quarter of 2023 was $21.8 million, an increase of 4% compared to $20.9 million for the fourth quarter of 2022. Annual Recurring Revenue ("ARR")1 was $75.0 million at the end of fourth quarter of 2023, an increase of 120% compared to $34.1 million at the end of fourth quarter of 2022. Net loss for the fourth quarter of 2023 was $(16.9) million, or $(0.11) per basic and diluted share, compared to net loss of $(28.3) million or $(0.20) per basic and diluted share in the fourth quarter of 2022. Adjusted net loss3 for the fourth quarter of 2023 was $(11.0) million, or $(0.07) per diluted share, compared to adjusted loss3 of $(18.3) million, or $(0.13) per diluted share, for the fourth quarter of 2022. Adjusted EBITDA3 for the fourth quarter of 2023 was $(9.5) million compared to $(18.0) million in the fourth quarter of 2022. As of December 31, 2023, the Company had cash, cash equivalents, marketable securities, and restricted cash of $118.7 million and no debt.

**Results for 2023**

Total revenue in 2023 was $80.4 million, an increase of 46% compared to $55.2 million in 2022. Net loss in 2023 was $(106.3) million, or $(0.71) per basic and diluted share, compared to net loss of $(86.4) million, or $(0.60) per basic and diluted share, in 2022. Adjusted net loss3 in 2023 was $(54.2) million, or $(0.36) per diluted share, compared to $(72.7) million, or $(0.51) per diluted share, in 2022. Adjusted EBITDA3 in 2023 was $(49.8) million, compared to $(69.7) million in 2022.

| | Three Months Ended December 31, | | | Twelve Months Ended December 31, | | |
|---|---|---|---|---|---|---|
| | 2023 | 2022 | % Change | 2023 | 2022 | % Change |
| Recurring revenue | $ 17,350 | $ 7,388 | 135 % | $ 52,491 | $ 21,372 | 146 % |
| Non-recurring revenue | 4,471 | 13,497 | (67)% | 27,927 | 33,823 | (17)% |
| Total revenue | $ 21,821 | $ 20,885 | 4 % | $ 80,418 | $ 55,195 | 46 % |

129. On February 29, 2024, Evolv filed its Form 10-K for the period ended December 31, 2023 (the "2023 10-K"), affirming the previously reported financial results. Specifically, it provided the following table of disaggregated revenue results:

| | Twelve Months Ended December 31, | |
|---|---|---|
| | 2023 | 2022 |
| Product revenue | $ 21,977 | $ 31,985 |
| Leased equipment | 37,247 | 17,569 |
| Service revenue | 16,141 | 4,331 |
| License fees | 2,963 | — |
| Professional services and other revenue | 2,090 | 1,310 |
| Total revenue | $ 80,418 | $ 55,195 |

130. On May 9, 2024, the Company announced its first quarter 2024 financial results in a press release that stated, in relevant part:

**Results for the First Quarter of 2024**

Total revenue for the first quarter of 2024 was $21.7 million, an increase of 17% compared to $18.6 million for the first quarter of 2023. Annual Recurring Revenue ("ARR")[] was $82.5 million at the end of first quarter of 2024, an increase of 96% compared to $42.0 million at the end of the first quarter of 2023. Net loss for the first quarter of 2024 was $(11.6) million, or $(0.08) per basic and diluted share, compared to $(28.6) million, or $(0.20) per basic and diluted share, in the first quarter of 2023. Adjusted earnings (loss)[] for the first quarter of 2024 was $(13.1) million, or $(0.09) per diluted share, compared to adjusted earnings (loss)3 of $(16.9) million, or $(0.12) per diluted share, for the first quarter of 2023. Adjusted EBITDA[] for the first quarter of 2024 was $(10.7) million compared to $(15.4) million in the first quarter of 2023. As of March 31, 2024, the Company had cash, cash equivalents, marketable securities, and restricted cash of $81.3 million and no debt.

The following table summarizes the breakdown of recurring and non-recurring revenue[] for each period presented:

| | Three Months Ended March 31, | | |
| | 2024 | 2023 | % Change |
|---|---|---|---|
| Recurring revenue | $ 19,381 | $ 9,075 | 114 % |
| Non-recurring revenue | 2,287 | 9,506 | (76)% |
| Total revenue | $ 21,668 | $ 18,581 | 17 % |

131.    On May 9, 2024, the Company filed its Form 10-Q for the period ended March 31, 2024 (the "1Q24 10-Q"), affirming the previously reported financial results. Specifically, it provided the following table of disaggregated revenue results:

| | Three Months Ended March 31, | |
| | 2024 | 2023 |
|---|---|---|
| Product revenue | $ 603 | $ 8,754 |
| Subscription revenue | 14,503 | 6,466 |
| Service revenue | 5,384 | 2,786 |
| License fees | 724 | — |
| Professional services and other revenue | 454 | 575 |
| Total revenue | $ 21,668 | $ 18,581 |

132.    On August 8, 2024, Evolv announced its second quarter 2024 financial results in a press release that stated, in relevant part:

**Results for the Second Quarter of 2024**

Total revenue for the second quarter of 2024 was $25.5 million, an increase of 29% compared to $19.8 million for the second quarter of 2023. Annual Recurring Revenue ("ARR")[] was $88.9 million at the end of second quarter of 2024, an increase of 64% compared to $54.3 million at the end of the second quarter of 2023. Net income for the second quarter of 2024 was $3.5 million, or $0.02 per basic and diluted share, compared to net loss of $(66.8) million, or $(0.45) per basic and diluted share, in the second quarter of 2023. Adjusted earnings (loss)[] for the second quarter of 2024 was $(11.1) million, or $(0.06) per diluted share, compared to adjusted earnings (loss)[] of $(14.3) million, or $(0.10) per diluted share, for the second quarter of 2023. Adjusted EBITDA[] for the second quarter of 2024 was

$(7.9) million compared to $(13.8) million in the second quarter of 2023. As of June 30, 2024, the Company had cash, cash equivalents, marketable securities, and restricted cash of $56.7 million and no debt.

*  *  *

| | Three Months Ended June 30, | | | Six Months Ended June 30, | | |
|---|---|---|---|---|---|---|
| | 2024 | 2023 | % Change | 2024 | 2023 | % Change |
| Recurring revenue | $ 21,249 | $ 11,689 | 82 % | $ 40,630 | $ 20,764 | 96 % |
| Non-recurring revenue | 4,291 | 8,136 | (47)% | 6,578 | 17,642 | (63)% |
| Total revenue | 25,540 | $ 19,825 | 29 % | $ 47,208 | $ 38,406 | 23 % |

133.    On August 8, 2024, Evolv filed its Form 10-Q for the period ended June 30, 2024 (the "2Q24 10-Q"), affirming the previously reported financial results. Specifically, it provided the following table of disaggregated revenue results:

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2024 | 2023 | 2024 | 2023 |
| Product revenue | $ 2,044 | $ 7,243 | $ 2,647 | $ 15,997 |
| Subscription revenue | 15,903 | 7,964 | 30,406 | 14,430 |
| Service revenue | 5,553 | 3,905 | 10,937 | 6,691 |
| License fees | 1,717 | — | 2,441 | — |
| Professional services and other revenue | 323 | 713 | 777 | 1,288 |
| Total revenue | $ 25,540 | $ 19,825 | $ 47,208 | $ 38,406 |

134.    The above statements were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors: (1) that the Company used extra-contractual terms and conditions in certain of its arrangements with customers and channel partners; (2) that these extra-contractual terms were not shared with accounting personnel and its outside auditor; (3) that, as a result, these extra-contractual terms and conditions were not accounted in accordance with GAAP; (4) that, as a result, Evolv's revenue and other financial

51

items that are a function of revenue were overstated; and (5) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially false and/or misleading and/or lacked a reasonable basis.

E.    **Internal Control Over Financial Reporting**

135.    As to the effectiveness of internal control over financial reporting, the Registration Statement stated, in relevant part:

> In the course of preparing the financial statements that are included in this proxy statement/prospectus, management has determined that we have material weaknesses in our internal control over financial reporting. These material weaknesses primarily pertain to maintaining effective segregation of duties, timely reconciliation, analysis of certain complex, non routine transactions, maintaining effective controls over information technology general controls for systems that are relevant to the preparing of financial statements and the ability to produce financial statements on a public company timeline. We have concluded that these material weaknesses in our internal control over financial reporting occurred because, prior to this offering, we were a private company and did not have the necessary business processes, personnel and related internal controls to operate in a manner to satisfy the accounting and financial reporting timeline requirements of a public company.

136.    On November 15, 2021, Evolv filed its Form 10-Q for the period ended September 30, 2021 (the "3Q21 10-Q"). The 3Q21 10-Q stated, in relevant part:

> We identified the following material weaknesses in our internal control over financial reporting as of December 31, 2020 that continue to exist as of September 30, 2021:
>
> ● We did not design and maintain an effective control environment commensurate with our financial reporting requirements. Specifically, we lacked a sufficient complement of personnel with an appropriate level of internal controls and accounting knowledge, training and experience commensurate with our financial reporting requirements. Additionally, the limited personnel resulted in our inability to consistently establish appropriate authorities and responsibilities in pursuit of our financial reporting objectives, as demonstrated by, among other things, insufficient segregation of duties in our finance and accounting function. This material weakness contributed to the following material weaknesses.
>
> ● We did not design and maintain effective controls over the period-end financial reporting process to achieve complete, accurate and timely financial accounting, reporting and disclosures, including the classification of various accounts in the financial statements.

● We did not design and maintain processes and controls to analyze, account for and disclose non-routine, unusual or complex transactions. Specifically, we did not design and maintain controls to timely analyze and account for debt modifications and extinguishments, convertible notes, warrant instruments, and non-routine complex revenue transactions including the leasing of products.

● We did not design and maintain formal accounting policies, procedures and controls to achieve complete, accurate and timely financial accounting, reporting and disclosures, including segregation of duties and controls over the preparation and review of account reconciliations and journal entries.

These material weaknesses resulted in audit adjustments in historical Evolv financial statements to accounts payable and accrued liabilities, long-term and short-term debt, convertible notes, equity, commission assets, revenue, deferred revenue and various expense line items and related financial statement disclosures, which were recorded prior to the issuance of our consolidated financial statements as of and for the years ended December 31, 2019 and 2020. The material weakness related to accounting for warrant instruments resulted in the restatement of the previously issued financial statements of the entity acquired as part of the July 16, 2021 Merger Agreement related to warrant liabilities and equity. Additionally, these material weaknesses could result in a misstatement of substantially all of our accounts or disclosures that would result in a material misstatement to the annual or interim consolidated financial statements that would not be prevented or detected.

● We did not design and maintain effective controls over information technology ("IT") general controls for information systems that are relevant to the preparation of our financial statements, specifically, with respect to: (i) program change management controls for financial systems to ensure that IT program and data changes affecting financial IT applications and underlying accounting records are identified, tested, authorized and implemented appropriately; (ii) user access controls to ensure appropriate segregation of duties and that adequately restrict user and privileged access to financial applications, programs, and data to appropriate company personnel; (iii) computer operations controls to ensure that critical batch jobs are monitored and data backups are authorized and monitored; and (iv) testing and approval controls for program development to ensure that new software development is aligned with business and IT requirements. These IT deficiencies did not result in a misstatement to the financial statements, however, the deficiencies, when aggregated, could impact maintaining effective segregation of duties, as well as the effectiveness of IT-dependent controls (such as automated controls that address the risk of material misstatement to one or more assertions, along with the IT controls and underlying data that support the effectiveness of system-generated data and reports) that could result in misstatements potentially impacting all financial statement accounts and disclosures that would not be prevented or detected. Accordingly, management has determined these deficiencies in the aggregate constitute a material weakness.

137.    The 3Q21 10-Q claimed that Evolv was taking steps to remediate the material weaknesses. Specifically, it stated:

We are in the process of designing and implementing controls and taking other actions to remediate the material weaknesses in internal control over financial reporting, including the following:

●    We are in the process of hiring additional accounting and IT personnel, to bolster our reporting, technical accounting and IT capabilities. Additionally, we are in the process of designing and implementing controls to formalize roles and review responsibilities to align with our team's skills and experience and designing and implementing controls over segregation of duties. During the three months ended September 30, 2021, we hired a new Vice President of Finance, Controller with an appropriate level of experience and reallocated responsibilities within the accounting organization.

●    We are in the process of designing and implementing controls related to the period-end financial reporting process and controls over the classification of various accounts in our financial statements.

●    We are in the process of designing and implementing controls to timely identify and account for non-routine, unusual or complex transactions, including controls over the preparation and review of accounting memoranda addressing these matters.

●    We are in the process of designing and maintaining formal accounting policies, procedures and controls to achieve complete, accurate and timely financial accounting, reporting and disclosures, including controls over the preparation and review of account reconciliations and journal entries.

●    We are in the process of designing and implementing information technology general controls, including controls over program change management, the review and update of user access rights and privileges, controls over batch jobs and data backups, and program development approvals and testing. During the three months ended September 30, 2021, we engaged outside consultants to assist us in the evaluation and implementation of a new Enterprise Resource Planning ("ERP") system.

As we continue to evaluate our internal control over financial reporting, we may take additional actions to address material weaknesses or modify the remediation actions described above.

While we continue to devote significant time and attention to these efforts, the material weaknesses will not be considered remediated until management completes the design and implementation of the actions described above and the

controls operate for a sufficient period of time, and management has concluded, through testing, that these controls are effective.

138.    Similarly, the 2021 10-K stated, in relevant part:

We did not design and maintain an effective control environment commensurate with our financial reporting requirements. Specifically, we lacked a sufficient complement of personnel with an appropriate level of internal controls and accounting knowledge, training and experience commensurate with our financial reporting requirements. Additionally, the limited personnel resulted in our inability to consistently establish appropriate authorities and responsibilities in pursuit of our financial reporting objectives, as demonstrated by, among other things, insufficient segregation of duties in our finance and accounting functions. This material weakness contributed to the following additional material weaknesses:

•    We did not design and maintain effective controls over the period-end financial reporting process to achieve complete, accurate and timely financial accounting, reporting and disclosures, including the classification of various accounts in the consolidated financial statements.

•    We did not design and maintain processes and controls to analyze, account for and disclose non-routine, unusual or complex transactions. Specifically, we did not design and maintain controls to timely analyze and account for debt modifications and extinguishments, convertible notes, warrant instruments, non-routine complex revenue transactions including the leasing of products and transfer of inventory for leased assets into property plant and equipment, merger transactions, and the accounting and valuation of earn out liabilities.

•    We did not design and maintain formal accounting policies, procedures and controls to achieve complete, accurate and timely financial accounting, reporting and disclosures, including segregation of duties and controls over the preparation and review of account reconciliations and journal entries.

•    ***We did not design and maintain effective controls to ensure the recording of revenue transactions in the appropriate period.***

•    We did not design and maintain effective controls over the completeness and accuracy of accounts payable and accrued liabilities.

139.    The 2021 10-K claimed that Evolv was taking steps to remediate the material

weaknesses. Specifically, it stated:

We have begun the process of, and are focused on, designing and implementing effective internal controls to improve our internal control over financial reporting and remediate the material weaknesses. Our efforts include a number of actions:

•    We are in the process of hiring additional accounting and IT personnel, to bolster our reporting, technical accounting and IT capabilities. Additionally, we are in the process of designing and implementing controls to formalize roles and review responsibilities to align with our team's skills and experience and designing and implementing controls over segregation of duties and have engaged outside consultants to assist us in these efforts.

•    We added, and continue to add, finance personnel, including a Chief Financial Officer and Chief Accounting Officer and Corporate Controller, to the organization to strengthen our internal accounting team, to provide oversight, structure and reporting lines, and to provide additional review over our disclosures.

•    We are in the process of designing and implementing controls related to the period-end financial reporting process and controls over the classification of various accounts in our consolidated financial statements.

•    We are in the process of designing and implementing controls to timely identify and account for non-routine, unusual or complex transactions, including controls over the preparation and review of accounting memorandum addressing these matters.

•    We are in the process of designing and implementing controls related to revenue recognition, including non-routine complex revenue transactions that may also include the leasing of products and the recording of revenue transactions in the appropriate period.

•    We are in the process of designing and implementing controls over the completeness and accuracy of accounts payable and accrued liabilities.

•    We are in the process of designing and maintaining formal accounting policies, procedures and controls to achieve complete, accurate and timely financial accounting, reporting and disclosures, including controls over the preparation and review of account reconciliations and journal entries.

•    We are in the process of designing and implementing information technology general controls, including controls over program change management, the review and update of user access rights and privileges, controls over batch jobs and data backups, and program development approvals and testing. During the year ended December 31, 2021, we engaged outside consultants to assist us in the evaluation and implementation of a new ERP system.

The process of designing and maintaining effective internal control over financial reporting is a continuous effort that requires management to anticipate and react to changes in our business, economic and regulatory environments and to expend significant resources. As we continue to evaluate our internal control over financial reporting, we may take additional actions to remediate the material weaknesses or modify the remediation actions described above.

While we continue to devote significant time and attention to these remediation efforts, the material weaknesses will not be considered remediated until management completes the design and implementation of the actions described above and the controls operate for a sufficient period of time, and management has concluded, through testing, that these controls are effective.

140.    The above statements in the 2021 10-K regarding existing material weaknesses, including those regarding revenue recognition, appeared in substantially the same form in the 1Q22 10-Q, 2Q22 10-Q, 3Q22 10-Q, 2022 10-K, 1Q23 10-Q, 2Q23 10-Q, 3Q23 10-Q, 2023 10-K, 1Q24 10-Q, and 2Q24 10-Q.

141.    The 2Q23 10-Q stated that the Company still had a material weakness due to, among others, the failure to "design and maintain effective controls to ensure the recording of revenue transactions in the appropriate period." To remediate the existing material weaknesses:

We continue to be focused on designing and implementing effective internal controls to improve our internal control over financial reporting and remediate the material weaknesses. Our efforts include a number of actions:

•We have hired additional accounting, internal audit, and IT personnel, to bolster our reporting, technical accounting, internal control, and IT capabilities. Additionally, we are in the process of designing and implementing controls to formalize roles and review responsibilities to align with our team's skills and experience and designing and implementing controls over segregation of duties.

•We added finance personnel to the organization, including in fiscal 2022 a new Chief Financial Officer and a Chief Accounting Officer, to strengthen our internal accounting team, to provide oversight, structure and reporting lines, and to provide additional review over our accounting and financial reporting.

•We have performed a financial statement risk assessment in order to identify material financial statement line items for which key controls are needed in order to ensure complete and accurate financial reporting. Additionally, we have engaged outside consultants to assist with the design and implementation of control activities resulting from the aforementioned risk assessment.

•We have designed and implemented additional review and training procedures within Evolv's accounting and finance functions to enhance knowledge and understanding of internal control over financial reporting.

•*During the three months ended June 30, 2023, we implemented controls related to* (i) the period-end financial reporting process and classification of various

57

accounts in our consolidated financial statements, including the presentation and disclosure of items in the consolidated statements of cash flows, (ii) *timely identification and accounting for non-routine, unusual and complex transactions, including controls over the preparation and review of accounting memorandum addressing these matters, (iii) revenue recognition, including non-routine complex revenue transactions that may also include the leasing of products and the recording of revenue transactions in the appropriate period*, and (iv) completeness and accuracy of accounts payable and accrued liabilities.

Additionally, we are in the process of designing and implementing controls related to:

•the preparation and review of journal entries and account reconciliations to ensure proper segregation of duties;

•formal accounting policies, procedures and controls to achieve complete, accurate and timely financial accounting, reporting and disclosures; and

•information technology general controls, including controls over program change management, the review and update of user access rights and privileges, controls over batch jobs and data backups, and program development approvals and testing. To this end, we implemented a new Enterprise Resource Planning ("ERP") system in April 2022 and have implemented, and continue to implement, IT general controls related to the new system.

142.    The 3Q23 10-Q stated that the Company still had a material weakness due to, among others, the failure to "design and maintain effective controls to ensure the recording of revenue transactions in the appropriate period." Defendants' efforts to remediate the material weaknesses included the actions reported in the 2Q23 10-Q, including:

During the three months ended June 30, 2023 and the three months ended September 30, 2023, we implemented controls related to (i) the period-end financial reporting process and classification of various accounts in our consolidated financial statements, including the presentation and disclosure of items in the consolidated statements of cash flows, (ii) timely identification and accounting for non-routine, unusual and complex transactions, including controls over the preparation and review of accounting memorandum addressing these matters, (iii) revenue recognition, including non-routine complex revenue transactions that may also include the leasing of products and the recording of revenue transactions in the appropriate period, and (iv) completeness and accuracy of accounts payable and accrued liabilities.

143.   The above statement appeared in substantially the same form in the 2023 10-K, 1Q24 10-Q, and 2Q24 10-Q.

144.   The above statements were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors: (1) that the Company used extra-contractual terms and conditions in certain of its arrangements with customers and channel partners; (2) that these extra-contractual terms were not shared with accounting personnel and its outside auditor; (3) that these terms were not shared with accounting personnel and its outside auditor due to Evolv's failure to institute internal controls regarding revenue recognition and segregation of finance and accounting duties; (4) that, as a result, these extra-contractual terms and conditions were not accounted in accordance with GAAP; and (5) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially false and/or misleading and/or lacked a reasonable basis.

## VI.   LOSS CAUSATION

145.   Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class. Defendants' misrepresentations and omissions caused and maintained the artificial inflation in Evolv's stock price throughout the Class Period until the truth was disclosed.

146.   On May 23, 2023, BBC News reported that Evolv Express was removed from a school after it failed to detect a 9-inch knife, which was used in a brutal attack. An investigation by the school district found that the product "was not designed to detect knives." On this news, the Company's stock price fell $0.45, or 7.56%, to close at $5.50 per share on May 23, 2023, on unusually heavy trading volume.

147.    On October 12, 2023, before the market opened, Evolv disclosed that it was under investigation by the FTC regarding "certain aspects of its marketing practices." On this news, the Company's stock price fell $0.58, or 13.33%, to close at $3.77 per share on October 12, 2023, on unusually heavy trading volume.

148.    On February 19, 2024, Evolv announced that it was under investigation by the SEC. On this news, the Company's stock price fell $0.82, or 15.67%, to close at $4.41 per share on February 20, 2024, on unusually heavy trading volume.

149.    On March 13, 2024, BBC News reported that Evolv revised prior claims regarding the effectiveness of Evolv Express's ability to detect firearms and other weapons because the third party entity did not conduct the type of testing claimed. On this news, the Company's stock price fell $0.13, or 3.5%, to close at $3.57 per share on March 13, 2024.

150.    On October 25, 2024, before the market opened, Evolv announced that it would restate its financial statements since second quarter 2022 because "certain sales of products and subscriptions to channel partners and end users were subject to extra-contractual terms and conditions that impacted revenue recognition and other metrics." As a result, revenue was overstated by $4 to $6 million. On this news, the Company's stock price fell $1.63, or 39.75%, to close at $2.47 per share on October 25, 2024, on unusually heavy trading volume.

151.    During the Class Period, Plaintiff and the Class purchased Evolv's securities at artificially inflated prices and were damaged thereby. The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## VII.    CLASS ACTION ALLEGATIONS

152.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired Evolv securities between June 28, 2021 and October 25, 2024, inclusive, and/or purchased or otherwise acquired Evolv common stock pursuant to the Company's Registration Statement, and who were damaged thereby (the "Class").  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

153.    The members of the Class are so numerous that joinder of all members is impracticable.  At all relevant times, Evolv's shares actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class.  Approximately 158 million Evolv shares were traded publicly during the Class Period on the NASDAQ.  Record owners and other members of the Class may be identified from records maintained by Evolv or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

154.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

155.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

156.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Evolv; and

(c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

157.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## VIII.    ADDITIONAL ALLEGATIONS REGARDING DEFENDANTS' SCIENTER

158.    As alleged herein, Defendants acted with scienter because they knew that the public documents and statements issued or disseminated in the name of Evolv were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

159.    As alleged herein, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Evolv, their control over, and/or receipt and/or modification of Evolv's allegedly materially misleading misstatements and/or their associations

with Evolv which made them privy to confidential proprietary information concerning Evolv, participated in the fraudulent scheme alleged herein.

### A.   Evolv's Product Effectiveness And Its Sales Were Central To Its Business

160.   Evolv purports to develop and sell AI-based weapons detection for security screening and during the Class Period, the Company focused on selling a single security screening device: Evolv Express. In fact, since 2022, the Company's product revenue was derived from sales of Evolv Express, sold through a direct sales organization and a global distribution channel of strategic partners and resellers.

161.   As such, the Individual Defendants were aware of the Evolv Express's lack of effectiveness and the sales practices regarding its only product; or if the Company's CEOs and CFOs were unaware, this ignorance constitutes acting in such a deliberately reckless manner as to constitute a fraud and deceit upon Plaintiff and other Class members. However, the most reasonable inference is that the Individual Defendants were aware of these facts.

162.   That the Company's executives were aware of these facts is further supported by former employees. For example, FE 6[9] recounted that Defendant George would "come in to all the classes we'd hold – because we'd have different training classes for all the channel partners" and that Defendant George "seemed to know about every one" of the Company's deployments of its products. Likewise, the Company's executives, including the Individual Defendants, would consistently talk about the effectiveness of Evolv's products and its sales and marketing efforts on earnings calls and other presentations to the investing public. Certainly, if the executives of the Company were involved in the sales and marketing efforts and were consistently talking about

---

[9] FE 6 was a Technical Documentation & Education Manager from December 2022 to May 2024 and a Customer Success Instructional Designer from March 2021 through December 2022.

them to the public, they were aware of the particulars of the product and these efforts, or they were

reckless in not learning about them before holding themselves out as knowledgeable about them.

**B.    The Overstatement Comprised A Substantial Amount Of The Company's Revenue Such That Knowledge Or Extreme Recklessness On The Part Of Defendants Is The Only Reasonable Inference**

163.    As discussed herein, the Company admitted that it had overstated its revenue for

two full years (between second quarter 2022 and second quarter 2024) by approximately $4 million

to $6 million. These amounts were material to the Company. For example, the Company's revenue

for its second quarter 2022 (the first overstated quarter) was only $9.1 million and its revenue for

the second quarter 2024 (the last overstated quarter) was $25.5 million. Assuming for simplicity

that the entire restatement relates to a single quarter, the overstated revenue was approximately

44% to 66% of second quarter 2022 revenue or approximately 16% to 24% of second quarter 2024

revenue. However, these percentages likely understate the magnitude of the restatement because

the "$4 million to $6 million" is a net basis approximation and Evolv has not yet disclosed the

details necessary to quantify the quarterly impact of the restatement.

164.    The Individual Defendants were certainly aware of the particulars of transactions

that constituted up to and over half of the entire Company's revenues; or if the Company's CEO

and CFOs were unaware, this ignorance constitutes acting in such a deliberately reckless manner

as to constitute a fraud and deceit upon Plaintiff and other Class members. However, the most

reasonable inference from this fact is that they were aware that the transactions at issue should not

have been recognized as the Company later admitted.

**C.    That George Was Terminated "Effective Immediately" Soon After The Company Announced The Impending Restatement Supports A Finding Of Scienter**

165.    As discussed herein, on October 25, 2024, the Company disclosed that relevant

information regarding "certain sales of products and subscriptions to channel partners and end

users were subject to extra-contractual terms and conditions that impacted revenue recognition and other metrics" were "not shared with the Company's accounting personnel, and that certain Company personnel engaged in misconduct in connection with those transactions." Moreover, the Company further disclosed "these extra-contractual terms and conditions were withheld from the Company's Audit Committee of the Board (the "Audit Committee") and the Company's independent registered public accounting firm, PricewaterhouseCoopers LLP ("PwC")."

166.    The Company also explained that the Board had formed an "ad hoc committee of independent directors" to investigate "the Company's sales practices including whether certain sales of products and subscriptions to channel partners and end users were subject to extra-contractual terms and conditions that impacted revenue recognition and other metrics, ***and if so, when senior Company personnel became aware of these issues.***"

167.    Only days after this announcement, on October 31, 2024, the Company announced that it had terminated the Company's CEO, Defendant George, "effective immediately." As the Company announced:

> On October 30, 2024, the Board of Directors (the "Board") of Evolv Technologies Holdings Inc. (the "Company") terminated Peter George, President and Chief Executive Officer of the Company without cause, effective immediately.

> On such date, the Board also appointed Michael Ellenbogen, the Company's Chief Innovation Officer and a member of the Board, as Interim President and Chief Executive Officer, and designated him as principal executive officer. Mr. Ellenbogen will serve in this interim role until a successor to Mr. George is appointed.

168.    According to a press release issued that same day, George's termination followed "months of careful planning and deliberation by the Board . . . to plan for an orderly CEO transition." Specifically, the Company explained:

> Today's announcement follows months of careful planning and deliberation by the Board. In May 2024, the Board formed a succession planning committee (the "committee") of independent directors of the Board to evaluate leadership

performance and effectiveness and plan for an orderly CEO transition. With the assistance of a nationally recognized executive search firm, the committee has been actively recruiting and interviewing CEO candidates. Following yesterday's decision, the committee will continue these efforts, and the Board intends to announce a new CEO expeditiously.

The Board commented:

"We appreciate Peter's years of dedication to our Company and his significant contributions to the Company's mission. We wish him well in his future endeavors. That said, we have determined that a change in leadership is needed to improve the Company's culture as we prepare for the next phase of growth.

We continue to believe that the fundamentals of our business remain strong. But we are also convinced that the Company can do even better.

The Board and leadership team are committed to ensuring a smooth transition, and we are grateful that we'll be able to benefit from Mike's experience and perspective at this time. The Board will remain actively engaged with Mike and the rest of the leadership team to ensure the Company remains on the right path."

169.    That explanation is belied by the facts.  If George's termination was the result of such deliberations, the Company would have had a replacement ready upon its announcement. Instead, they disclosed George's immediate termination just after disclosing the results of the investigation and the improper sales practices and revenue recognition.  The most logical inference from the timing of George's termination, right after the disclosure of the fraud but before a replacement had been found, is that he had knowledge of the conduct alleged herein or acted recklessly in not knowing.  This inference is even further supported by the fact that the Company admitted that executives were hiding the nature of transactions from appropriate accounting personnel, the audit committee and its outside audit firm. Executives who hid material information from the Board would surely be terminated.

> **D.    That The Company Was Already Under Investigation By The FTC And SEC Further Demonstrates The Individual Defendants' Recklessness**

170.    The Company admitted that it was both under investigation by the Federal Trade Commission regarding "certain aspects of its marketing practices" and was also under

investigation by the SEC, which analysts believed also related to the marketing practices.  These investigations put the Company and its executives on notice that there were issues with its marketing and public statements. Faced with this situation, the most logical inference is that the Company's executives were aware of the specifics of Evolv's marketing practices and that they were investigating the issues at the Company. As such, the Individual Defendants would have been aware of the specifics of the Company's marketing, including that it was making unsupported claims about the effectiveness of its products, or at a minimum, the Individual Defendants were reckless if they did not look into the issues they were being investigated for or choose not become aware of the falsity of their statements.

### E.    Improperly Recognized Revenue Was To One Of Its Largest Channel Partners

171.    The Company admitted that the improperly recognized sales included "***sales to one of its largest channel partners,*** were subject to extra-contractual terms and conditions, some of which were not shared with the Company's accounting personnel, and that certain Company personnel engaged in misconduct in connection with those transactions."  The Company's executives would have been aware of the parameters of its contracts with one its largest channel partners, particularly since its executives touted these same channel partners in their earnings calls.

### F.    The Company Failed To Maintain Effective Internal Controls Over Revenue Even After Being Aware That The Company Already Had Weakness In Its Revenue Internal Controls

172.    The Individual Defendants failed to comply with their obligations imposed by the SEC to maintain books and records in sufficient detail to reflect the transactions of the Company and to prepare financial statements in accordance with GAAP. Section 13(b)2 of the Exchange Act, entitled *Periodical and Other Reports*, states the following with respect to books and records and internal controls:

Every issuer which has a class of securities registered pursuant to section 12 and every issuer which is required to file reports pursuant to section 15(d) shall:

A.    make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer;

B.    devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that–

i.      transactions are executed in accordance with management's general or specific authorization;

ii.     transactions are recorded as necessary (I) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (II) to maintain accountability for assets;

iii.    access to assets is permitted only in accordance with management's general or specific authorization; and

iv.     the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

173.    Evolv's management is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rule 13a-15(f) under the Exchange Act. The Company's internal control over financial reporting is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP. This is made clear in SEC regulations and in a report prepared by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO"), Internal Control – Integrated Framework (the "COSO Report").

174.    The COSO Report defines internal control as a process that is "designed to provide reasonable assurance regarding the achievement of objectives" related to the effectiveness and efficiency of operations, the reliability of financial reporting, and compliance with applicable laws and regulations. The COSO Report defines five components of an internal control framework that

are needed to enable a business to achieve its objectives: (1) the control environment, (2) risk assessment, (3) control activities, (4) information and communications and (5) monitoring.

175.    Specifically, the CEO sets the "tone at the top" that affects integrity, ethics, and other factors of a positive control environment. "In any organization, 'the buck stops' with the chief executive. He or she has ultimate ownership responsibility for the internal control system. . . . The influence of the CEO on an entire organization cannot be overstated." COSO Report, Chapter 8, p. 84. The chief executive fulfills this duty by providing leadership and direction to senior managers and reviewing the way they are controlling the business.  The fact that the CEO was terminated following the announcement of the need for a financial restatement indicates that the "tone at the top" was not one of strong internal controls.

176.    By Evolv's own admission, there were several material weaknesses in its internal control over financial reporting. On October 25, 2024, the Company admitted that an internal investigation uncovered the improper sales and marketing process and the need to restate its financial results. It also revealed that Evolv expects to report material weaknesses in its internal control over financial reporting. Of course, these material weaknesses were egregious if its executives hid the terms of its contracts from Evolv's accounting personnel, audit committee and the independent auditing firm. Evolv's internal control system completely failed to live up to the standards as set forth in the five elements of the internal control framework described above.

177.    The inference that the Company's executives were aware of this improper conduct is further supported by the fact that throughout the Class Period, the Company had a myriad of internal deficiencies, including deficiencies specific to revenue recognition.  *See* Section V.E, *supra*; ¶140 ("***We did not design and maintain effective controls to ensure the recording of revenue transactions in the appropriate period.***").  The Company repeatedly stated that it was

69

working to remedy these deficiencies and in August 2023, the Company announced that it had "implemented controls related to … ***revenue recognition, including non-routine complex revenue transactions that may also include the leasing of products and the recording of revenue transactions in the appropriate period***."  If these controls were actually implemented, the Individual Defendants would have uncovered the improper conduct.  The fact that they did not uncover this conduct supports an inference that the Individual Defendants already knew about it (and concealed it) or at a minimum reckless in not knowing of it.  It beggars belief that Evolv's finance and accounting team would miss such basic and massive accounting issues while working to remedy its revenue recognition lack of controls.

### G. Corporate Scienter And *Respondeat Superior*

178.    Each of the Individual Defendants was a high-ranking management-level employee that either (i) made the false or misleading statements alleged herein; (ii) approved the false or misleading statements alleged herein; or (iii) approved the making or issuance of the false or misleading statements alleged herein. In so doing, each was acting in his/her role as an executive employee and representative of Evolv. The scienter of each of these individuals and all other management-level employees of Evolv, is therefore imputed to Defendant Evolv.

## IX. UNDISCLOSED ADVERSE FACTS

179.    The market for Evolv's securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and/or misleading statements, and/or failures to disclose, Evolv's securities traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired Evolv's securities relying upon the integrity of the market price of the Company's securities and market information relating to Evolv, and have been damaged thereby.

180.    During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Evolv's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading.  The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about Evolv's business, operations, and prospects as alleged herein.

181.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Evolv's financial well-being and prospects.  These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

X.    **APPLICABILITY OF PRESUMPTION OF RELIANCE**

182.    The market for Evolv's securities was open, well-developed and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, Evolv's securities traded at artificially inflated prices during the Class Period.  On July 23, 2021, the Company's share price closed at a Class Period high of $10.70 per share.  Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying

upon the integrity of the market price of Evolv's securities and market information relating to Evolv, and have been damaged thereby.

183.    During the Class Period, the artificial inflation of Evolv's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Evolv's business, prospects, and operations.  These material misstatements and/or omissions created an unrealistically positive assessment of Evolv and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

184.    At all relevant times, the market for Evolv's securities was an efficient market for the following reasons, among others:

(a)    Evolv shares met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)    As a regulated issuer, Evolv filed periodic public reports with the SEC and/or the NASDAQ;

(c)    Evolv regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d)    Evolv was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

185.    As a result of the foregoing, the market for Evolv's securities promptly digested current information regarding Evolv from all publicly available sources and reflected such information in Evolv's share price. Under these circumstances, all purchasers of Evolv's securities during the Class Period suffered similar injury through their purchase of Evolv's securities at artificially inflated prices and a presumption of reliance applies.

186.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## XI.    NO SAFE HARBOR

187.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be

characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Evolv who knew that the statement was false when made.

## XII.    CLAIMS

### FIRST CLAIM

**Violations of Section 11 of the Securities Act**
**Against Evolv and the Securities Act Individual Defendants**

188.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein, except any allegation of fraud, recklessness, or intentional misconduct.

189.    This claim is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of the Class against Evolv and the Securities Act Individual Defendants.

190.    The Registration Statement for the Business Combination was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

191.    Evolv is the registrant for the newly issued shares in the Business Combination. Defendants were responsible for the contents and dissemination of the Registration Statement.

192.     As the issuer of the shares, Evolv is strictly liable to Plaintiff and the Class for the misstatements and omissions.

193.     None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

194.     By reasons of the conduct herein alleged, each Defendant violated and/or controlled a person who violated Section 11 of the Securities Act.

195.     Plaintiff acquired Evolv shares pursuant to the Registration Statement for the Business Combination.

## SECOND CLAIM

### Violations of Section 15 of the Securities Act
### Against the Securities Act Individual Defendants

196.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein, except any allegation of fraud, recklessness, or intentional misconduct.

197.     This claim is asserted against the Securities Act Individual Defendants and is based upon Section 15 of the Securities Act.

198.     The Securities Act Individual Defendants, by virtue of their offices, directorship, and specific acts were, at the time of the wrongs alleged herein and as set forth herein, controlling persons of Evolv within the meaning of Section 15 of the Securities Act. The Securities Act Individual Defendants had the power to influence and exercised the same to cause Evolv to engage in the acts described herein.

199.     The Securities Act Individual Defendants were culpable participants in the violations of Section 11 of the Securities Act as alleged above, based on their having signed or

authorized the signing of the Registration Statement and having otherwise participated in the process which allowed the Business Combination to be successfully completed.

200.    By virtue of the conduct alleged herein, the Securities Act Individual Defendants are liable for the aforesaid wrongful conduct and are liable to Plaintiff and the Class for damages suffered.

### THIRD CLAIM

**Violation of Section 10(b) of The Exchange Act and
Rule 10b-5 Promulgated Thereunder
Against Evolv and the Individual Defendants**

201.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

202.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Evolv's securities at artificially inflated prices.   In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

203.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Evolv's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

204. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Evolv's financial well-being and prospects, as specified herein.

205. Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Evolv and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

206. Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the

Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

207.    Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Evolv's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

208.    As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Evolv's securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Evolv's securities during the Class Period at artificially high prices and were damaged thereby.

209.    At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Evolv was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Evolv securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

210.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

211.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## FOURTH CLAIM

**Violation of Section 20(a) of The Exchange Act**
**Against the Individual Defendants**

212.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

213.    Individual Defendants acted as controlling persons of Evolv within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff

contends are false and misleading. Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

214.    In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

215.    As set forth above, Evolv and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## XIII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)    Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    Such other and further relief as the Court may deem just and proper.

## XIV.  JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: November 20, 2024

By: */s/ Daryl Andrews*

**ANDREWS DEVALERIO LLP**
Glen DeValerio (BBO #122010)
Daryl Andrews (BBO #658523)
P.O. Box 67101
Chestnut Hill, MA 02467
Telephone: (617) 999-6473
Email: glen@andrewsdevalerio.com
        daryl@andrewsdevalerio.com

*Liaison Counsel for Lead Plaintiff Robert Falk*

**GLANCY PRONGAY & MURRAY LLP**
Robert V. Prongay
Casey E. Sadler (admitted *pro hac vice*)
Pavithra Rajesh
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

*Counsel for Lead Plaintiff Robert Falk and Lead Counsel for the Class*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on this 20th day of November 2024, a true and correct copy of the foregoing document was served by CM/ECF to the parties registered to the Court's CM/ECF system.

<u>*/s/ Daryl Andrews*</u>
Daryl Andrews