**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| IN RE EVOLV TECHNOLOGY HOLDINGS INC. SECURITIES LITIGATION | Case No. 1:24-cv-10761-ADB <br><br> Leave to File Granted On February 26, 2025 |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**

## TABLE OF CONTENTS

GLOSSARY.................................................................................................................... x

INTRODUCTION ........................................................................................................... 1

STATEMENT OF FACTS ............................................................................................. 3

    A.    Defendants Repeatedly Touted That Express, The Company's Flagship Product, Could "Reliably" Detect Threats More Efficiently Than Traditional Metal Detectors .................................................................................................. 3

    B.    Unbeknownst To Investors, Express Could Not "Reliably" Detect Weapons ........ 4

    C.    Evolv Improperly Recognized Revenue For Contracts Subject To "Extra-Contractual Terms And Conditions," Including Trial Periods During Which Customers Did Not Make A Purchase Commitment ............................................... 4

    D.    The Truth Regarding Express's Efficacy And False Financial Statements Emerged Through A Series Of Partial Disclosures, Including An Investigation By Federal Regulators ................................................................................................ 5

    E.    The FTC Concluded Defendants Overstated Express' Detection Abilities And Won Contracts Through Deceptive Marketing ....................................................... 6

LEGAL STANDARD .................................................................................................... 7

ARGUMENT ................................................................................................................. 7

I.    THE SAC STATES CLAIMS UNDER THE SECURITIES ACT ................................... 7

    A.    Plaintiffs Face A Minimal Pleading Burden ............................................................ 8

    B.    The SAC Adequately Alleges Standing To Raise The Securities Act Claims ........ 8

    C.    The Registration Statement Was Materially False And/Or Omitted To State Material Facts Regarding Effectiveness Of Express................................................. 9

    D.    The Registration Statement Misleadingly Conveyed Risks As Hypothetical ....... 10

II.    THE SAC STATES CLAIMS UNDER THE EXCHANGE ACT .................................. 12

    A.    The SAC Adequately Alleges Standing to Raise the Exchange Act Claims......... 13

    B.    The SAC Adequately Alleges False or Misleading Statements ........................... 14

        1.    Defendants Continued To Overstate The Effectiveness Of Express......... 14

        2.    The Fox Business Appearance Presents Actionable Statements.............. 15

        3.     The NSC4 Safety Score Announcement Is Misleading By Omission ...... 15

        4.     The SAFETY Act Designation Misled Investors ..................................... 16

        5.     Evolv Did Not Follow Its Revenue Recognition Policy ........................... 17

        6.     Evolv's Revenue Between Second Quarter 2022 And Second Quarter 2024 Was Overstated ........................................................................................ 18

        7.     Evolv's Internal Controls Over Financial Reporting Were Not Effective  18

    C.     The SAC Adequately Alleges A Strong Inference Of Scienter ............................. 19

    D.     The SAC Adequately Alleges Loss Causation ....................................................... 25

III.    PLAINTIFFS REQUEST LEAVE TO AMEND IF DEEMED NECESSARY ................ 29

CONCLUSION ............................................................................................................................ 30

# TABLE OF AUTHORITIES

## CASES

*Abramson v. NewLink Genetics Corp.*,
965 F.3d 165 (2d Cir. 2020) ............................................................................... 26

*Angelos v. Tokai Pharm., Inc.*,
494 F. Supp. 3d 39 (D. Mass. 2020) .................................................................... 12

*Auto. Indus. Pension Tr. Fund v. Textron Inc.*,
682 F.3d 34 (1st Cir. 2012) ................................................................................. 24

*Blue Chip Stamps v. Manor Drug Stores*,
421 U.S. 723 (1975)............................................................................................. 13

*Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse Sec. (USA) LLC*,
752 F.3d 82 (1st Cir. 2014) ................................................................................. 29

*Brumbaugh v. Wave Sys. Corp.*,
416 F. Supp. 2d 239 (D. Mass. 2006) .................................................................. 17

*Chalverus v. Pegasystems, Inc.*,
59 F. Supp. 2d 226 (D. Mass. 1999) .................................................................... 21

*City of Bristol Pension Fund v. Vertex Pharm. Inc.*,
12 F. Supp. 3d 225 (D. Mass. 2014) .................................................................... 14

*City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*,
399 F.3d 651 (6th Cir. 2005)............................................................................... 10

*Cody v. Conformis, Inc.*,
199 F. Supp. 3d 409 (D. Mass. 2016) ............................................................11, 12

*Collier v. ModusLink Glob. Sols., Inc.*,
9 F. Supp. 3d 61 (D. Mass. 2014) ........................................................................ 20

*Constr. Indus. & Laborers Joint Pension Tr. v. Carbonite, Inc.*,
22 F.4th 1 (1st Cir. 2021) ......................................................................... 7, 13, 15

*Coyne v. Metabolix, Inc.*,
943 F. Supp. 2d 259 (D. Mass. 2013) .................................................................. 25

*Crowell v. Ionics, Inc.*,
343 F. Supp. 2d 1 (D. Mass. 2004) ................................................................ 21, 23

*Dura Pharm., Inc. v. Broudo*,
    544 U.S. 336 (2005)...................................................................................................... 26

*Fed. Deposit Ins. Corp. v. Consol. Mortg. & Fin. Corp.*,
    805 F.2d 14 (1st Cir. 1986) ......................................................................................... 30

*Fox v. First BanCorp*,
    2006 WL 4128534 (D.P.R. Nov. 6, 2006)................................................................... 8

*Franchi v. SmileDirectClub, Inc.*,
    633 F. Supp. 3d 1046 (M.D. Tenn. 2022) ................................................................... 9

*Ganino v. Citizens Utils. Co.*,
    228 F.3d 154 (2d Cir. 2000) ...................................................................................... 12

*George v. China Auto. Sys., Inc.*,
    2012 WL 3205062 (S.D.N.Y. Aug. 8, 2012).............................................................. 14

*Godinez v. Alere Inc.*,
    272 F. Supp. 3d 201 (D. Mass. 2017) ....................................................................... 22

*Greebel v. FTP Software*,
    194 F.3d 185 (1st Cir. 1999) ............................................................................... 18, 19

*Gross v. Summa Four, Inc.*,
    93 F.3d 987 (1st Cir. 1996) ....................................................................................... 14

*Herman & MacLean v. Huddleston*,
    459 U.S. 375 (1983)..................................................................................................... 8

*Hevesi v. Citigroup Inc.*,
    366 F.3d 70 (2d Cir. 2004) ........................................................................................ 14

*In re Allaire Corp. Sec. Litig.*,
    224 F. Supp. 2d 319 (D. Mass. 2002) ...........................................................10, 11, 16

*In re Alphabet, Inc. Sec. Litig.*,
    1 F.4th 687 (9th Cir. 2021)........................................................................................ 12

*In re Ariad Pharm., Inc. Sec. Litig.*,
    842 F.3d 744 (1st Cir. 2016) ....................................................................................... 9

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
    324 F. Supp. 2d 474 (S.D.N.Y. 2004) ....................................................................... 18

iv

*In re Bank of Bos. Corp. Sec. Litig.*,
  762 F. Supp. 1525 (D. Mass. 1991) ................................................................. 13

*In re Biogen Inc. Sec. Litig.*,
  193 F. Supp. 3d 5 (D. Mass. 2016) .................................................................. 15

*In re Biogen Inc. Sec. Litig.*,
  857 F.3d 34 (1st Cir. 2017) ............................................................................. 24

*In re Bristol Myers Squibb Co. Sec. Litig.*,
  586 F. Supp. 2d 148 (S.D.N.Y. 2008) ........................................................ 21, 29

*In re Cabletron Sys., Inc.*,
  311 F.3d 11 (1st Cir. 2002) ..................................................................... 13, 19, 25

*In re Gilead Scis. Sec. Lit.*,
  536 F.3d 1049 (9th Cir. 2008) ........................................................................ 29

*In re Honest Co. Sec. Litig.*,
  615 F. Supp. 3d 1149 (C.D. Cal. 2022) ........................................................... 11

*In re Hub Cyber Sec. Ltd.*,
  2025 WL 872078 (S.D.N.Y. Mar. 20, 2025) ................................................. 8, 19

*In re iDreamSky Tech. Ltd. Sec. Litig.*,
  236 F. Supp. 3d 824 (S.D.N.Y. 2017) ............................................................. 11

*In re IMAX Sec. Litig.*,
  587 F. Supp. 2d 471 (S.D.N.Y. 2008) ............................................................. 27

*In re iRobot Corp. Sec. Litig.*,
  527 F. Supp. 3d 124 (D. Mass. 2021) .............................................................. 15

*In re KBC Asset Mgmt. N.V.*,
  572 F. App'x 356 (6th Cir. 2014) .................................................................... 29

*In re MBIA, Inc., Sec. Litig.*,
  700 F. Supp. 2d 566 (S.D.N.Y. 2010) ........................................................ 12, 29

*In re No. Nine Visual Tech. Corp. Sec. Litig.*,
  51 F. Supp. 2d 1 (D. Mass. 1999) ................................................................... 10

*In re Omnicom Grp., Inc. Sec. Litig.*,
  597 F.3d 501 (2d Cir. 2010) ............................................................................ 29

*In re Pareteum Sec. Litig.*,
2021 WL 3540779 (S.D.N.Y. Aug. 11, 2021) ........................................................................ 22

*In re PerkinElmer, Inc. Sec. Litig.*,
286 F. Supp. 2d 46 (D. Mass. 2003) ...................................................................................... 15

*In re Pfizer Inc. Sec. Litig.*,
282 F.R.D. 38 (S.D.N.Y. 2012) .............................................................................................. 14

*In re Raytheon Sec. Litig.*,
157 F. Supp. 2d 131 (D. Mass. 2001) .................................................................................... 20

*In re Restoration Robotics, Inc. Sec. Litig.*,
417 F. Supp. 3d 1242 (N.D. Cal. 2019) .................................................................................. 9

*In re Sipex Corp. Sec. Litig.*,
2005 WL 3096178 (N.D. Cal. Nov. 17, 2005) ....................................................................... 23

*In re StockerYale*,
453 F. Supp. 2d 345 (D.N.H. 2006) ....................................................................................... 27

*In re Telxon Corp. Sec. Litig.*,
133 F. Supp. 2d 1010 (N.D. Ohio 2000) ................................................................................ 25

*In re Viropharma, Inc. Sec. Litig.*,
2003 WL 1824914 (E.D. Pa. Apr. 7, 2003) ........................................................................... 10

*In re WebSecure, Inc. Sec. Litig.*,
182 F.R.D. 364 (D. Mass. 1998) .............................................................................................. 8

*Jackson v. Abernathy*,
960 F.3d 94 (2d Cir. 2020) .................................................................................................... 26

*Kaufman v. CVS Caremark Corp.*,
836 F.3d 88 (1st Cir. 2016) ................................................................................................... 13

*Khoja v. Orexigen Therapeutics, Inc.*,
899 F.3d 988 (9th Cir. 2018) ................................................................................................. 28

*Lloyd v. CVB Financial Corp.*,
811 F.3d 1200 (9th Cir. 2016) ............................................................................................... 27

*Loos v. Immersion Corp.*,
762 F.3d 880 (9th Cir. 2014) ................................................................................................. 27

*SoltaMed., Inc. v. Lumenis, Inc.*,
   454 F. Supp. 3d 107 (D. Mass. 2020) ............................................................................... 8

*Mass. Ret. Sys. v. CVS Caremark Corp.*,
   716 F.3d 229 (1st Cir. 2013) .................................................................................... 26, 27

*Matrixx Initiatives, Inc. v. Siracusano*,
   563 U.S. 27 (2011) ............................................................................................................ 14

*Meyer v. Greene*,
   710 F.3d 1189 (11th Cir. 2013) ............................................................................... 27, 29

*Miss. Pub. Emps.' Ret. Sys. v. Boston Sci. Corp.*,
   523 F.3d 75 (1st Cir. 2008) .............................................................................................. 13

*Mulderrig v. Amyris, Inc.*,
   492 F. Supp. 3d 999 (N.D. Cal. 2020) ........................................................................... 18

*Orton v. Parametric Tech. Corp.*,
   344 F. Supp. 2d 290 (D. Mass. 2004) .............................................................................. 8

*Pizzuto v. Homology Medicines, Inc.*,
   2024 WL 1436025 (D. Mass. Mar. 31, 2024) ........................................................... 16, 29

*Premca Extra Income Fund LP v. iRobot Corp.*,
   763 F. Supp. 3d 121 (D. Mass. 2025) ............................................................................. 30

*Public Emps. Ret. Sys. of Miss. v. Amedisys*,
   769 F.3d 313 (5th Cir. 2014) ........................................................................................... 27

*Quinones v. Frequency Therapeutics, Inc.*,
   665 F. Supp. 3d 156 (D. Mass. 2023) ....................................................................... 24, 25

*Republic Maximal LLC v. Romulus Cap. Partners II LLC*,
   2024 WL 3169798 (D. Mass. June 25, 2024) ................................................................. 14

*Roth v. LAL Fam. Corp.*,
   748 F. Supp. 3d 180 (S.D.N.Y. 2024) ............................................................................ 13

*San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.*,
   732 F. Supp. 3d 300 (S.D.N.Y. 2024) ............................................................................ 22

*Scritchfield v. Paolo*,
   274 F. Supp. 2d 163 (D.R.I. 2003) ............................................................................ 10, 15

*SEC v. Egan*,
   994 F. Supp. 2d 558 (S.D.N.Y. 2014) ........................................................................ 21

*SEC v. e-Smart Techs., Inc.*,
   31 F. Supp. 3d 69 (D.D.C. 2014) .............................................................................. 20

*SEC v. Johnston*,
   986 F.3d 63 (1st Cir. 2021) ...................................................................................... 17

*Shaw v. Digit. Equip. Corp.*,
   82 F.3d 1194 (1st Cir. 1996)....................................................................................... 8

*Shenwick v. Twitter, Inc.*,
   282 F. Supp. 3d 1115 (N.D. Cal. 2017).................................................................... 25

*Singer v. Reali*,
   883 F.3d 425 (4th Cir. 2018)..................................................................................... 26

*Steinberg v. PRT Grp., Inc.*,
   88 F. Supp. 2d 294 (S.D.N.Y. 2000) ........................................................................ 12

*Summit Tech., Inc. v. High-Line Med. Instruments, Co.*,
   933 F. Supp. 918 (C.D. Cal. 1996)............................................................................ 15

*Swack v. Credit Suisse First Bos.*,
   383 F. Supp. 2d 223 (D. Mass. 2004) ....................................................................... 12

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
   551 U.S. 308 (2007).............................................................................................. 20, 25

*Toussaint v. Care.com Inc.*,
   490 F. Supp. 3d 341 (D. Mass. 2020) ....................................................................... 15

*Washtenaw Cnty. Emps. Ret. Sys. v. Avid Tech., Inc.*,
   28 F. Supp. 3d 93 (D. Mass. 2014) ........................................................................ 7, 22

*Yan v. ReWalk Robotics Ltd.*,
   973 F.3d 22 (1st Cir. 2020) ...................................................................................... 10

## STATUTES

15 U.S.C. § 77k(a) ..................................................................................................... 7, 8

15 U.S.C. § 78c(a)(13)................................................................................................... 13

## RULES

Fed. R. Civ. P. 12(b)(6) ................................................................................................ 7

**REGULATIONS**

17 C.F.R. § 240.10b-5(b) ............................................................................................ 14

**GLOSSARY**

| Term | Definition |
|---|---|
| Additional Plaintiffs | Chris Williams, Tim R. Carrillo, and Chris Swanson |
| AI | Artificial intelligence |
| Board | The Board of Directors of Evolv Technologies Holdings, Inc. |
| Business Combination | Transaction through which Legacy Evolv became a wholly owned subsidiary of NewHold Investment Corp., a special purpose acquisition company, and was renamed Evolv |
| Class Period | June 28, 2021 to October 25, 2024 |
| Def. Br. | Memorandum of Law In Support of Motion to Dismiss (ECF 97) |
| Defendants | Evolv, George, Mark Donohue, Mario Ramos, Kevin Charlton, Thomas J. Sullivan, Charles Goldman, Charlie Baynes-Reid, Adam Deutsch, Marc Saiontz, Kathleen Harris, Brian Mathis, Neil Glat, Sezaneh Taherian |
| DHS | Department of Homeland Security |
| DOJ | U.S. Department of Justice |
| Evolv or the Company | Evolv Technologies Holdings, Inc. |
| Exchange Act | Securities Exchange Act of 1934 |
| Express | Evolv Express, which is a touchless screening system that purports to detect the size, shape, and composition of objects concealed on people as they walk through a scanner |
| FE | Former employee |
| FTC | Federal Trade Commission |
| FTC Complaint | SAC, Exhibit A |
| GAAP | Generally accepted accounting principles |
| George | Peter George |
| George Br. | Memorandum of Law in Support of Defendant Peter George's Motion to Dismiss Plaintiffs' Second Amended Class Action Complaint for Violations of Federal Securities Laws (ECF 96) |
| George Motion | Defendant Peter George's Motion to Dismiss Plaintiffs' Second Amended Class Action Complaint for Violations of Federal Securities Laws (ECF 95) |
| Individual Defendants | George, Mark Donohue, Mario Ramos, and Kevin Charlton |
| Lead Plaintiff | Robert Falk |
| Legacy Evolv | Evolv Technologies, Inc. d/b/a Evolv Technology, Inc. |

| Mendell Decl. | Declaration of Nathaniel R. Mendell in Support of Defendants' Motion to Dismiss the Second Amended Complaint (ECF 91) |
|---|---|
| Motion to Dismiss or Motion | Defendants' Motion to Dismiss the Second Amended Complaint (ECF 90) |
| NCS4 | National Center for Spectator Sports Safety and Security |
| NPSA | National Protective Security Authority |
| Plaintiffs | Robert Falk, Chris Williams, Tim R. Carrillo, and Chris Swanson |
| PSLRA | Private Securities Litigation Reform Act of 1995 |
| Registration Statement | Registration statement, its amendments, and prospectus filed in connection with the Business Combination |
| SAC | Plaintiffs' Second Amended Class Action Complaint for Violations of the Federal Securities Laws (ECF 84) |
| SEC | Securities & Exchange Commission |
| SFC | Senate Finance Committee |
| Securities Act | Securities Act of 1933 |
| Securities Act Individual Defendants | Kevin Charlton, Thomas J. Sullivan, Charles Goldman, Charlie Baynes-Reid, Adam Deutsch, Marc Saiontz, Kathleen Harris, Brian Mathis, Neil Glat, Sezaneh Taherian |

**INTRODUCTION**

Plaintiffs oppose Defendants' motion to dismiss (ECF 90) this class action, which is brought on behalf of persons and entities that: (1) purchased or otherwise acquired Evolv securities during the Class Period, seeking to pursue remedies under the Exchange Act; and/or (2) purchased or otherwise acquired Evolv common stock pursuant to the Registration Statement, seeking to pursue remedies under the Securities Act. Defendants' Motion does not establish any ground for dismissal. This case should be allowed to proceed to discovery.

Evolv purports to develop and sell AI-based weapons detection systems for security screening, including at schools, airports, and stadiums. ¶¶4-5, 40-41, 182.[1] Its flagship product, Express, is a touchless screening system that purports to detect the size, shape, and composition of objects concealed on people as they walk through a scanner. *Id*. Evolv marketed Express "as an answer to the problems of guns and other weapons" in schools, ¶¶2, 103, one that could "reliably" detect "all [] weapons" from guns to knives to explosives. ¶¶5, 56, 58, 111, 115. Evolv also touted significant savings when compared to traditional metal detectors, ¶¶4, 104, 115, as Express allegedly did not require "stopping, removing coats or backpacks, or emptying pockets," allowing customers to screen for weapons with less manpower and less disruption. ¶¶4, 40-41, 102, 114-15.

But Express was not what it claimed. It reported false alarms and failed to detect knives. ¶¶2, 84-85. "Evolv detected some knives at a rate of 0% with a 53% rate overall." ¶6. It could not reliably detect guns and knives at average sensitivity settings, and when used at higher sensitivity settings, false alarms spiked. ¶¶84, 102-03. Customers were forced to take additional measures, diminishing promised advantages. ¶¶2, 102-04. FEs stated that customers often could not get the results they wanted and refused to go forward after a trial period, putting pressure on revenue. ¶83.

---

[1] Citations to "¶__" refer to the SAC, unless otherwise noted.

It all unraveled. There was a serious knife attack at a school in Utica, New York, and a district investigation that concluded Express could not detect knives. Settings were increased, and the false positive rate climbed to as high as 50%. ¶102. School districts had little room to escape their contracts as they were locked into expensive multi-year deals. ¶¶78, 104. The FTC and SEC launched investigations of Evolv for potential misstatements and deceptive practices, and news agencies and independent investigators scrutinized Evolv's product claims. ¶¶102-07. Evolv was ultimately subject to an FTC enforcement action, a financial restatement, an admission of a new material weakness in internal controls, official admissions of misconduct, and a complete house-cleaning at senior levels of management.

The SAC states claims under *both* the Securities Act and the Exchange Act. First, Plaintiffs have standing to assert both types of claims because they acquired the relevant security. Second, the SAC states a claim under the Securities Act against Evolv and the Securities Act Individual Defendants because the Registration Statement exaggerated the efficacy of Express, which suffices to plead a claim because there is no element of scienter. Third, the SAC sufficiently alleges claims under the Exchange Act because the Class Period statements continued to overstate product efficacy and overstated revenue. Indeed, Evolv has admitted its financial statements were materially false and misleading.[2] There are numerous indicia of scienter or recklessness for the Class Period statements, from Evolv's admission of "misconduct," to the withholding of information from auditors, to the secret scrubbing of claims from already published articles, to the terminations and resignations, to internal, external, and government investigations into the truthfulness of its claims. This is buttressed by a core operations inference, including facts from

---

[2] Notably, Evolv issued its final restated financials on April 28, 2025, after the filing of Defendants' motions to dismiss, which confirmed inaccuracies in prior statements and offered final restated figures for the second quarter of 2022 to the second quarter of 2024.

2

well-placed FEs who confirmed difficulties in closing deals because Express's capabilities were overstated. When viewed holistically, it is clear the SAC supports an inference of scienter that is at least as strong as the non-culpable inference. The SAC adequately alleges loss causation because each corrective disclosure partially revealed the true state of Express's abilities and revealed the falsity of earlier statements. Thus, the SAC alleges Exchange Act claims.

The Motion to Dismiss should be denied,[3] and this case should proceed into discovery.

## STATEMENT OF FACTS

**A.    Defendants Repeatedly Touted That Express, The Company's Flagship Product, Could "Reliably" Detect Threats More Efficiently Than Traditional Metal Detectors**

Evolv develops and sells AI-powered weapons detection systems. ¶4. At all relevant times, Evolv's revenue has been primarily derived from sales of Express, a product which claims to "use[] artificial intelligence to reliably detect real threats." ¶¶4-5, 40-42, 56, 111-12. Evolv went public through the Business Combination in July 2021. ¶¶47-52.

In connection with the Business Combination, Evolv filed a Registration Statement that touted Express's advantages over traditional metal detectors. For example, the Securities Act Defendants claimed: "unlike conventional walk-through metal detectors, our products use advanced sensors, artificial intelligence software, and cloud services to reliably detect guns, improvised explosives, and large knives while ignoring harmless items like phones and keys." ¶¶111, 115. During a Fox Business interview on July 23, 2021, George stated Evolv had "written the machine learning algorithms for all the guns, all the bombs, and all the large tactical knives in the world and our sensor system can identify those signatures quickly, send an alert, and will stop it before it gets into the venue." ¶114.

---

[3] In light of the restatement, Plaintiffs withdraw without prejudice allegations regarding the falsity of pre-June 2022 statements about revenue recognition policy (¶¶126-27) and about financial results (¶¶131-36).

Defendants continued to overstate Express's efficacy after the Business Combination. ¶¶115-16. On March 23, 2022, Evolv posted the results of alleged independent testing performed by the NCS4, stating that "Express earn[ed] an overall composite score of 2.84." ¶118. Defendants also touted that Express had received the DHS SAFETY Act Designation, which involved "rigorous use and review to meet and/or exceed the DHS' performance standards[.]" ¶¶120-21.

**B.      Unbeknownst To Investors, Express Could Not "Reliably" Detect Weapons**

Defendants' statements overstated the efficacy of Express. Even in a controlled environment, Express: failed to detect large knives 42% of the time (¶60); "detected some knives at a rate of 0% with a 53% rate overall" (¶64); detected knives over 5" only 58% of the time (¶64); did not detect "non-ferrous materials such as 'plastic explosives, 3D-printed guns, and many types of improvised explosive devices (IEDs) such as lead pipe bombs'" at all (¶66); and detected micro-compact pistols less accurately than traditional metal detectors (¶63). Express fared even worse in real-world conditions when trialed by its customers, 50% of which were schools; many customers found it "could not detect knives" despite being marketed as a weapons detection system. ¶¶13, 82-86, 103. Moreover, Evolv had such a high rate of false positives that customers had to employ additional personnel to monitor scanners, and it recommended using conveyor belts to divert personal items, nullifying the purported efficiencies of its technology. ¶¶13, 84, 103, 117. And, as the FTC later established, Evolv had "not conducted testing, has not had Express tested by United States or United Kingdom government agencies, and ***does not otherwise possess studies that substantiate [its] marketing claims***." ¶¶13, 105.

**C.      Evolv Improperly Recognized Revenue For Contracts Subject To "Extra-Contractual Terms And Conditions," Including Trial Periods During Which Customers Did Not Make A Purchase Commitment**

Because Evolv targeted venues without standardized regulations for security protocols, customers would have to test Express at their venues to understand its effectiveness. ¶¶81-82.

4

Through these trials, customers found that Express delivered "so many false alarms" and could not detect many common weapons, like knives. ¶¶83-86. Evolv recognized revenue for these trial periods, which was improper under GAAP because the customers had not made a purchase commitment. ¶¶88-94. Moreover, to coax customers to sign contracts despite product deficiencies, Evolv offered certain extra contractual terms and conditions to channel partners and end users that were not shared with the accounting department and caused it to overstate revenue. ¶¶95-98.

> **D.    The Truth Regarding Express's Efficacy And False Financial Statements Emerged Through A Series Of Partial Disclosures, Including An Investigation By Federal Regulators**

A series of reports revealed Evolv had overstated the effectiveness of the Express, leading to federal investigations and Evolv's confession to accounting manipulation. ¶¶68-73, 87-96. On May 23, 2023, BBC reported that Express was removed by a Utica school because an internal investigation concluded that it "was not designed to detect knives." ¶68. The investigation was prompted after an incident in which a 9" knife went undetected by Express and was used in a stabbing. *Id.* Express failed to detect knives, including a 7" knife, at three other schools in the same district. *Id.* Notably, Evolv had deleted poor ratings from the NCS4 report about knives greater than 5". ¶64. On this news, Evolv's stock price fell $0.45, or 7.56%, to close at $5.50 per share on May 23, 2023, on unusually heavy trading volume. ¶69.

News that Express failed to reliably detect weapons prompted federal investigations. On October 12, 2023, before the market opened, Evolv disclosed that it was under investigation by the FTC regarding "certain aspects of its marketing practices." ¶70. On this news, its stock price fell 13.33% to close at $3.77 per share. ¶71. Then, on February 19, 2024, Evolv reported the SEC had also opened an investigation. ¶72; *see also* ¶7 n.1. On this news, its stock fell 15.67%. ¶73.

Following these investigations, Evolv quietly edited prior press releases to backtrack its testing claims, which was exposed by another BBC report on March 13, 2024. ¶74. Previously,

5

Evolv stated a UK Government department had "concluded that the Evolv Express solution was highly effective." ¶74. The BBC reported, however, that that department does not do this type of testing and that Evolv had later changed the release to reveal an "independent company" had performed testing merely using UK government standards. ¶74. The BBC also reported Evolv had changed how it referred to "third party testing" related to its SAFETY Act designation in a similar manner. ¶74. On this news, Evolv's stock price fell $0.13, or 3.5%. ¶75.

These investigations forced Evolv to admit that it had used certain "extra-contractual" terms and conditions that had artificially inflated revenue. ¶95. On October 25, 2024, Evolv announced that its financial statements since second quarter of 2022 could no longer be relied on and would have to be restated because "certain sales, including sales to one of its largest channel partners, were subject to extra-contractual terms and conditions." *Id.* Moreover, "certain Company personnel engaged in misconduct in connection with those transactions." *Id.* On this news, Evolv's stock price fell $1.63, or 39.75%, to close at $2.47 per share. ¶96.

In the wake of these disclosures, George was terminated as President and CEO and Donohue resigned without severance benefits. ¶¶97, 100, 110. Evolv admitted "certain accounting personnel were aware of these extra-contractual terms and conditions during affected periods, and that related allegations were raised internally in July 2024 and known to senior finance and accounting personnel, but that those allegations were not escalated." ¶99.

### E.    The FTC Concluded Defendants Overstated Express' Detection Abilities And Won Contracts Through Deceptive Marketing

On November 26, 2024, the FTC filed a complaint against Evolv for false marketing, concluding based on its investigation that "Evolv misrepresented that its Evolv Express system will detect all weapons." ¶¶102-03. According to the FTC, Evolv falsely claimed that Express was cheaper and more effective than traditional metal detectors; Evolv's claims about NSC4 and US

6

government testing were misleading; and Evolv won contracts and "earned significant revenues" through deceptive acts and practices that coerced schools into multi-year subscription-based contracts. ¶¶103-107; FTC Complaint, ¶¶6-13, 32. Evolv settled the FTC's claims by releasing schools from their contracts. ¶¶108-09. Then George resigned from his remaining position. ¶110.

## LEGAL STANDARD

When considering a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the Court must "accept well-pleaded factual allegations in the complaint as true" and "view all reasonable inferences in the plaintiff's favor." *Constr. Indus. & Laborers Joint Pension Tr. v. Carbonite, Inc.*, 22 F.4th 1, 6 (1st Cir. 2021).[4] A motion to dismiss "does not measure the complaint's probability of success, but rather its legal adequacy." *Washtenaw Cnty. Emps. Ret. Sys. v. Avid Tech., Inc.*, 28 F. Supp. 3d 93, 103 (D. Mass. 2014).

## ARGUMENT

### I.    THE SAC STATES CLAIMS UNDER THE SECURITIES ACT

Section 11 attaches liability to a registration statement that "contain[s] an untrue statement of a material fact" or "omit[s] . . . a material fact . . . necessary to make the statements therein not misleading.'" 15 U.S.C. § 77k(a). Plaintiffs "need only show a material misstatement or omission to establish [a] *prima facie* case." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983) (liability against issuer for even "innocent misstatement" is "virtually absolute"). Here, the Securities Act Defendants made misleading statements that omitted material facts about Express in the Registration Statement.

---

[4] Unless otherwise stated, all emphasis is added, all citations and quotations are omitted, and all citations are cleaned up.

### A.    Plaintiffs Face A Minimal Pleading Burden

The sufficiency of Section 11 claims is governed by Rule 8(a), not Rule 9(b), unless claims "sound in fraud." *Shaw v. Digit. Equip. Corp.*, 82 F.3d 1194, 1223 (1st Cir. 1996). Defendants assert that the heightened standard applies, but fail to explain why the claims sound in fraud. Def. Br. at 10 (citing *Orton v. Parametric Tech. Corp.*, 344 F. Supp. 2d 290, 298–99 (D. Mass. 2004) (10(b) claims only)).[5] Defendants may not redress this error on reply. *See SoltaMed., Inc. v. Lumenis, Inc.*, 454 F. Supp. 3d 107, 112 (D. Mass. 2020) (on waiver). Even if the Securities Act claims sound in fraud (they do not), they are sufficiently pled under Rule 9(b).

### B.    The SAC Adequately Alleges Standing To Raise The Securities Act Claims

Defendants half-heartedly argue that Lead Plaintiff lacks standing because he did not "purchase" Evolv stock, Def. Br. at 3, 29-30, but this wrongly ignores that "any person ***acquiring*** such security" also has standing, 15 U.S.C. § 77k(a). Lead Plaintiff is part of the class, which includes investors who "otherwise acquired" common stock, as he acquired 116,877 shares of newly issued Evolv common stock pursuant to the challenged Registration Statement. ¶¶1, 20; *see also* ECF No. 64-1 at 2. Lead Plaintiff's "acqui[sition]" of Evolv stock pursuant to that Registration Statement establishes standing to sue for false or misleading statements made therein. *See In re Hub Cyber Sec. Ltd.*, 2025 WL 872078, *8 (S.D.N.Y. Mar. 20, 2025) (receipt of newly issued shares through business combination "plainly fall[s] into the category of 'any person acquiring' the securities at issue"). Defendants' authority is inapposite because those plaintiffs, who purchased shares on the open market, had to "prove [their] shares were issued under the allegedly

---

[5] Plaintiffs expressly disclaim fraud as to the Securities Act claims. ¶¶212, 220; *see also* ¶¶55-56 ("The Registration Statement was *negligently* prepared"); *Fox v. First BanCorp*, 2006 WL 4128534, at *4 (D.P.R. Nov. 6, 2006) (disclaimer sufficient to preclude Rule 9(b)). At minimum, the Securities Act claims against Defendants Sullivan, Goldman, Baynes-Reid, Deutsch, Saiontz, Harris, Mathis, Glat, and Taherian—who are not named as defendants for the Exchange Act claims—do not sound in fraud. *See In re WebSecure, Inc. Sec. Litig.*, 182 F.R.D. 364, 367 (D. Mass. 1998) ("[n]owhere in the complaint is there any allegation of scienter with regard to [them]").

8

false or misleading registration statement, rather than some other registration statement." *In re Ariad Pharm., Inc. Sec. Litig.*, 842 F.3d 744, 755 (1st Cir. 2016) (Def. Br. at 30). No one disputes that Lead Plaintiff's shares were issued under the Registration Statement. Thus, he has standing.

**C.      The Registration Statement Was Materially False And/Or Omitted To State Material Facts Regarding Effectiveness Of Express**

The Registration Statement overstated the effectiveness of Express. It falsely stated Express can "***reliably*** detect real threats" and "***reliably*** detect guns, improvised explosives, and large knives." ¶¶55-56, 111. In reality, Express failed to accurately and consistently detect common weapons, including large knives, and non-ferrous materials like 3D-printed guns. ¶¶60-66. The FTC confirmed that Evolv misrepresented Express's weapons detection capabilities. ¶¶102-104. These facts demonstrate falsity. *In re Restoration Robotics, Inc. Sec. Litig.*, 417 F. Supp. 3d 1242 (N.D. Cal. 2019) (registration statement misleading where robotic hair restoration product was not capable of level of precision stated).

The Registration Statement was also misleading because it claimed Express was superior to traditional metal detectors when, in reality, Express actually had such high false alarms that venues employed "additional personnel to monitor the process." ¶¶102-104, 111; *Franchi v. SmileDirectClub, Inc.*, 633 F. Supp. 3d 1046, 1074 (M.D. Tenn. 2022) (qualitative statement about "convenient access to excellent clinical care" actionable where sales assistants acted without meaningful oversight from licensed dentist). Express is not more effective than traditional metal detectors because it cannot detect compact pistols at the same rate and does not detect non-ferrous metal at all. ¶¶63, 66. Express is also more expensive than traditional metal detectors because additional measures, such as personnel to monitor conveyor belts, were required to mitigate the high rate of false positives. ¶¶13, 15, 40, 84, 102-103, 117; *see, e.g.*, *In re Allaire Corp. Sec. Litig.*, 224 F. Supp. 2d 319, 328 (D. Mass. 2002) (claiming that software was "capable of running large

9

business websites" and was "successfully beta tested" actionable "given the problems later found with the product" and "evidence that [it] was not operable—at least not as its customers and investors understood that it should operate").

These statements are not puffery because they make a statement of Express' "present status and capabilities" and "connote[] that the product was comparatively superior."[6] *Scritchfield v. Paolo*, 274 F. Supp. 2d 163, 175 (D.R.I. 2003) (statements that company was a "premier provider" and "leading provider" of services not puffery). Unlike in Defendants' cases, the alleged misstatements are concrete representations of present fact. *Yan v. ReWalk Robotics Ltd.*, 973 F.3d 22, 33 (1st Cir. 2020) ("breakthrough product" is a "puffed-up qualitative expression") (Def. Br. at 14). Whether Express can "reliably" detect weapons is capable of being tested and objectively verified. *See City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 674 (6th Cir. 2005) (objective verification exists when there is "an assertion of a relationship between data and a conclusion, one that a finder of fact could test against record evidence").

**D.      The Registration Statement Misleadingly Conveyed Risks As Hypothetical**

The Registration Statement presented certain risks, such as reputational harm if Express did not work as advertised, as hypothetical when they had already materialized. *In re No. Nine Visual Tech. Corp. Sec. Litig.*, 51 F. Supp. 2d 1, 24–25 (D. Mass. 1999) ("There is a difference between knowing that [a product] *may* run into a few snags, and knowing that a particular product has *already developed* problems."). Defendants claimed that Evolv's business "***could***" be harmed "***if***" its products "fail or are perceived to fail to detect threats." ¶112; *see also* ¶124 ("Problems with the reliability or security of its systems ***could*** harm its reputation."). But, at the time of the

---

[6] *Cf.* Def. Br. at 14; *see also In re Viropharma, Inc. Sec. Litig.*, 2003 WL 1824914, at *6 (E.D. Pa. Apr. 7, 2003) ("Indeed, it would be sad day when court could determine that misstatements about a whether a company's primary product worked did not alter the 'total mix' of information available in the market.").

Registration Statement, customers had already "realized the system did not work the way Evolv marketed" and "was not effective." ¶¶83-85; *In re Honest Co. Sec. Litig.*, 615 F. Supp. 3d 1149, 1156 (C.D. Cal. 2022) (registration statement's risks of potential negative customer sentiment inadequate for omitting then-existing customer dissatisfaction with product's technology). Thus, Evolv's reputation had *already* been harmed at the time of the Registration Statement. *In re iDreamSky Tech. Ltd. Sec. Litig.*, 236 F. Supp. 3d 824, 831 (S.D.N.Y. 2017) (generalized risk of potential reputational harm insufficient where product already had billing issues and would be delayed).

Defendants improperly insert a knowledge requirement; Plaintiffs are not required to show that "anyone at Evolv had reached [a] determination" that the risk had materialized. *See* Def. Br. at 15-16 (citing *Cody v. Conformis, Inc.*, 199 F. Supp. 3d 409, 417 (D. Mass. 2016) ("statement that an event *may* happen can be materially misleading if the event is *already* happening") (emphasis in original)). Regardless, any argument that this risk had not already materialized incorrectly presumes Express worked before the Business Combination but not after. *See Allaire*, 224 F. Supp. 2d at 329 ("highly unlikely" that "the product worked properly in December, but did not in January"). The FTC Complaint, which found that marketing materials as early as 2019— years before the Registration Statement—misrepresented the extent to which the Express will detect weapons and ignore harmless items, confirms that Express never worked. ¶¶102, 104-107; FTC Complaint, ¶¶ 2, 9, 27; *cf. Conformis*, 199 F. Supp. 3d at 417 (no allegation of ongoing manufacturing problems).

Defendants' purported disclosure that Express may experience errors "from time to time" is meaningless in light of the widespread failures to detect common weapons. *Cf.* Def. Br at 17; *see, e.g.*, ¶60 ("Express failed to detect large knives 42% of the time"); ¶64 (Express "detected

11

some knives at a rate of 0%"). Defendants' claim that that they accurately disclosed the error rates is belied by the market reaction, as the stock drop at the eventual disclosures demonstrates that investors did not know how poorly Evolv performed. ¶¶68-75; *see In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 703 (9th Cir. 2021) ("market reaction" to disclosure of security vulnerabilities "support[ed] the materiality of the misleading omission").

At best, Defendants' argument amounts to a premature "truth on the market" affirmative defense, which is "intensely fact specific and rarely an appropriate basis for dismissal." *Swack v. Credit Suisse First Bos.*, 383 F. Supp. 2d 223, 238 (D. Mass. 2004). Defendants have not borne their burden, as corrective information must be conveyed with a "degree of intensity and credibility sufficient to counter-balance effectively" any misleading information.[7] *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 167 (2d Cir. 2000). Still, the significant stock drop following the corrective disclosures precludes a finding that the market was aware of the alleged omission. *In re MBIA, Inc., Sec. Litig.*, 700 F. Supp. 2d 566, 582 (S.D.N.Y. 2010) ("market reaction" to corrective disclosure sufficient to "question whether [d]efendants provided the 'truth-on-the-market'").

## II.    THE SAC STATES CLAIMS UNDER THE EXCHANGE ACT

A claim for securities fraud under Section 10(b) and/or SEC Rule 10b-5 has six elements: "(1) a material misrepresentation or omission; (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation." *Miss. Pub. Emps.' Ret. Sys. v. Boston Sci. Corp.*, 523 F.3d 75, 85 (1st Cir. 2008). The PSLRA requires a plaintiff to "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading." *Carbonite*, 22 F.4th at 6. The complaint must allege "the who, what, where, and

---

[7] Defendants' cases are inapposite because those risks discussed exactly what was alleged to have been omitted. *Angelos v. Tokai Pharm., Inc.*, 494 F. Supp. 3d 39, 51 (D. Mass. 2020) (registration statement disclosed that preclinical studies had limited inferential value and did not imply drug would be found effective); *Steinberg v. PRT Grp., Inc.*, 88 F. Supp. 2d 294, 302 (S.D.N.Y. 2000) (company disclosed that it relied on third-party, not proprietary, software).

when" of the allegedly false statements. *Kaufman v. CVS Caremark Corp.*, 836 F.3d 88, 91 (1st Cir. 2016). But the standards "do not require a plaintiff to plead evidence." *In re Cabletron Sys., Inc.*, 311 F.3d 11, 33 (1st Cir. 2002).

    **A.**     **The SAC Adequately Alleges Standing to Raise the Exchange Act Claims**

As with the Securities Act claims, Lead Plaintiff has standing for the Exchange Act claims due to his acquisition of Evolv shares during the Class Period. *See* 15 U.S.C. § 78c(a)(13) ("purchase" "include[s] any contract to buy, purchase, *or otherwise acquire*"). Defendants cite a decades-old case that found the acquisition of stock via merger was a decision not to sell, but that is questionable given the breadth of the term "purchase." *See In re Bank of Bos. Corp. Sec. Litig.*, 762 F. Supp. 1525, 1531-32 (D. Mass. 1991) (Def. Br. at 30); *see also Roth v. LAL Fam. Corp.*, 748 F. Supp. 3d 180, 189 (S.D.N.Y. 2024)("[T]he ordinary meaning of 'purchase' at the time of the Exchange Act's passage entailed that the purchaser 'acquire' or 'obtain' the subject of the transaction[.]"), *aff'd sub nom. Roth on behalf of Estee Lauder Companies Inc. v. LAL Fam. Corp.*, 138 F.4th 696 (2d Cir. 2025) . Lead Plaintiff has "documentary verification" that he "dealt in the security to which the prospectus, representation, or omission relates," thereby obviating the policy concerns of the purchaser-seller rule. *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 746-47 (1975).

Defendants do not challenge the Additional Plaintiffs' standing but argue that they cannot supplant a purported requirement that Lead Plaintiff have standing. Def. Br. at 30. But "[n]othing in the PSLRA indicates that district courts must choose a lead plaintiff with standing to sue on every available cause of action." *Hevesi v. Citigroup Inc.*, 366 F.3d 70, 82 & n.13 (2d Cir. 2004) ("[As] the PSLRA mandates that courts must choose a party who has, among other things, the largest financial stake in the outcome of the case, it is inevitable that, in some cases, the lead plaintiff will not have standing to sue on every claim."). It follows that the Lead Plaintiff can add

13

additional plaintiffs "to aid . . . in representing a class," including to bring claims that the lead plaintiff does not have standing to allege. *Id.* at 83.[8] The court should not "permit[] defendants to police the adequacy of class representatives and their counsel [since it] is like 'permitting a fox . . . to take charge of the chicken house.'" *In re Pfizer Inc. Sec. Litig.*, 282 F.R.D. 38, 48 (S.D.N.Y. 2012); *George v. China Auto. Sys., Inc.*, 2012 WL 3205062, at \*16 (S.D.N.Y. Aug. 8, 2012) (defendants' "sudden concern for the best interests of the class is as ironic as it is unconvincing").

## B.    The SAC Adequately Alleges False or Misleading Statements

A statement is actionable if it (1) "make[s] any untrue statement of a material fact" or (2) "omit[s] to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37 (2011) (quoting 17 C.F.R. § 240.10b-5(b)). A statement is misleading when "a reasonable investor, in the exercise of due care, would have received a false impression from the statement." *Republic Maximal LLC v. Romulus Cap. Partners II LLC*, 2024 WL 3169798 at \*11 (D. Mass. June 25, 2024). The SAC adequately alleges Defendants made false or misleading statements regarding the effectiveness of Express and its financial results.

### 1.    Defendants Continued To Overstate The Effectiveness Of Express

Defendants' actionable statements in the Registration Statement were repeated in Evolv's 2021 10-K, 2022 10-K, and 2023 10-K, thus they are misleading for substantially the same reasons. *See* Secs. I.C-D., *supra*; ¶¶111-13, 115-16, 124-25. Express's shortcomings existed throughout the Class Period because Evolv never improved its detection capabilities. *See, e.g.*, ¶84 (customers found Express had "so many false alarms" he instructed his team not to sell the product); *see also*

---

[8] Defendants' other cases, Def. Br. at 30, are distinguishable. *City of Bristol Pension Fund v. Vertex Pharm. Inc.*, 12 F. Supp. 3d 225, 234 (D. Mass. 2014) (plaintiff purchased shares only after partial corrective disclosure); *Gross v. Summa Four, Inc.*, 93 F.3d 987, 993 (1st Cir. 1996) (plaintiff's only "purchases" was before the class period).

14

¶¶63-65 (testing revealed weapons detection was "unreliable"); *Carbonite*, 22 F. 4th at 7 (statements that new data-backup product improved its performance actionable where product was not capable of the backing up virtual environments completely).

These statements are not puffery. *See* Sec. I.C., *supra*. Defendants improperly isolate portions of alleged misstatements to claim they are "classic examples of generalized statements about brand quality." Def. Br. at 14; *Scritchfield v. Paolo*, 274 F. Supp. 2d 163, 176 (D.R.I. 2003) (improper to "pluck[] the statements out of their context to determine . . . [if] vague'"). A reasonable shareholder would consider information which undermines claims of product effectiveness to be important. *E.g.*, *In re PerkinElmer, Inc. Sec. Litig.*, 286 F. Supp. 2d 46, 53 (D. Mass. 2003) (omission that x-ray panels were not workable material); *accord Carbonite*, 22 F. 4th at 8. Defendants' cases rely on statements that were not concrete, verifiable statements of fact. *See In re iRobot Corp. Sec. Litig.*, 527 F. Supp. 3d 124, 138 (D. Mass. 2021) ("strong" market share); *Toussaint v. Care.com Inc.*, 490 F. Supp. 3d 341, 350 (D. Mass. 2020) ("compete[s] favorably"); *In re Biogen Inc. Sec. Litig.*, 193 F. Supp. 3d 5, 42 (D. Mass. 2016) ("terrific product"); *see also Summit Tech., Inc. v. High-Line Med. Instruments, Co.*, 933 F. Supp. 918, 931 (C.D. Cal. 1996) ("perfectly reliable" is mere puffery, not actionable under the Lanham Act, California state law). Again, Defendants raise a truth-on-the-market defense improper for adjudication at this stage.

### 2. The Fox Business Appearance Presents Actionable Statements

Plaintiffs incorporate by reference Section I.A.2. of the concurrently-filed George Opposition in response to Defendants' arguments about George's statements during the Fox Business appearance.

### 3. The NSC4 Safety Score Announcement Is Misleading By Omission

On March 23, 2022, Defendants stated Express had received an "overall composite score of 2.84" out of 3 and "met the criteria established" in testing by NSC4, but omitted material information necessary to make this statement accurate. ¶¶118-119. Defendants removed from the

15

report key details, including that Express: failed to detect large knives 42% of the time (¶¶118, 60); "detected some knives at a rate of 0% with a 53% rate overall" (¶64); detected knives over 5 inches only 58% of the time (¶64); testing found "knives were not consistently detected" (¶61); multiple evaluators called knife detection "not consistent" and "unreliable" (¶64); and Express is less effective at detecting micro-compact pistols than a conventional metal detector (¶63). "[H]aving elected to comment on [the NSC4 test and the Express's capabilities], [Evolv] was required to make full and accurate disclosures." *Allaire*, 224 F. Supp. 2d at 327.

Defendants' argument, that this announcement is technically accurate, ignores the context in which the statement was made. Def. Br. at 13-14. Defendants deleted damning details, including a *1.3* score for detecting knives greater than 5 inches, which skewed investors and consumers' understanding of Express' efficacy. ¶¶64, 119. Defendants cite a case wherein the statements explicitly disclosed the manner in which the data was incomplete. *Pizzuto v. Homology Medicines, Inc.*, 2024 WL 1436025, at *14 (D. Mass. Mar. 31, 2024) (company acknowledged that the reported data only reflected the three subjects whose data was collected before "cutoff date"). No such disclaimer was made here, and the FTC has also concluded that Defendants' claims about the NCS4 report were misleading because Evolv failed to disclose that it was "working with NCS4 on changes to the report, including removal of negative information." ¶106.

### 4.    The SAFETY Act Designation Misled Investors

Evolv's claimed SAFETY Act designation, which is purportedly awarded to "technologies that . . . have undergone rigorous use and review," was misleading because, as the FTC found, Evolv "has not conducted testing, has not had Express tested by United States or United Kingdom government agencies, and does not otherwise possess studies that substantiate [its] marketing claims." ¶¶105, 120-22. Having elected to comment on the SAFETY Act designation, Evolv was required to make complete and accurate disclosures and not mislead investors about the

16

designation. *SEC v. Johnston*, 986 F.3d 63, 74 (1st Cir. 2021). Instead, Evolv engaged in "half-truths and distortions" intended to "convey a false understanding" of the SAFETY Act designation and the testing it involved. *Id.*

Defendants argue that Evolv's announcement of its SAFETY Designation was technically accurate, and thus non-actionable. Def. Br. at 14. However, the "disclosure required by the securities laws is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead prospective buyers." *Brumbaugh v. Wave Sys. Corp.*, 416 F. Supp. 2d 239, 249-50 & n.10 (D. Mass. 2006) (press release announcement of partnership deals that omitted terms was materially misleading as a "reasonable shareholder" would have assumed the announcement was significant). A reasonable shareholder would have a misleading impression about the significance of the designation and the testing conducted. *See* ¶105.

### 5.     Evolv Did Not Follow Its Revenue Recognition Policy

Evolv represented that it "recognize[d] revenue in accordance with [ASC] 606," including in Evolv's 2022 and 2023 Form 10-Ks. ¶¶126-29. These statements were false because, at least from the second quarter of 2022 to the second quarter of 2024, Evolv has admitted it failed to comply with GAAP. During this period, Evolv improperly offered extra-contractual terms and conditions that were not shared with accounting personnel or its outside auditor and were not accounted for in accordance with GAAP and/or ASC 606. ¶¶95, 98-99, 130. This was black-and-white falsity: Evolv claimed to be operating in compliance with GAAP and ASC 606 when it was not. *See Mulderrig v. Amyris, Inc.*, 492 F. Supp. 3d 999, 1017 (N.D. Cal. 2020) (compliance with GAAP and ASC 606 false or misleading when they "did not align with what defendants actually were recognizing in their statements").

17

### 6.    Evolv's Revenue Between Second Quarter 2022 And Second Quarter 2024 Was Overstated

Evolv's financial results for revenue and related metrics were materially inaccurate between the second quarter of 2022 and the second quarter of 2024. ¶¶135-56. Defendants do not (because they cannot) challenge whether these financial statements were false. Def. Br. at 18.[9] Instead, they claim that Plaintiffs must allege "with particularity which financial metrics in which periods were misstated or by what amounts." *Id.* (citing *Greebel v. FTP Software*, 194 F.3d 185, 203 (1st Cir. 1999)). Not so. *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 486 (S.D.N.Y. 2004) ("[T]he mere fact that financial results were restated is sufficient basis for pleading that those statements were false when made.").

Regardless, the SAC pleads that these financial statements were misleading because they included "premature or incorrect revenue recognition of approximately $4 million to $6 million." ¶95. *Greebel* did not involve a restatement and did not even require plaintiffs to allege the dates of transactions or the identities of customers in every instance. 194 F.3d at 203 ("We do not say that each of these particulars must appear in a complaint . . . ."). If the Court requires the specifics Defendants now seek, Plaintiffs can provide them through amendment. *See* Sec. III., *infra*.

### 7.    Evolv's Internal Controls Over Financial Reporting Were Not Effective

In light of the restatement of two years' worth of financial statements, it strains credulity for Defendants to suggest that the statements about the adequacy of Evolv's internal controls were not misleading. Def. Br. at 18; *see generally* ¶¶156-66. From the time of the Registration Statement, Evolv was forced to acknowledge that it suffered from material weaknesses in internal control over financial reporting, including weaknesses related to "the analysis of certain complex, non-routine transactions." ¶157. Evolv initially played the material weaknesses off as resulting

---

[9] Plaintiffs have withdrawn their challenges to financial statements before June 30, 2022. *See* n.3, *supra*.

18

from the fact that Evolv had only recently gone public, citing a failure to build out controls and hire necessary staff. ¶¶157-58. Evolv touted to investors that it was working to remediate these problems, ¶¶159, 163-64, but the material weaknesses were never fixed. Instead, serious revenue recognition issues were allowed to drag on for ***three years***, until Evolv suffered an additional material weakness on the same issue that caused a financial restatement, numerous internal and external investigations, and a mass expulsion of senior leadership. *See Cabletron*, 311 F.3d at 23-23 (finding "unremittingly optimistic" statements in the face of adverse factors, coupled with poor results, to state a claim). The SAC adequately pleads the falsity of the internal control remediation statements. *See Hub*, 2025 WL 872078, *15-16 (statements about internal controls false or misleading in context). In sum, the SAC adequately pleads that Defendants made false and misleading statements during the Class Period.[10]

## C.    The SAC Adequately Alleges A Strong Inference Of Scienter

Plaintiffs' SAC alleges a strong inference of scienter or recklessness on the part of Defendant Evolv and Individual Defendants George, Donohue, Ramos, and Charlton. Defendants' Motion takes the disfavored "divide and conquer" approach to scienter. *See, e.g.*, *Collier v. ModusLink Glob. Sols., Inc.*, 9 F. Supp. 3d 61, 76 (D. Mass. 2014) (rejecting scienter analysis where defendants "[sought] to . . . pick[] apart each allegation one-by-one"). As such, the Motion argues that core operations "alone" cannot establish scienter, or investigations "alone," or resignations "alone," and so forth. Def. Br. at 22-29. Such arguments are not only unconvincing;

---

[10] Defendants briefly state that the Individual Defendants cannot be liable because they were not "directly involved in the alleged misstatements." Def. Br. at 30 n.16. This is false: the Individual Defendants uttered challenged statements and signed documents containing challenged statements, and thus they are clearly "makers" of those statements, at a minimum. *See, e.g.*, *SEC v. e-Smart Techs., Inc.*, 31 F. Supp. 3d 69, 80 (D.D.C. 2014) ("Courts have consistently held that the signer of a corporate filing is its 'maker,' because signing a filing implies 'ultimate control' over its contents."). Defendants argue that the SAC improperly relies on "group pleading," but they do not explain how. Def. Br. at 11 n.4; *see also In re Raytheon Sec. Litig.*, 157 F. Supp. 2d 131, 152 (D. Mass. 2001) (finding it reasonable to presume that annual or quarterly reports or other group-published information are the collective actions of the corporate officers).

19

they violate the central command of *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, which is that scienter allegations must be viewed, not in isolation, but holistically. 551 U.S. 308, 323 (2007).

Viewed holistically, the SAC alleges with particularity that Defendants were *at least* reckless as to the misleading nature of their statements during the Class Period. The inference begins with the black-and-white falsities propagated by Defendants. Defendants stated that Express detected "all [] weapons" and "all . . . large tactical knives in the world," when they knew that it did not detect knives, ¶¶58, 66, 85, 102-04, as in it "truly, truly could not" detect knives, Mendel Decl., Ex. O at 3. Defendants stated that Express could replace traditional metal detectors at lower costs, when it could not. ¶¶6, 13, 15, 40, 103-04, 111, 117. Defendants stated that Evolv followed GAAP-approved revenue recognition methods, while it skirted them. ¶¶76-99, 126-130. Defendants issued revenue figures, but they were false and inaccurate. ¶¶95-99, 131-56. Defendants stated that they were improving their internal controls, but problems festered. ¶¶95-99, 157-66. The clear nature of these falsities contributes to the inference of scienter.

To this, the SAC adds direct evidence of scienter in the form of Evolv's admission of "*misconduct*" within the Company, ¶¶95, 187, 195, including that the fact that material information was "*withheld*" from its audit committee and outside auditor. ¶¶10, 95. Obscuring information from auditors is strong indication of fraud. *See SEC v. Egan*, 994 F. Supp. 2d 558, 567 (S.D.N.Y. 2014) (classifying it as conscious misbehavior). Evolv admitted that the misconduct had been known by "*senior finance and accounting personnel*," ¶12, 99, and was so serious that Evolv's Board launched an internal investigation into "*when senior Company personnel became aware*." ¶95. There were also other instances of deceitful behavior, as when Evolv scrubbed negative evidence from already published articles. ¶61. Evolv was ultimately forced to make a series of retractions and corrections for inaccurate public statements in press releases and on their

20

websites. *See, e.g.*, ¶74 (updated press release to indicate that Express has not been "validated" by UK company); Mendel Decl., Ex. T at 4 ("We . . . deeply regret if any of our past statements confused or appeared to generalise our capabilities at the time"). This all reenforces the inference of scienter. *See Crowell v. Ionics, Inc.*, 343 F. Supp. 2d 1 (D. Mass. 2004) ("violations of GAAP and of a corporation's own corporate revenue recognition policies are obviously probative of scienter"); *Chalverus v. Pegasystems, Inc.*, 59 F. Supp. 2d 226, 235 (D. Mass. 1999) (same).

All of this is corroborated by an FTC enforcement action that alleged "***deceptive[]***" practices and "***false claims***" on the part of Evolv for statements about the extent to which "its AI-powered security screening system could detect weapons and ignore harmless personal items, including in school settings." ¶102; *see also In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 168 (S.D.N.Y. 2008) (DOJ investigation "relevant to the holistic view of the purported facts as they relate to scienter"). Tellingly, Defendants fail to address the FTC's findings in their Memorandum or Motion and instead dismiss the FTC as a "government investigation" that did not reach "conclusions."  Def. Br. at 3, 6, 26-27. That Evolv "neither admit[ed] nor denie[d]" wrongdoing detracts little from the fact that the Evolv was forced to allow schools to cancel their contracts because they had been misled about Express's abilities. ¶¶104, 109. Moreover, the FTC action coincided with other independent news reports that questioned Evolv's truthfulness. IPVM, for example, a firm that analyzes security equipment, concluded that Evolv ***"exaggerated how effective the system is."*** Mendel Decl., Ex. O at 4 (Evolv had "audacious" marketing claims and was "playing fast and loose"). These allegations support a strong inference, as Defendants' own authority acknowledges. *Godinez v. Alere Inc.*, 272 F. Supp. 3d 201, 219 (D. Mass. 2017) (Def. Br. at 26) (citing *Avid Tech.*, 28 F. Supp. 3d at 115 ("[T]he government investigation can be seen as

21

one more piece of the puzzle, a series of circumstances that add up to a strong inference of scienter.")).

But there is more. The termination of George, Evolv's then-CEO, and the suspicious resignation of Donohue, its then-CFO, both after multiple investigations into misconduct in financial reporting and deceptive marketing practices, ¶¶187-93, do add to the scienter puzzle. *See In re Pareteum Sec. Litig.*, 2021 WL 3540779, at *17 (S.D.N.Y. Aug. 11, 2021) ("timing of terminations and resignations . . . can [support] a strong inference of scienter") (collecting cases). That resignations "alone" do not support a strong inference of scienter misses the point; there was a spate of them. *See San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.*, 732 F. Supp. 3d 300, 322 (S.D.N.Y. 2024) ("there were too many departures to say that they were coincidental"). George, who had been with the Company since Legacy Evolv, was terminated, just five days after Evolv announced the results of a Board investigation into improper sales practices and revenue recognition, ¶¶3, 11, 189, one that admitted "misconduct" at "senior" levels of Evolv, ¶¶95, 99. Even if the decision was made "months" earlier, as Defendants suggest, Def. Br. at 8, 26, that would still place it in the wake of the FTC and SEC investigations, another bad spot for Defendants to land. In the end, "[s]uch house-cleaning and reforms do not follow innocent mistakes. Rather, they customarily, even if not invariably, follow systemic and fraudulent abuse of internal financial controls." *In re Sipex Corp. Sec. Litig.*, 2005 WL 3096178, at *1 (N.D. Cal. Nov. 17, 2005) ("These circumstances, combined with the announcement of the impending restatement establish a strong inference that the company itself believes that fraud led to materially misleading financials for the period in question."). Although a press release gave lip service to the fact the termination of George was pre-planned, there was no permanent replacement ready, and there is no reason to accept Evolv's self-serving characterizations. ¶¶11, 190-91. Donohue's resignation was also suspicious,

22

as he resigned without any severance along with four other employees from the sales, accounting, and finance departments who were either terminated or resigned. ¶¶3, 12. As CFO of Evolv during the Class Period, it is reasonable to infer that Donohue was one of the "senior finance and accounting personnel" who knew of allegations in July 2024 but failed to alert the Audit Committee or outside auditor. ¶193.

All of these inferences are reinforced through a "core operations" inference, which adds additional context and support to the scienter allegations in the SAC. Under the doctrine, "facts critical to a business's core operations . . . may be attributed to the company and its officers." *Ionics*, 343 F. Supp. 2d at 19. Defendants attempt to cast core operations as an all-or-nothing affair; but it is not. Defendants do not dispute that the Individual Defendants, or at least George (the CEO) and Donohoe (the CFO), were hands-on managers deeply steeped in Evolv's day-to-day operations. ¶¶25-29, 182-84, 237. Indeed, FEs stated that George was a hands-on manager who would attended training classes held with channel partners and knew every one of Evolv's product deployments. ¶184; *see also* ¶¶84-87. Defendants do not dispute, nor could they, that Express Evolv was "core" to their business, or that improper revenue recognition issue concerned one of Evolv's large channel partners. Def. Br. at 1-30. Evolv was for all intents and purposes a one-product company during the Class Period. ¶¶182-83. Multiple FEs confirmed that the trials of Express enabled Evolv to improperly report revenue. ¶¶81-87. According to an executive at Motorola Express, there was "high pressure to sell [Express]." ¶83 (Express "pushed hard"). Former employees noted that there was pressure to deliver product before a sales order was confirmed, particularly at quarter's end. ¶87. Defendants criticize the FE allegations as "anonymous" and "unverified," Def. Br. at 25, but that criticism is inappropriate at the pleading stage. Defendants' argument that the FE allegations do not ascribe any particular knowledge or

documents to Evolv executives, Def. Br. at 25, also misses the mark. Defendants admit that the FE allegations cover "Evolv's purported influence over testing, certain customers allegedly slowing purchases, and products sometimes producing false alarms." Def. Br. at 25. The FE allegations thus supplement the allegations of scienter in the case.[11]

Given that Evolv had previously declared a material weakness, Defendants would have been on notice of revenue recognition problems. If not, they were reckless. Once again, it beggars belief that Evolv's finance and accounting team would miss such basic accounting issues while working to remedy its revenue recognition lack of controls. ¶201.

Defendants cite *Quinones v. Frequency Therapeutics, Inc.*, 665 F. Supp. 3d 156, 180 (D. Mass. 2023) (Def. Br. at 23-24), for the proposition that core operations does not apply absent "other significant evidence of a defendant's intent or recklessness, or a 'plus factor.'" This is dubious, particularly insofar as it implies that the "plus factor" must be a "smoking gun" or evidence of guilty knowledge. Def. Br. at 24 n.11. In any case, the inference was rejected in *Quinones* because plaintiffs failed to plead other evidence or recklessness. Here, the "other evidence" or "plus factor" exists in the form of direct admissions of misconduct, the withholding of information from auditors, deceptive behavior, public retractions, terminations and resignations, a Board investigation, an FTC enforcement action, and a restatement. It is not really a close call.

Again, Defendants do not dispute that Express was central to Evolv's business. *Id*. (citing ¶¶182-84). Defendants complain that scienter cannot be based "solely" on an executive's position. Def. Br. at 24 (citing ¶183). But the SAC does more than rely only on that; those allegations are certainly not "naked [or] unadorned." Def. Br. at 24 n.11. None of Defendants' cases involved

---

[11] This case is distinguishable from *In re Biogen Inc. Sec. Litig.*, 857 F.3d 34, 42 (1st Cir. 2017) (Def. Br. at 25); the complaint there, unlike here, "never allege[d] that there was any misreporting of revenue." It is also distinguishable from *Auto. Indus. Pension Tr. Fund v. Textron Inc.*, 682 F.3d 34, 40 (1st Cir. 2012) (Def. Br. at 25), where the court simply noted that there was no conflict on the central question in this case there.

internal and external investigations, restatements, and a mass expulsion of executives, and thus the results in those cases are not surprising. *See* Def. Br. at 24-25 & n.11. Defendants claim that it is irrelevant that the revenue recognition problems concerned one of Evolv's largest customers, claiming that "alone" does not support a strong inference of scienter. Def. Br. at 28. Again, Defendants simply refuse to read the SAC holistically.[12]

Viewed holistically, the inference of scienter is at least as plausible as the opposing requested inference that Defendants' repeated misconduct over years, including secretly scrubbing claims from already published articles, was a series of innocent mistakes. And if it was a close call—it is really not—the tie would go to Plaintiffs under the Supreme Court's *Tellabs* mandate.[13]

### D.    The SAC Adequately Alleges Loss Causation

The element of loss causation requires Plaintiffs to allege "a causal connection between the material misrepresentation and the [economic] loss." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342 (2005). Loss causation can come through "an express, corrective disclosure," through "events constructively disclosing the fraud," *Abramson v. NewLink Genetics Corp.*, 965 F.3d 165, 179 (2d Cir. 2020), or through an "amalgam" of the two, *Singer v. Reali*, 883 F.3d 425, 447 (4th Cir. 2018). Loss causation is "not meant to impose a heavy burden" at the pleading stage. *Dura*, 544 U.S. at 347 (applying "ordinary pleading rules" and Rule 8(a)). The "appropriate inquiry" here is "whether

---

[12] Defendants wrongly suggest that a lack of alleged stock sales refutes scienter. Def. Br. at 29 n.13; *see Tellabs*, 551 U.S. at 325 ("[t]he absence of a motive allegation . . . is not fatal"). Moreover, the Individual Defendants did have a motive to defraud: their lies were necessary to live up to their own promises about the value of Evolv. *See Cabletron*, 311 F.3d at 39 (finding scienter allegations adequate where disclosure of fact might imperil career); *In re Telxon Corp. Sec. Litig.*, 133 F. Supp. 2d 1010, 1032 n.5 (N.D. Ohio 2000) (finding new CEO's motive "to manipulate revenue in order to live up to their own promises" supported inference of scienter); *Shenwick v. Twitter, Inc.*, 282 F. Supp. 3d 1115, 1149 (N.D. Cal. 2017) ("Defendants felt pressure to live up to the targets announced at Analyst Day"). Defendants' citation to *Coyne v. Metabolix, Inc.*, 943 F. Supp. 2d 259, 272 (D. Mass. 2013) (Def. Br. at 29 n.13), is inapposite because that complaint lacked what is alleged in the SAC—direct admissions, internal and external investigations, an FTC settlement order and preliminary injunction, terminations and resignations, and so forth.

[13] Just as the SAC pleads scienter as to the Individual Defendants, it pleads scienter as to Evolv. Where a defendant is a corporation, a plaintiff can plead corporate scienter by alleging "facts that give rise to a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter." *Jackson v. Abernathy*, 960 F.3d 94, 98 (2d Cir. 2020). This is true of all of the Individual Defendants. ¶¶25-29, 202.

the [corrective disclosures], as a whole, plausibly revealed to the market that" Evolv had problems with the effectiveness of Express and the recognition of revenue. *See Mass. Ret. Sys. v. CVS Caremark Corp.*, 716 F.3d 229, 240 (1st Cir. 2013).

The SAC alleges five corrective disclosures: (i) a May 23, 2023 *BBC News* report about a school stabbing, which led to investigations that concluded that Evolv was exaggerating product capabilities, ¶¶68-69, 168; (ii) an October 12, 2023 disclosure of an FTC investigation into deceptive marketing practices, ¶¶70-71, 102-09, 169; (iii) a February 19, 2024 announcement of an SEC investigation, ¶¶72-73, 170; (iv) a March 13, 2024 *BBC News* report that detailed how Evolv had misrepresented testing and validation done on Express, ¶¶74-75, 171; and (v) Evolv's October 25, 2024 announcement by restatement of certain financial results, ¶¶95-96, 172. Together, they demonstrate the falsity of the challenged statements and are accompanied by drops in the stock price, demonstrating loss causation. ¶¶167-73; *Public Emps. Ret. Sys. of Miss. v. Amedisys*, 769 F.3d 313, 326 (5th Cir. 2014) ("Where the [SAC] sets forth specific allegations of a series of partial corrective disclosures, joined with the subsequent fall in [] stock value, and in the absence of any other contravening negative event, [Plaintiffs] have complied with *Dura*'s analysis of loss causation."). To the extent Defendants demand a "mirror-image" disclosure or a "direct admission" of fraud, that is simply not required. *CVS Caremark I*, 716 F.3d at 240.

Defendants claim that the mere announcement of FTC and SEC investigations, "standing alone" and "without more," does not constitute a corrective disclosure. Def. Br. at 21. Not so. *See In re StockerYale*, 453 F. Supp. 2d 345, 359 (D.N.H. 2006) (finding loss causation where shares dropped the day SEC announced investigation). Moreover, the SAC alleges that the FTC investigation ripened into an FTC complaint, settlement order, and permanent injunction. ¶¶102-110; *In re IMAX Sec. Litig.*, 587 F. Supp. 2d 471, 485 (S.D.N.Y. 2008) (finding SEC inquiry could

26

constitute a partial corrective disclosure where it "culminated in the restatement of . . . earnings and revenues").[14] Defendants try to downplay the enforcement action, Def. Br. at 3, 6, 21, but the FTC charged Evolv with making "*false claims*" and engaging in "*deceptive*" practices. ¶¶102-09. In *Amedisys*, the announcement of a government investigation was "viewed together with the totality of the other alleged partial disclosures," and allegations of SEC, DOJ, and SFC investigations, online research reports, a *WSJ* article, two executive departures, and a decline in stock price were sufficient to plead loss causation. 769 F.3d at 323-34. Similarly here, an internal board investigation, *BBC News* reports, executive terminations and resignations, a financial restatement, and a decline in stock price are sufficient. ¶¶68-74, 95-110, 167-72, 187-93.

Defendants claim that the 2023 *BBC News* article about a knife attack and the overstated capabilities of Express cannot be corrective because the story of the attack "broke several months beforehand" and thus the article contained no "new information." Def. Br. at 20. Boldly, Defendants try to introduce more than twenty "exhibits," including (as relevant here) four news articles not mentioned anywhere in the SAC. *Id*. These documents are not incorporated into the SAC and should be disregarded.[15] But in the end, they do not do anything for Defendants anyway. Defendants claim coverage of the knife attack on October 31, 2022, November 1, 2022, and November 16, 2022 is identical to subsequent BBC investigations and reports, but the articles merely recounted the immediate aftermath of the event and did not mention Evolv or its

---

[14] Defendants cite *Loos v. Immersion Corp.*, 762 F.3d 880, 890 (9th Cir. 2014) (Def. Br. at 21), but fail to mention the Ninth Circuit's later opinion that clarified that the announcement of an agency investigation could serve as a viable basis for loss causation when combined with subsequent partial disclosures. *See Lloyd v. CVB Financial Corp.*, 811 F.3d 1200 (9th Cir. 2016); *see also Meyer v. Greene*, 710 F.3d 1189, 1201 n.13 (11th Cir. 2013) ("That is not to say that an SEC investigation could never form the basis for a corrective disclosure.") (Def. Br. at 20-21 & n.9).

[15] Plaintiffs' separate and full opposition to Defendants' Request for Judicial Notice, ECF No. 94, is submitted concurrently herewith. Plaintiffs note that this abuse of the judicial notice doctrine is exactly the type of practice that Ninth Circuit noted is a "concerning pattern in securities cases" in which defendants are "exploiting these procedures improperly to defeat what would otherwise constitute adequately stated claims at the pleading stage." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018).

involvement. *See* Def. Br. at 20. Defendants suggest that a school official's opinion on Express's capabilities was disclosed in a November 2022 WKTV piece, Def. Br. at 20, but the 2023 *BBC News* report discloses more. Among other things, it called into question George's statements about Express detecting "all of the weapons," it pointed out how Evolv changed its corporate website to cover up misstatements, and it included a statement from an analyst who said that Evolv was one of the "worst offenders" in an "epidemic of schools buying new technology based on audacious marketing claims."[16] Mendel Decl., Ex. O at 5. Thus, it was by no means old news.

Finally, Defendants cite a "March 6, 2022" article that expresses doubts about Express, Def. Br. at 20, but that article is from *March 6, 2023*. *Id*., Ex. S at 1. It came out in the local press not long before the *BBC News* feature on May 23, 2023.[17] *Id*. To the extent Defendants quibble over small time gaps, there is no "bright-line rule requiring an immediate market reaction" after a revelation because "[t]he market is subject to distortions that prevent the ideal of a free and open public market from occurring." *In re Gilead Scis. Sec. Lit.*, 536 F.3d 1049, 1057-58 (9th Cir. 2008). In any case, it is not a question for the pleading stage.

Defendants suggest that the 2024 *BBC News* article cannot serve as a corrective disclosure because it contains no new information and is not linked to a misstatement. Def. Br. at 21-22. But the article exposed Evolv's backtracking on claims of validation and third-party safety testing, Def. Br. at 21; ¶171, and this revelation is clearly linked to the product effectiveness statements, even if none of the statements specifically related to the NPSA. Nor was the 2024 *BBC News* article

---

[16] Defendants conveniently ignore that, immediately after the knife attack, Evolv attempted to deny the reports. ¶67.

[17] In *Meyer*, 710 F.3d at 1198 (Def. Br. at 20 n.9), the court held that a short-seller report based entirely on public information did not contain "new" information. But the instant case does not involve a short-seller report. In *Homology Medicines*, 2024 WL 1436025, *60 (Def. Br. at 20), plaintiffs admitted that certain documents did not include disclosures. In *Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse Sec. (USA) LLC*, 752 F.3d 82, 89 (1st Cir. 2014) (Def. Br. at 20), the court referenced "stale" information in an event study, without much discussion as to why. In *In re KBC Asset Mgmt. N.V.*, 572 F. App'x 356, 362 (6th Cir. 2014) (Def. Br. at 20 n.9), information in affidavits was "old news" because legal issues had been resolved "two years earlier." This is not that case.

28

simply a "negative journalistic characterization of previously disclosed facts," *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 512 (2d Cir. 2010), as it contained new information about more misleading claims with Evolv. Regardless, that the stock declined after the corrective disclosures is indicative that the market itself viewed the information as new.[18] *MBIA*, 700 F. Supp. 2d at 582 (concluding "there are sufficient facts pled to question whether [d]efendants provided the 'truth-on-the-market'" where stock price dropped immediately after corrective disclosure).

Finally, Defendants claim that Evolv's October 25, 2024 announcement of its need to restate its financials, ¶¶95-96, was not corrective because there is no causal connection between it and any false statement. Def. Br. at 22. This is absurd. The restatement here was corrective of previous revenue and revenue-related figures. ¶¶95-96, 98-99, 131-56, 172. Defendants claim that the restatement is not corrective of financials that were *not* restated, Def. Br. at 22, but this does not get them far, as it *is* corrective of figures from at least the second quarter of 2022 to the second quarter of 2024. ¶¶137-56. The restatement was corrective of statements about revenue recognition policy, ¶¶128-30, as it acknowledged the failure to properly apply GAAP principles related to revenue recognition, ¶95. Finally, it was corrective of statements about internal controls because it was accompanied by a new material weakness, ¶200, which put the lie to Evolv's claims that it was remedying its internal control deficiencies, ¶¶162-66. Thus, the SAC plausibly alleges loss causation, and even does so with particularity.

## III.   PLAINTIFFS REQUEST LEAVE TO AMEND IF DEEMED NECESSARY

If the Motion is granted, Plaintiffs request leave to amend to plead facts from Evolv's

---

[18] Despite the fact that loss causation here is based on five different partial disclosures, Defendants focuses on a 3.5% stock price drop after the publication of the 2024 *BBC News* article and claims that it is not "significant" and thus that the disclosure was not corrective. Def. Br. at 22 n.10. But the Motion does not explain why it is insignificant as a matter of law, stock drops must be viewed in context, and at least one court has found adequate allegations of loss causation based on a 2.0% decline in stock price. *See Bristol Myers Squibb*, 586 F. Supp. 2d at 165.

recently filed restatement. These final restated figures were issued on April 28, 2025 and confirms the inaccuracy of previous figures and provides additional detail, including its effect on particular figures and periods. Leave should be "granted liberally by the Court." *Fed. Deposit Ins. Corp. v. Consol. Mortg. & Fin. Corp.*, 805 F.2d 14, 16 (1st Cir. 1986). Plaintiffs have not been "silent": they specifically raised it and stated how they would amend. *Cf. Premca Extra Income Fund LP v. iRobot Corp.*, 763 F. Supp. 3d 121, 31 (D. Mass. 2025) (Def. Br. at 30-31 n.17).

## CONCLUSION

Defendants' Motion to Dismiss, ECF No. 90, should be denied in full, except for the pre-June 2022 revenue recognition policy and financial result statements (¶¶126-27, 131-36), which Plaintiffs have withdrawn without prejudice.[19] This case should move forward into discovery on the remaining statements (¶¶111-125, 128-30, 137-166).

Respectfully submitted,

Dated: June 24, 2025

*/s/ Daryl Andrews*

**ANDREWS DEVALERIO LLP**
Glen DeValerio (BBO #122010)
Daryl Andrews (BBO #658523)
P.O. Box 67101
Chestnut Hill, MA 02467
Telephone: (617) 999-6473
glen@andrewsdevalerio.com
daryl@andrewsdevalerio.com

*Liaison Counsel for Plaintiffs*

**GLANCY PRONGAY & MURRAY LLP**
Robert V. Prongay
Casey E. Sadler (admitted *pro hac vice*)
Pavithra Rajesh
1925 Century Park East, Suite 2100
Los Angeles, CA 90067

---

[19] Defendants' only argument as to control person liability under Sections 15 and 20(a) is that a primary violation under Sections 11 and 10(b), respectively, have not been pled. Def. Br. at 11 n.3. As Plaintiffs adequately plead primary violations, they state control person liability claims, too.

30

Telephone: (310) 201-9150
rprongay@glancylaw.com
csadler@glancylaw.com
prajesh@glancylaw.com

*Counsel for Plaintiffs and Lead Counsel for the Class*

**THE LAW OFFICES OF FRANK R. CRUZ**
Frank R. Cruz
2121 Avenue of the Stars, Suite 800
Los Angeles, CA 90067
Telephone: (310) 914-5007
fcruz@frankcruzlaw.com

*Additional Counsel for Plaintiff Chris Swanson*

31

**CERTIFICATE OF SERVICE**

I hereby certify that on this 24th day of June 2025, a true and correct copy of the foregoing

document was served by CM/ECF to the parties registered to the Court's CM/ECF system.


/s/ *Daryl Andrews*
Daryl Andrews

.